## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| SHORELINE ENERGY LLC, *et al.*,[1] | : | Case No. 16-35571 (DRJ) |
|  | : |  |
| Debtors. | : | (Joint Administration Requested) |
|  | : |  |

## DECLARATION OF DANIEL P. HURLEY
## IN SUPPORT OF FIRST DAY PLEADINGS

Daniel P. Hurley, being first duly sworn, deposes and states as follows:

1.      I currently serve as the Chairman and Chief Executive Officer ("CEO") of Shoreline Energy LLC (together with the above-captioned debtors, the "Debtors" or "Shoreline").  I have served in this capacity since September 28, 2016.  From 2006 until my appointment as CEO of Shoreline, I served as its President and Chief Operating Officer.  During my employment with Shoreline I have become familiar with the Debtors' history, day-to-day operations, business and financial affairs, and books and records, as well as the Debtors' restructuring efforts.  I have over 20 years of experience in the oil and gas industry, including serving 11 years as a geologist for Ocean Energy Inc. (formerly, Flores & Rucks) and three years as a geologist for Marlin Energy LLC.

2.      I submit this Declaration in support of the eight Debtors' petitions for relief under chapter 11 of the Bankruptcy Code and the First Day Pleadings.  Except as otherwise indicated, all statements set forth in this Declaration are based upon:  (a) my personal

---

[1]      The Debtors are the following eight entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Shoreline Energy LLC (2777); Shoreline Southeast LLC (0562); Shoreline Offshore LLC (2882); Harvest Development LLC (2703); Shoreline GP LLC (5184); Shoreline Central Corporation (1579); Shoreline Energy Partners, LP (5035); Shoreline EH LLC (6570).  The address of each of the Debtors is 16801 Greenspoint Park Drive #380, Houston, Texas 77060.

knowledge; (b) information supplied to me by other members of the Debtors' management or the Debtors' professionals that I believe in good faith to be reliable; (c) my review of relevant documents; and/or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could and would testify to the facts set forth in this Declaration.  I am authorized by the Debtors to submit this Declaration.

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court for relief under chapter 11 of the Bankruptcy Code.  To minimize the adverse effects of filing for chapter 11 protection and facilitate a prudent restructuring process that preserves value and enhances the Debtors' ability to successfully sell their assets as a going concern and confirm a corresponding chapter 11 plan, the Debtors have filed a number of pleadings requesting various kinds of "first day" relief (collectively, the "First Day Pleadings") concurrently with the filing of this declaration (this "Declaration").  I am familiar with the contents of each First Day Pleading (including the exhibits and other attachments to such motions) and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Pleading:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption; (b) is critical to the Debtors' efforts to preserve value and pursue a successful going concern sale of their assets; and (c) best serves the Debtors' estates and creditors' interests.  Further, it is my belief that the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the goals of these chapter 11 cases.

4.      Section I of this Declaration provides an overview of the Debtors' corporate structure, business and prepetition indebtedness.  Section II describes the circumstances surrounding the commencement of these chapter 11 cases.  Section III sets forth relevant facts in support of the First Day Pleadings.

# I.
## THE DEBTORS' BUSINESS

A.     History

5.     Shoreline is a privately owned oil and gas exploration and production company that was formed in 2006 by four colleagues who had worked together for a number of years at other oil and gas companies, including Ocean Energy Inc. and Marlin Energy LLC.  The founders brought together different disciplines, including geology, land and finance, to the common goal of acquiring, exploring and developing oil and gas reserves in the Gulf of Mexico and Louisiana's gulf coast.  This combination of talents allowed Shoreline to integrate subsurface geology with seismic data, and to utilize historical production data to determine the full scope of remaining reserves.   As further described below, Shoreline (a) directly operates certain oil and gas properties along the coast of Louisiana and (b) owns interests in oil and gas properties in Louisiana and Texas through its wholly owned subsidiaries, Shoreline Southeast LLC and Shoreline Offshore LLC.  The Debtors' corporate headquarters is located in Houston, Texas.

6.     Currently, Shoreline owns approximately 164,483 gross lease acreage (91,408 net acres) in Louisiana and Texas.  Shoreline owns interests in 403 oil, gas and related wells, and Shoreline has estimated proved reserves of approximately 26.7 million barrels of oil equivalents (MMBoe), comprised of 109 billion cubic feet (Bcf) of natural gas and 8.5 MMBo of oil and condensate.

7.     Throughout their history, Shoreline has maintained mature fields and has established an excellent environmental and safety record.  The locations of the Debtors' primary

operations are set forth below:



8.      For the first three years of existence, Shoreline had no debt, and it devoted significant attention to evaluating potential acquisition opportunities.  The initial capital to create Shoreline was approximately $17 million, approximately 25% of which was contributed by the four founders, with the remaining portion contributed by high net worth individuals that were interested in getting into the exploration and production business.  Shoreline's model was to acquire assets from companies that were more interested in pursuing unconventional shale opportunities and no longer focusing on their conventional assets along Louisiana's gulf coast.  As a consequence, Shoreline was careful about acquisitions, and focused on acquiring mature fields with complex geology.

9.      In 2009, a stabilization in commodity pricing provided Shoreline with promising investment opportunities, allowing Shoreline to begin making acquisitions.  These acquisitions included an acquisition from Crimson Energy Partners IV, L.L.C. in 2009, which

included properties in Cameron, Jefferson, Davis and Calcasieu Parishes, as well as Shoreline's purchase of the Tullos field in LaSalle Parish, Louisiana in 2010.  Between 2010 and 2012, Shoreline consummated an additional seven acquisitions from operators such as Rosetta Resources Inc., Marlin Energy LLC, Energy XXI Ltd. and Davis Petroleum Corp.  Shoreline's acquisitions were financed primarily through traditional first lien reserve based loans, as well as equity contributions.

10.     In early 2012, Shoreline estimated its proved reserve value to be approximately $777 million.[2]  At that time, Shoreline pursued a potential sale of its entire asset base.  As a result of these efforts, Shoreline sold its interest in the Tullos field, and following the sale of the Tullos field, Shoreline had approximately $40 million in debt and approximately $40 million of accrued equity commitments, and Shoreline estimated its proved reserve value to be approximately $381 million.[3]  No acceptable offers were made for Shoreline's gulf coast assets, and based upon this result, the management of Shoreline determined to seek additional strategic acquisitions to increase the value of the company.

11.     In late 2012, Shoreline acquired certain gulf coast assets of XTO Energy Inc., which included fields in multiple parishes within Shoreline's current asset base.  The acquisition doubled Shoreline's production and provided significant upside with mature properties.  The XTO acquisition was funded through debt, bringing Shoreline's debt to $146 million.

---

[2]     1P Pv10 Strip Pricing, $338 million proved developed producing ("PDP"), $147 million proved developed non-producing ("PDN") and $292 million proved undeveloped reserves ("PUD").

[3]     1P Pv10 Strip Pricing, $179 million PDP, $95 million PDN and $107 million PUD.

12.     In early 2013, Shoreline estimated its proved reserve value to be approximately $676 million.[4]  At that time, Shoreline pursued a second sale process for its entire asset base.  There was one bidder for $385 million that was not able to close the transaction.  Therefore, it was determined that Shoreline needed to continue to add strategic acquisitions with the intent to become large enough to either merge with a public entity or go public.  As a consequence, Shoreline engaged in a significant acquisition from Manti Resources (the "Manti Acquisition"), for a purchase price of $167.5 million, which was financed through the Second Lien Secured Indebtedness (as defined and described in more detail below).  It was projected that the acquisition would increase Shoreline's production to nearly 9000 barrels of oil equivalent per day ("BOEPD").

13.     Following the closing of the Manti Aquisition, however, Shoreline encountered various operational issues on the purchased assets which prevented the acquisition from realizing its projected benefits and production.  For instance, a primary gas line was shut in for maintenance and a significant cash-generating well had a mechanical failure.  The combination of these two events reduced Shoreline's production by 1500 BOEPD.  This production drop put Shoreline in default under its then current loans and restricted its ability to drill new wells.  Therefore, the management of Shoreline determined that they needed to pursue new capital to reduce debt and/or accelerate drilling.

14.     In early 2014, Shoreline estimated its proved reserve value to be approximately $735 million.[5]  At that time, Shoreline pursued new capital as well as explored multiple sale offers, including an unsolicited $405 million offer for Shoreline's entire asset base and team.  However, the unsolicited offer could not raise the funds to close.  Instead, Shoreline

---

[4]     1P Pv10 Strip Pricing, $230MM PDP, $163MM PDN and $283MM PUD.

[5]     1P Pv10 Strip Pricing, $269 million PDP, $184 million PDN and $282 million PUD.

obtained an additional $50 million of unsecured financing in the form of the Note Purchase Agreement (as defined and described in more detail below) and $25 million in redeemable preferred stock.

15.     In early 2015, Shoreline encountered an encouraging prospect in the Miogyp Sand, within the Lacassine field located in Cameron Louisiana (the "B-13 Well"). According to Shoreline's testing, the B-13 Well could produce in excess of 30 million cubic feet equivalent per day ("MMCFEPD").  Although the B-13 Well appeared successful, the company was unable to access the entire Miogyp section, and a second well (the "B-14 Well") was planned for mid-2015.  The B-14 Well was anticipated to perform similarly to the B-13 Well, while accessing the entire Miogyp section.

16.     In mid-2015, Shoreline's first lien lender group indicated they would like to be taken out of their position.  In October 2015, and as further described below, Morgan Stanley replaced the lender group with an un-syndicated RBL which had an initial borrowing base of $157 million.  Shoreline ended 2015 with $365 million in debt.

17.     By early 2016, Shoreline's estimated proved reserve value had decreased to approximately $240 million.[6]  At that time, Shoreline attempted to complete the B-14 Well. Unfortunately, the B-14 Well initially failed to produce, and Shoreline's attempts to stimulate the well were unsuccessful.  Currently, the B-14 Well is shut-in until Shoreline has additional capital to recomplete the well to a different reservoir.  Additionally, the B-13 Well has started making substantial amounts of water, and production decreased from a high of 30 MMCFEPD to approximately 1.6 MMCFEPD at the current time.

---

[6]     1P Pv10 Strip Pricing, $70 million PDP, $95 million PDN and $75 million PUD.

18.     By mid-2016, Shoreline estimated its proved reserve value to be approximately $234 million.[7]  Production continued to decline due to Shoreline's lack of capital to complete new drilling or perform workovers and recompletions of existing wells.  In addition, Shoreline, along with over 100 other oil and gas companies, became involved in litigation with Cameron Parish and the State of Louisiana regarding alleged violations of the Coastal Zone Management Act of 1978.  Litigation on this issue is ongoing.

19.      As of the date hereof, Shoreline estimates its proved reserve value to be approximately $197 million.[8]  In addition, production has temporarily stabilized at an average of approximately 3500 BOEPD.

20.     Effective September 28, 2016, Frank D. Willoughby voluntarily resigned from his position as Chairman and CEO of Shoreline, and I currently serve in these capacities.

B.    <u>Corporate Structure</u>

21.     A corporate ownership chart depicting the ownership structure of the Debtors is attached hereto as <u>Exhibit A</u>.  Shoreline EH LLC ("<u>Shoreline EH</u>") is a holding company that owns 100% of Shoreline Energy LLC ("<u>Shoreline Energy</u>").  The membership interests in Shoreline EH are as set forth in <u>Exhibit B</u> attached hereto.  Shoreline Energy in turn directly or indirectly owns all of the other Debtors.

22.     Shoreline EH was originally taxed as a pass through entity, but on September 12, 2016 the members of Shoreline EH unanimously elected to "check the box" to allow Shoreline EH to receive corporate tax treatment at the entity level.

---

[7]     1P Pv10 Strip Pricing, $64 million PDP, $85 million PDN and $85 million PUD.

[8]     1P Pv10 Strip Pricing, $43 million PDP, $71 million PDN and $83 million PUD.

C.    Prepetition Indebtedness[9]

23.    As of the Petition Date, the Debtors' primary liabilities consist of (a) first lien secured indebtedness in the form of a senior credit facility (the "Prepetition First Lien Facility"); (b) a second lien secured indebtedness in the form of a second lien facility; (c) unsecured debt in the form of a note purchase agreement; (d) royalty obligations; (e) trade debt; and (f) lease obligations.  These liabilities are described in more detail below.

24.    Prepetition First Lien Facility.  Shoreline, as borrower, and the lenders party thereto from time to time (the "Prepetition First Lien Lenders") and Morgan Stanley Energy Capital Inc. ("Morgan Stanley"), as administrative agent (in such capacity, the "Prepetition First Lien Agent") are parties to that certain Third Amended and Restated Credit Agreement dated as of October 16, 2015 (as amended, the "Prepetition First Lien Credit Agreement").  All of the Debtors, with the exception of Shoreline EH, are guarantors under the Prepetition First Lien Credit Agreement.

25.    The Prepetition First Lien Credit Agreement provides up to $200 million of loans under a revolving basis, subject to a borrowing base, with an initial borrowing base of $157,000,000.  The Prepetition First Lien Credit Agreement is secured by a first lien on substantially all of the Debtors' assets.  As of the Petition Date, there is no less than $150,400,000 in aggregate principal amount outstanding under the Prepetition First Lien Credit Agreement (plus outstanding interest, fees, expenses and other amounts that would constitute obligations thereunder).

---

[9]    This summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits.

26.     While the Prepetition First Lien Credit Agreement is secured by a lien on substantially all of the Debtors' assets, the Debtors reviewed their books and records and have determined that a few of their leases may be unmortgaged as of the Petition Date.

27.     Second Lien Secured Indebtedness.  Shoreline, as borrower, and the lenders party thereto from time to time (the "Prepetition Second Lien Lenders") are parties to that certain Prepetition Second Lien Credit Agreement dated as of September 30, 2013 (as amended, the "Prepetition Second Lien Credit Agreement").  All of the other Debtors, with the exception of Shoreline EH, are guarantors under the Prepetition Second Lien Credit Agreement.

28.     The Prepetition Second Lien Credit Agreement provides for $180,000,000 of term loans.  As of the Petition Date, there is approximately $168,600,000 outstanding under the Prepetition Second Lien Credit Agreement.  The Prepetition Second Lien Credit Agreement is secured by a second lien on substantially all of the Debtors' assets.  The Debtors did not make their regularly scheduled interest or principal payments due at the end of the first three quarters of 2016.

29.     Note Purchase Agreement.  Shoreline EH, as issuer, and several purchasers from time to time thereto (the "Purchasers") and Sankaty Advisors, LLC as administrative agent (in such capacity, the "Note Agent"), are parties to a Note Purchase Agreement dated as of September 30, 2014 (as amended, the "Note Purchase Agreement").  The obligations under the Note Purchase Agreement are guaranteed by each of the Debtors other than Shoreline EH.  As of the Petition Date, there is approximately $71,400,000 outstanding under the Note Purchase Agreement.  The obligations under the Note Purchase Agreement are unsecured.

30.     Royalty Obligations.  As of the Petition Date, the Debtors have approximately 2200 royalty owners in pay status, and owe approximately $7.8 million in royalty

obligations.  As of the Petition Date, the Debtors believe that they are current on their royalty payments.

31.    Trade Debt.  In the ordinary course of producing oil and gas from its properties, the Debtors have historically obtained goods and services from over 200 vendors.  As of the Petition Date, the Debtors estimate that they owe approximately $15 million to such vendors.

## II.
## RECENT FINANCIAL PERFORMANCE AND EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

A.    Industry Overview and Recent Performance.

32.    Low commodity prices have caused broad-ranging distress in the oil and gas industry.  West Texas Intermediate ("WTI") crude oil[10] spot prices have fallen from a monthly high of approximately $105 per barrel in June of 2014 to a recent approximately $50 per barrel as of the Petition Date with a low price in the $25 range in this period.  Natural gas prices have also fallen significantly.  The average natural gas price paid to the Debtors dropped from $3.58 per Mcf during the fourth quarter of 2014 to approximately $2.90 per Mcf as of the Petition Date with a low in the $1.60 range in this period.

33.    Independent exploration and production companies like Shoreline have been particularly hard hit because they rely primarily on sales of oil and gas to generate revenues.  Like the industry as a whole, the Debtors' recent performance has been significantly impacted by the extreme and continuing decline in oil and natural gas prices.  Revenues from oil and gas sales decreased from $122,092,000 in 2014 to $88,299,000 in 2015.  Further, at the end of 2015 Shoreline had $924,000 in cash compared to $3,465,000 in 2014.

---

[10]    WTI crude oil is a grade of crude oil that is a key benchmark for oil pricing.  It is the underlying commodity of the New York Mercantile Exchange's oil futures contracts.

B.      The Debtors' Cost-Reduction Initiatives.

34.     The Debtors have implemented various strategies to respond to fluctuations in commodity prices.  Among other things, the Debtors have (a) continued to seek out ways to increase efficiency and reduce operational costs, (b) focused on their core areas and (c) sought to maintain balance and diversification in their product mix (oil and natural gas).  In particular, lease operating expenses have been reduced by approximately $1 million per month since December of 2014, in part through personnel reductions, the removal of compressors at various sites and vendor negotiations.  However, the steep decline in crude oil and natural gas prices that began in 2014, as well as the disappointing production from the Manti Acquisition, has adversely affected the Debtors' liquidity and balance sheet to the point that a restructuring has become necessary.

C.      The Debtors' Prepetition Lender Negotiations and Marketing Process.

35.     In February 2016, the Debtors engaged Imperial Capital, LLC ("Imperial") as a financial advisor to assist with evaluating strategic solutions for the Debtors' liquidity issues. Upon being engaged, Imperial focused on understanding the Debtors' operations, reserves, history, cash needs and relationship with their lenders.  Through Imperial, the Debtors reached out to Morgan Stanley in its capacity as lender under the Prepetition First Lien Credit Agreement.  These discussions continued through the Petition Date and have culminated in the proposed DIP Financing (as discussed below).

36.     Additionally, the Debtors and Morgan Stanley Capital Services LLC ("Capital Services"), an affiliate of Morgan Stanley, were also parties to certain oil and gas hedging agreements.  On October 5, 2016, the Debtors and Capital Services agreed to liquidate the Debtors' hedge position, which resulted in a payment to the Debtors of approximately $8,273,046 on account of hedges of crude oil, and a payment by the Debtors of approximately

$374,346 on account of hedges of natural gas.  As a consequence, the approximate net liquidation value of the hedges to the Debtors was $7,898,700, which proceeds were collateral securing the Prepetition First Lien Credit Agreement.  The Debtors retained $2 million of the proceeds in advance of the bankruptcy filing, and the remaining proceeds were applied against the Debtors' obligations under the Prepetition First Lien Credit Agreement.

37.     As well, the Debtors also engaged in discussions with the lenders under the Prepetition Second Lien Credit Agreement.  In mid-April through May 2016, Imperial worked with the Debtors to negotiate a preliminary term sheet with Highbridge Capital Management, LLC ("Highbridge") and other second lien lenders which contemplated an investment of new capital, both with and without a potential merger with another oil and gas company.  At the time, the preliminary term sheets contemplated a full reinstatement of Prepetition First Lien Credit Agreement and discounted recoveries to other constituents.  However, by June 2016, due in part to changes in reserves, Highbridge was no longer willing to invest capital absent a significant write-down of the Prepetition First Lien Credit Agreement.

38.     On the advice of Imperial, the Debtors initiated a broader marketing process for their assets in August 2016.  The Debtors contacted  over 140 parties, 20 of which signed non-disclosure agreements and received access to a data room.  By late September 2016, the Debtors received four initial formal and informal proposals.

D.     The Restructuring Support Agreement.

39.     After extensive good faith negotiations with Morgan Stanley and Highbridge, on November 2, 2016 the Debtors finalized an agreement on the terms of a restructuring as set forth in the Restructuring Support Agreement (the "RSA"), a copy of which is attached hereto as Exhibit C.  In accordance with the RSA, the Debtors, affiliates of Highbridge and the Prepetition First Lien Lenders have agreed on the basic terms of a sale

process (the "Sale Process") for substantially all of the assets of the Debtors and the terms of a

chapter 11 plan of liquidation (the "Plan"), a summary of which is attached as an exhibit to the

RSA.  Among other things, the RSA provides that the Sale Process will provide for the sale of

both core and non-core assets, and a partnership established by the HB Parent (as defined in the

RSA) will directly or indirectly acquire the assets as a stalking horse for the core assets.  Further,

under the RSA (and subject to the terms thereof) the Debtors, affiliates of Highbridge, and the

Prepetition First Lien Lenders agreed, among other things, to support the Sale Process and the

Plan, and to abide by certain milestones regarding the Plan and administration of these chapter

11 cases.  The milestones in the RSA are as follows:[11]

(a)     no later than November 2, 2016, the Debtors shall commence the Chapter 11
        Cases by filing bankruptcy petitions with the Bankruptcy Court (such filing date,
        the "Petition Date");

(b)     on the Petition Date, the Debtors shall file with the Bankruptcy Court a motion
        seeking entry of the Interim DIP Order and the Final DIP Order;

(c)     no later than November 4, 2016, the Bankruptcy Court shall have entered the
        Interim DIP Order;

(d)     no later than November 8, 2016, the Debtors shall file with the Bankruptcy Court
        a motion seeking to assume the RSA (the "RSA Assumption Motion");

(e)     no later than November 18, 2016, the Debtors shall file with the Bankruptcy
        Court: (i) a motion (the "Sale Motion") seeking entry of the Designated Assets
        Sale Order, and (ii) a motion seeking entry of the Bid Procedures and the Bid
        Procedures Order (the "Bid Procedures Motion");

(f)     no later than December 1, 2016, the Debtors shall file with the Bankruptcy Court:
        (i) the Plan; (ii) the Disclosure Statement; (iii) a motion (the "Disclosure
        Statement and Solicitation Motion") seeking, among other things, (A) approval of
        the Disclosure Statement, (B) approval of procedures for soliciting, receiving, and
        tabulating votes on the Plan and for filing objections to the Plan, and (C) to
        schedule the hearing to consider confirmation of the Plan (the "Confirmation
        Hearing");

---

[11]     Capitalized terms used in this section and not otherwise defined shall have the meanings set forth in the
         RSA.  In the event of any conflict between this summary and the terms of the RSA, the terms of the RSA
         govern.

(g)     no later than December 2, 2016, the Bankruptcy Court shall have entered (i) the Final DIP Order and (ii) the RSA Assumption Order;

(h)     no later than December 13, 2016, the Bankruptcy Court shall have entered the Bid Procedures Order;

(i)     the deadline for third parties to submit higher and better cash offers for all or substantially all of the Debtors' assets, shall be no later than January 27, 2016 (the "Bid Deadline"), and any auction, if required, shall be held no later than February 1, 2016;

(j)     no later than January 6, 2016, (i) the Bankruptcy Court shall have entered an order approving the Disclosure Statement and the relief requested in the Disclosure Statement and Solicitation Motion; and (ii) no later than five (5) business days after entry of the order approving the Disclosure Statement and Solicitation Motion, the Debtors shall have commenced solicitation on the Plan by mailing the Solicitation Materials to parties eligible to vote on the Plan;

(k)     no later than February 8, 2017, the Bankruptcy Court shall have commenced the Confirmation Hearing and the hearing to consider entry of the Designated Assets Sale Order;

(l)     no later than February 10, 2017, the Bankruptcy Court shall have entered the Designated Assets Sale Order;

(m)     no later than February 10, 2017, the Bankruptcy Court shall have entered the Confirmation Order;

(n)     no later than February 17, 2017, the Debtors shall consummate the transactions contemplated by the Plan (the date of such consummation, the "Effective Date"), it being understood that the satisfaction of the conditions precedent to the Effective Date (as set forth in the Plan and the Term Sheet) shall be conditions precedent to the occurrence of the Effective Date; and

(o)     no later than February 17, 2017, the Debtors shall consummate the transactions contemplated by the APA (the date of such consummation, the "Sale Closing Date"), it being understood that the satisfaction of the conditions precedent in the APA shall be conditions precedent to the occurrence of the Sale Closing Date.

E.     <u>Debtor in Possession Financing.</u>

40.     Morgan Stanley Capital Group, Inc. (in such capacity, the "DIP Lender") agreed to provide a $50 million debtor in possession financing facility (the "DIP Facility"), which includes a $32 million roll up of the amounts owed under the Prepetition First Lien Credit Agreement.  The DIP Facility provides the Debtors with the liquidity they need to fund their

operations and the costs of these cases through emergence, which is anticipated to occur in the first quarter of 2017.  In particular, and as further described below, the milestones of the RSA, which will become an event of default upon entry of the final order approving the DIP Facility, provide the Debtors with the flexibility necessary to develop and implement a dual-track Sale Process and Plan confirmation.  The Debtors, along with their advisors, have determined that a financing proposal by the DIP Lender provides the Debtors with the best opportunity to continue operations and maximize value for all stakeholders.  I will discuss the DIP Facility in more detail in the section that follows on first day pleadings.

## III.
## FIRST DAY PLEADINGS

41.     Concurrently with the filing of these chapter 11 cases, the Debtors filed the First Day Pleadings requesting various forms of relief.  The Debtors narrowly tailored the First Day Pleadings to enable the Debtors to meet their goals of:  (a) continuing their operations in chapter 11 with as little disruption as possible; (b) maintaining the confidence and support of their employees, vendors, and service providers during these chapter 11 cases; and (c) establishing procedures for the smooth and efficient administration of these chapter 11 cases.

42.     Given the importance of the relief sought in the First Day Pleadings to the Debtors' ability to maintain their operations and preserve value as they pursue an expeditious restructuring, the Debtors will move for entry of an order scheduling an expedited hearing on the First Day Pleadings.  The Debtors anticipate that the Court will conduct a hearing soon after the commencement of their chapter 11 cases (the "First Day Hearing") at which the Court will hear

and consider certain First Day Pleadings.  Those First Day Pleadings that the Debtors anticipate will be heard at the First Day Hearing are described below.[12]

43.       I have reviewed each of the First Day Pleadings filed contemporaneously herewith.  To the best of my knowledge, I believe that the facts set forth in the First Day Pleadings are true and correct.  If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Pleadings.

44.       Further, as a result of my personal knowledge, information supplied to me by other members of the Debtors' management, my review of relevant documents, or upon my opinion based upon my experience, discussions with the Debtors' advisors, and knowledge of the Debtors' operations and financial condition, I believe the relief sought in the First Day Pleadings is necessary for the Debtors to effectuate a smooth transition into chapter 11, is necessary to avoid irreparable harm to their business and estates and will maximize value and recoveries for the benefit of the Debtors' creditors.

45.       It is my further belief that, with respect to those First Day Pleadings requesting authority to pay discrete prepetition claims or continue selected prepetition programs (e.g., those First Day Pleadings seeking relief related to the Debtors' obligations to their employees, taxing authorities, potential lien claimants, royalty holders and insurers), the relief requested is essential to the Debtors' operations and necessary to avoid immediate and irreparable harm to the Debtors, their estates, employees, creditors, and other parties-in-interest.  Specifically, the success of these cases depends in large part on the continuing operation of the Debtors' business in as normal course as possible.  Impairment of the Debtors' operations at the

---

[12]      Capitalized terms used below in the descriptions of the First Day Pleadings and not otherwise defined have the meanings given to them in the applicable First Day Pleadings.

early stages of these cases would imperil the Debtors' ability to successfully and expeditiously sell their assets as a going concern and potentially damage the value of the Debtors' estates.

46.     I respectfully request that all the relief requested in the First Day Pleadings, and such other further relief as may be just and proper, be granted.

A.     Debtor in Possession Financing.

47.     The Debtors' business is cash intensive, with significant daily costs to produce oil and gas, satisfy obligations to employees, maintain the safety of their operations and fulfill environmental and other regulatory requirements.  As such, the Debtors require immediate access to postpetition financing and the use of Cash Collateral to operate their businesses, preserve value and pursue their restructuring goals.  The Debtors, in consultation with Imperial, have reviewed and analyzed the Debtors projected cash needs and have prepared a budget (as updated from time to time in accordance with the DIP Credit Agreement the "Budget") outlining the Debtors' postpetition cash needs during the anticipated length of these cases.  The Debtors believe that the Budget is an accurate reflection of their funding requirements over the identified period, will allow them to meet their obligations, and is reasonable and appropriate under the circumstances.

48.     Immediate and ongoing access to funding under the DIP Facility will demonstrate to employees, vendors, suppliers, purchasers and other key constituencies that the Debtors have sufficient resources available to meet their obligations in the ordinary course during these cases.  Absent funds available under the DIP Financing, access to Cash Collateral and the cooperation of key business partners at this critical early stage, the Debtors could (a) face a devastating interruption in their businesses; (b) risk regulatory and environmental noncompliance, which could adversely impact their ability to obtain or maintain permits and licenses critical to operations; (c) undermine the support of important groups on whom the

Debtors' businesses and restructuring depend, which, in turn, would hinder their ability to maximize the value of their estates; and (d) be forced to modify their operations in a significant and adverse manner, which the Debtors believe could hamper their ability to maximize the value of their estates.

49. The proposed DIP Facility is a postpetition revolving credit facility in the aggregate principal amount of up to $50 million, $5 million of which will be available on an interim basis. Of the $50 million available for borrowing, $32 million must be borrowed to permanently repay $32 million of the outstanding prepetition first lien obligations.

50. The DIP Credit Agreement incorporates the milestones outlined above from the RSA, and a failure to meet such milestones constitutes an event of default under the DIP Credit Agreement (following the entry of a final order). I believe that these milestones set forth in the RSA and incorporated into the DIP Credit Agreement are reasonable and achievable under the circumstances, and provide the Debtors with sufficient flexibility to implement their Sale Process and confirm the Plan.

51. The DIP Facility was preceded by a competitive marketing process designed to secure postpetition financing on the best available terms. The Debtors extensively researched alternative sources of postpetition financing, reaching out to over 140 parties. While the Debtors received proposals from a handful of interested parties, the proposal submitted by the DIP Lenders was the most advantageous and provided the most favorable economics and terms. The DIP Facility was the product of an extensive arm's-length negotiation with the DIP Lenders, and no competing proposal provided the Debtors with a similarly beneficial set of comprehensive terms.

52.     It is essential that the Debtors immediately obtain the proposed financing, which is necessary to preserve and protect the value of their estates.  As I noted above, the decline in oil and natural gas prices has adversely affected the Debtors' liquidity.  The liquidity provided by the DIP Facility, is necessary to, among other things, ensure that the Debtors are able to meet their obligations, including payroll obligations, as they come due and avoid disruption to their operations.  In addition, the Debtors do not have sufficient working capital, financing or cash collateral to continue the operation of their business without immediate, additional financing.  Accordingly, the DIP Facility is necessary to ensure that the Debtors are able to maintain their business, and thus maximize the value of their estates, pending confirmation of a plan.

53.     Finally, I also believe that the Budget is achievable, reasonable under the circumstances, and will allow the Debtors to operate in chapter 11 without the accrual of unpaid liabilities.  Furthermore, I believe that the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the DIP Facility and the Budget.

B.     Filing Consolidated Lists of Creditors and Related Relief.

54.     Given the affiliated nature of the Debtors, the fact that they share a number of creditors in common and the manner in which the Debtors keep their records in the ordinary course, the Debtors are seeking a waiver of the requirement that each debtor file a list of creditors containing the name and address of each entity included or to be included on a debtor's schedules of liabilities and request that they be permitted to maintain a single, consolidated list of creditors.  Requiring the Debtors to segregate and convert their computerized records to provide eight separate Debtor-specific creditor matrices would be an unnecessarily burdensome task and would result in duplicate mailings.

C.      Employee Wages and Benefits.

55.      As of the Petition Date, the Debtors have 22 full-time employees.  Many of the employees are owed or have accrued various sums as of the Petition Date.  To minimize the personal hardship that employees will suffer if prepetition employee-related obligations are not paid when due and to maintain the employees' morale as the Debtors pursue the successful sale their business as a going concern, the Debtors are seeking authority to pay and/or perform, as applicable, employee-related obligations, including the following:  (a) prepetition wages, salaries, bonuses, sick pay, vacation pay, payroll taxes and other accrued compensation; (b) unreimbursed or unpaid, as applicable, prepetition employee expenses; (c) amounts deducted from employee paychecks on behalf of the employees for or with respect to, among other things, the Debtors' employee benefit programs, amounts due third parties and on account of various federal, state or local income, FICA, Medicare, state disability, workers' compensation, and other taxes to the appropriate parties; (d) prepetition contributions to, and benefits under, employee benefit plans; (e) obligations accrued with respect to the prepetition services of certain independent contractors and consultants; and (f) all costs and expenses incident to the foregoing payments and contributions, including related processing and administration costs.

56.      In addition to their regular workforce, the Debtors utilize the services of 16 independent contractors (the "Independent Contractors") pursuant to formal and informal arrangements.  The Independent Contractors provide assistance in the areas of accounting, reception, land, geology and engineering, and each of the Independent Contractors spends significant time on site at the Debtors' offices in Lafayette, Louisiana or Houston, Texas.  The Independent Contractors have developed a specialized knowledge of the Debtors' operations, and the Debtors' business would be significantly impacted if the Independent Contractors ceased providing services.  In addition, while the Independent Contractors are not directly on the

Debtors' payroll, the types of services provided is akin to the types of services provided in-house by many of the Debtors' competitors.  The services provided by the Independent Contractors are vital to the efficient operation of the Debtors' business.

57.     The uninterrupted payment of the Debtors' employees and Independent Contractors is essential to the continued operations of the Debtors.  Maintaining the goodwill of the Debtors' employees and ensuring the uninterrupted availability of their services will protect the going concern value of the estates and maximize the value ultimately available to creditors by (a) assisting the Debtors in maintaining the necessary "business as usual" atmosphere and (b) preserving the smooth operation of the business.

58.     It is likewise critical that the Debtors maintain the services of the Independent Contractors who provide a variety of important services for the Debtors.  Any delay in payments to the Independent Contractors could cause the Debtors to lose the benefit of necessary services and guidance, which would significantly disrupt and impair certain aspects of the Debtors' operations.

59.     Furthermore, any harm resulting from the Debtors' failure to obtain the relief requested herein would not be limited to the Debtors' estates.  Because the amounts represented by prepetition compensation and benefits are needed to enable the Debtors' employees and Independent Contractors to meet their own personal obligations, they would suffer undue hardship and, in many instances, serious financial difficulties if the relief requested herein is not granted.

D.     Taxes.

60.     The Debtors, in the ordinary course of their business, incur various tax liabilities, including, among others, property taxes, franchise taxes, business license and environmental fees and annual report taxes (collectively, the "Prepetition Taxes") owed to certain

taxing authorities (the "Taxing Authorities").  Prior to the Petition Date, the Debtors generally paid their tax obligations as they became due.

61.     The Debtors are seeking the entry of an order allowing them to pay the Prepetition Taxes to the Taxing Authorities, including all Prepetition Taxes subsequently determined upon audit to be owed for periods prior to the Petition Date.  The Debtors have ample business justification to pay the Prepetition Taxes because it is my understanding that: (a) certain of the Prepetition Taxes would be priority claims under the Bankruptcy Code that would be paid in full under a chapter 11 plan; (b) certain of the Prepetition Taxes may not constitute property of the Debtors' chapter 11 estates; (c) the Debtors are required to pay the Prepetition Taxes to maintain their good standing in the jurisdictions in which they do business; (d) a failure to pay certain of the Prepetition Taxes could give rise to liens on certain of the Debtors' real and personal property; and (e) the Debtors' directors and officers may face personal liability if certain of the Prepetition Taxes are not paid.  Therefore, to prevent immediate and irreparable harm to the Debtors' operations that would result from such disruptions and distractions, the Debtors are seeking authority to pay the Prepetition Taxes, including any amounts that may be found to be owing following any audits, as they become due in the ordinary course.

E.     Royalties, Withholding Taxes, Severance Taxes and Delay Rentals.

62.     For the reasons stated below, the Debtors are seeking authority to, among other things, pay any prepetition amounts due with respect to certain oil and gas interests.  The Debtors own a working interest in almost 3,000 oil and gas leases (the "Leases") in Texas and Louisiana.  There are approximately 400 wells on the Leases (the "Wells"), and the Debtors operate approximately 75% of these Wells.  Of the Wells that the Debtors operate, approximately

130 are producing.  The Debtors are parties to multiple joint operating agreements ("JOAs") governing the operation of the Wells.

63.     The Debtors' Leases are generally subject to or burdened by one or more of:  Royalty Interests, overriding royalty interests ("ORRI"), non-participating royalty interests ("NPRI"), net profits interests ("NPI") and third party Working Interests (collectively with Royalty Interests, ORRI, NPRI and NPI, the "Interests").  Failure to make payments on account of the Interests would have a material adverse effect upon the Debtors and their operations, including, without limitation, potential cancellation, forfeiture, or termination of the Leases, penalties and interest, turnover actions, conversion claims, significant lien claims, constructive trust claims, litigation, and, in some instances, removal as operator.

64.     The Debtors are required to pay taxes imposed on the removal of nonrenewable resources such as crude oil and natural gas (the "Severance Taxes") to certain taxing authorities each month.  Failure to pay the Severance Taxes when due could result in penalties, liens to secure payment of outstanding Severance Taxes and disruption of the Debtors' operations.

65.     The Debtors may also choose to make rental payments during the term of certain Leases (the "Delay Rentals").  Payment of the Delay Rentals postpones the Debtors' obligation for initial exploration and development of a Lease for the entire period for which they are paid.  Thus, if the Delay Rentals are paid on or before the anniversary date for each year during the primary term of each Lease, each Lease will be maintained in full force and effect and the Debtors will not be required to engage in exploration and development.  In one instance, the Debtors have entered into an agreement with the City of New Orleans, Trustee of the Edward Wisner Foundation to pay certain Delay Rentals, originally due on June 1, 2016, over a period of

three years in the total amount of $471,121.00 (the "CNO Delay Rentals").  The payments were to be paid in three installments of $157,040.34, the first of which was paid September 1, 2016. The second and third payments of $157,040.34 are due on June 1, 2017 and June 1, 2018, respectively.  If the Delay Rentals, including the CNO Delay Rentals, are not paid and the Debtors do not engage in initial exploration and development, the Lease will terminate. Accordingly, failure to pay the Delay Rentals could similarly have a material adverse effect upon the Debtors and their operations, including, inter alia, the loss of the underlying Lease.

F.    Potential Lien Claimants, Joint-Interest Billings, GPT Expenses and Shipping and Warehousing Claims.[13]

66.    The Debtors hold working interests in various oil and gas leases, which entitle them to the exclusive right to extract the hydrocarbons in the ground, but require that they bear the cost of exploration, development and operation of the property.  In certain instances, the Debtors are joint-interest holders with other working interest holders on a particular oil and gas lease.  In such cases, a joint operating agreement governs the relationship among joint-interest holders and provides the terms under which revenues and costs will be split.  The joint operating agreement typically designates a particular working interest owner as the "operator," who is responsible for the operation and control of the well and initially covers expenses that are later reimbursed by other working interest owners pursuant to the terms of the joint operating agreement.

67.    The Debtors serve as the operator of nearly all of the wells that they have an interest in.  Accordingly, in the ordinary course of business, the Debtors pay significant expenses related to the day-to-day costs of the exploration, drilling and production of oil and gas

---

[13]    The Debtors are not seeking to have this motion heard on an emergency basis; instead, the Debtors seek to have this motion heard on regular notice.

from properties they operate.[14]  A significant portion of these expenses are payments to third parties (the "Mineral Lien Claimants") that perform labor or furnish or transport materials, equipment or supplies in the "oil patch" — i.e. in connection with drilling, producing, repairing, operating or maintaining the Debtors' oil and gas wells.  The Mineral Lien Claimants could potentially assert statutory and contractual liens against the Debtors' property (or even property of other third parties with working interests under operating agreements) to secure payment for prepetition goods and services provided to the Debtors.  Given the nature of the Debtors' business, nearly all of their vendors are Mineral Lien Claimants, and in certain circumstances, the liens of Mineral Lien Claimants may prime the liens of other secured creditors.

68.     The Mineral Lien Claimants provide services that are essential to the Debtors' daily operations.  Further, the work being performed by the Mineral Lien Claimants is, in many instances, technical and requires specialized expertise that only a limited number of service providers may have.  Absent payment, the Debtors may have no alternative service providers, or no service providers that will be able to perform the required services in a reasonable time period.

69.     Although the Debtors operate the vast majority of wells in which they own an interest, there are certain instances in which the Debtors hold non-operating working interests in wells under various joint operating agreements.  In such instances, the Debtors receive payment representing their share of production revenues.  The Debtors receive revenue receipts from the operators and directly from the purchasers and then reimburse the operators for their share of the production costs through payment of joint-interest billings ("JIBs").  Rights to

---

[14]     A certain portion of these operating costs may be reimbursable by other working interest owners.  Even so, an operator is responsible for paying such expenses when due irrespective of the timing of any reimbursement payments.

payment of JIBs are often secured under contractual lien rights or statutory lien rights in favor of the operator against the Debtors' interest in the well.

70.     In their role as operator, the Debtors also occasionally utilize the services of certain vendors to transport or deliver goods, materials or other property used in the daily operation of their business (the "Shippers").  Such materials are frequently integral to the exploration and production of oil and gas and include drilling pipe, casing and wellheads. Accordingly, the Shippers often have possession of materials belonging to the Debtors that are vital to their business operations.  Additionally, the Debtors rely on vendors in the ordinary course of their business to store materials when not in use (the "Warehousemen").

71.     If the Debtors fail to pay the claims (collectively, the "Potential Lien Claims") of the Mineral Lien Claimants, Shippers, Warehouseman or on account of the JIBs (collectively, the "Potential Lien Claimants"), the Debtors believe that many of the Potential Lien Claimants may stop providing essential services to the Debtors.  Delays in receiving essential services and products would cause major disruptions to the Debtors' operations and undermine the Debtors' restructuring efforts.  In addition, if the Debtors do not timely pay the Potential Lien Claimants, the Debtors believe that the Lien Claimants may be able to assert possessory or statutory liens, or administrative expense claims.

72.     In an effort to ensure that payment (each, a "Lien Claimant Payment") of any portion of the Potential Lien Claims provides the Debtors with a benefit to their estates, the Debtors may require the recipient of a Lien Claimant Payment to execute an agreement (a "Trade Agreement") whereby a Potential Lien Claimant agrees to:  (a) the continuance of the parties' existing business relationship; (b) other business terms on a postpetition basis, including the pricing of goods and services, the provision of equivalent levels of service and the timing of

payment, on terms at least as favorable as those extended in the normal course prior to the

Petition Date, or on such other terms that are acceptable to the Debtors; and (c) the release to the

Debtors of goods or other assets owned by the Debtors in the Potential Lien Claimant's

possession, if any (collectively, the "Trade Terms").  The Trade Terms would be applicable

throughout the pendency of the Debtors' chapter 11 cases.

    73. If a Potential Lien Claimant that has executed a Trade Agreement accepts

a Lien Claimant Payment and fails to provide the Debtors with the requisite Trade Terms

specified therein, then (a) any Lien Claimant Payment received by the Potential Lien Claimant

may be deemed by the Debtors an unauthorized postpetition transfer under section 549 of the

Bankruptcy Code that the Debtors may, at the Debtors' option, (i) seek to recover from the

Potential Lien Claimant in cash or (ii) apply against any outstanding administrative claim held by

such Potential Lien Claimant; and (b) upon recovery of any Lien Claimant Payment, the

corresponding prepetition claim of the Potential Lien Claimant will be reinstated in the amount

recovered by the Debtors.

    74. The Debtors are also obligated under various agreements to market oil and

gas production to potential purchasers.  In connection with such marketing obligations, the

Debtors are responsible for, among other things, the costs associated with gathering,

transporting, processing, and other services related to the storage and sale of hydrocarbons

produced on the Debtors' leases (the "GPT Expenses").  In some circumstances, the Debtors pay

the GPT Expenses from funds otherwise belonging to working interest owners, and the Debtors'

failure to forward all required amounts could have a material adverse effect upon the Debtors,

including, without limitation, penalties and interest, turnover actions, conversion and

constructive trust claims, assertion of significant secured claims against property of the estate,

litigation, and, in some instances, removal as operator.

75.     In other circumstances, the Debtors have entered into netting agreements (the "Netting Arrangements") where purchasers of the Debtors' oil and gas (the "Counterparties") deduct the GPT Expenses on the Debtors' behalf.[15]  Once the Counterparties or other third parties sell marketed production subject to the Netting Arrangements, the Counterparties net the GPT Expenses before remitting the balance of the sale proceeds to the Debtors.  The GPT Expenses are fully secured by the Counterparties' set off rights under the Netting Arrangements, but the Debtors are concerned that some Counterparties may choose to withhold payments under the Netting Arrangements in an attempt to preserve their setoff or recoupment rights following commencement of the Debtors' bankruptcy cases.  In order to avoid any disruption in the payment from their production, the Debtors seek to clarify that the Counterparties may continue to perform under the Netting Arrangements in the ordinary course of business.

76.     As a result of the foregoing, the Debtors are seeking the entry of an order authorizing them to pay the undisputed prepetition amounts owed by the Debtors on account of Potential Lien Claims and the GPT Expenses and clarifying that the Counterparties may continue to perform under the Netting Arrangements in the ordinary course of business.

G.     Insurance.

77.     In the ordinary course of their business, the Debtors maintain various insurance policies (the "Insurance Policies").  Maintenance of insurance coverage under the various Insurance Policies is essential to the operation of the Debtors' business and is required under the U.S. Trustee's Operating Guidelines for Chapter 11 Cases, the laws of the states in which the Debtors operate and the Debtors' financial agreements.  In connection with the

---

[15]     In limited circumstances, Counterparties may also remit certain of the Debtors' severance tax obligations, which are also netted against payments to the Debtors.

Insurance Policies, the Debtors utilize the services of third-party service providers, including brokers and insurance finance service providers.  Certain of the Debtors' insurers and insurance finance providers are owed amounts as of the Petition Date.  Failure to pay such amounts could result in loss of services and lapses in coverage and impact the Debtors' ability to renew coverage.

78.     Accordingly, the Debtors are seeking authority to (a) continue their Insurance Policies on an uninterrupted basis and to renew their Insurance Policies or obtain replacement coverage as needed, in the ordinary course of business, (b) pay, in their sole discretion all undisputed premiums, claims, deductibles, fees and other obligations relating to the Insurance Policies, as applicable, that relate to the period before or after the Petition Date and are due and payable, and (c) liquidate in an appropriate forum or settle such Insurance Obligations as necessary.

H.     Utilities.

79.     The Debtors utilize various utility services provided by numerous utility companies (collectively, the "Utility Providers").  Because the Utility Providers provide essential services to the Debtors with respect to their operations, an interruption in utility services would likely prove disruptive and could jeopardize the Debtors' operations and restructuring efforts.

80.     The Debtors have proposed procedures that ensure that the Debtors will maintain continuous and uninterrupted utility services and also protect the rights of Utility Providers.  The Debtors intend to pay all obligations owed to Utility Providers in a timely manner, and I believe that the Debtors have, or will continue to have, sufficient funds from operations and their proposed postpetition financing to satisfy such obligations.

I.      Cash Management.

81.    The Company utilizes an integrated, centralized cash management system (the "Cash Management System") to collect, manage, invest, and disburse funds throughout the Company.  The Cash Management System involves a total of six bank accounts.  The Debtors maintain current and accurate accounting of all of the Debtors' transactions through the Cash Management System.  The Cash Management System includes the necessary accounting controls to enable the Debtors, as well as creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.

82.    In connection with its Cash Management System and the Company's overall operations, the Company established various banking and business practices, including use of numerous business forms.  These practices are tailored to the Company's day-to-day longer-term needs and, as such, were specifically designed and implemented for the Company. As a result, the Debtors seek authority to continue use of the Cash Management System and the use of prepetition business forms.

83.    Historically, the Debtors pay any royalties, working interest payments, and other party funds through a bank account held by Debtor Shoreline Southeast LLC.  Pursuant to the Complex Chapter 11 Guidelines, the Debtors seek authority to open an additional bank account with Whitney Bank, which will be used in the ordinary course of business to hold and disburse funds received prepetition that are held in suspense and postpetition that are attributable to a royalty, overriding royalty, working interest owner, or third party, including amounts in suspense.

84.    Finally, in the ordinary course of business, the Company conducts certain transactions that are treated as extensions of intercompany credit.   Under the Cash Management System, funds generated through business operations of each participating Debtor typically flow

directly into a bank account controlled by the same Debtor.  As individual Debtors require funds to meet current obligations, however, cash is occasionally transferred among different bank accounts.  The continuation of these transactions is in the best interests of the Debtors' estates and creditors, as it will allow the Debtors to conduct business as usual without disruption or delay. The Debtors will account for all of their postpetition intercompany transactions and request that such transactions be afforded administrative priority status to ensure that each individual Debtor will not, at the expense of its creditors, fund the operations of another entity.

## CONCLUSION

85.     For all the reasons described herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

[remainder of page intentionally left blank]

Dated:  November 2, 2016

/s/ Daniel P. Hurley
Daniel P. Hurley

# EXHIBIT A

**Organizational Chart**

## SHORELINE STRUCTURE CHART



# **EXHIBIT B**

**Membership Interests in Shoreline EH**

## MEMBERSHIP INTERESTS IN SHORELINE EH LLC

| Equity Holder | Address of Equity Holder | Number of Units Held/ Percentage of Equity Held |
|---|---|---|
| **CLASS A-1 UNITS** | | |
| BCC Shoreline Holdings (E), LLC | 200 Clarendon Street Boston, MA 02116 | 28,333 units |
| **CLASS A** | | |
| Randy E. Wheeler | 42 Player Green Place The Woodlands, TX 77382 | 2.217% |
| Willoughby Investments, Ltd. | 31 Forest Green Trail Kingwood, TX 77339 | 2.97% |
| Daniel P. Hurley | 400 Princeton Woods Loop Lafayette, LA 70508 | 2.977% |
| David J. Morgan | 2347 Christian Street, Suite A Baton Rouge, LA 70808 | 2.026% |
| Talon Oil & Gas, L.L.C. | 103 Jean Baptiste Lafayette, LA 70503 | 7.45% |
| Live Apple Oil & Gas, LLC | 510 Bering, Suite 100 Houston, TX 77057 | 5.499% |
| Wells Fargo Central Pacific Holdings, Inc. | 600 California Street, 20th Floor San Francisco, CA 94108 | 12.439% |
| Cross Creek Properties, LLC | P.O. Box 1548 Broussard, LA 70518 | 8.002% |
| B.R.M.S. Enterprises | P.O. Box 1557 Broussard, LA 70518 | 6.668% |
| Talon Oil & Gas II, L.L.C. | 103 Jean Baptiste Lafayette, LA 70503 | 5.415% |
| Talon Oil & Gas III, L.L.C. | 103 Jean Baptiste Lafayette, LA 70503 | 3.543% |
| UnionBanCal Equities, Inc. | 445 South Figueroa, Floor 21 Los Angeles, CA 90071 | 4.664% |
| Joel Broussard | 120 White Rose Drive Raceland, LA 70375 | 2.798% |
| **Class A Total:** | | **66.667%** |
| **CLASS B** | | |
| Randy E. Wheeler | 42 Player Green Place The Woodlands, TX 77382 | 7.708% |
| Frank D. Willoughby | 31 Forest Green Trail Kingwood, TX 77339 | 7.708% |
| Daniel P. Hurley | 400 Princeton Woods Loop Lafayette, LA 70508 | 7.708% |

| Equity Holder | Address of Equity Holder | Number of Units Held/ Percentage of Equity Held |
|---|---|---|
| David J. Morgan | 2347 Christian Street, Suite A Baton Rouge, LA 70808 | 7.708% |
| Paul Arceneaux | 105 Sundance Pass Lafayette, LA 70508-8000 | 1.000% |
| Glenn Carpenter | 106 Carrolton Cir. Lafayette, LA 70503-5482 | .500% |
| Dana Westphal | 218 Greenhill Cir. Broussard, LA 70518-7514 | .500% |
| Toby E. Hamrick | 201 Main Street Broussard, LA 70518-7514 | .500% |
| **Class B Total** | | **33.333%** |

**EXHIBIT C**

**Restructuring Support Agreement**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF VOTES WITH RESPECT TO A CHAPTER 11 PLAN OF REORGANIZATION.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  ACCEPTANCES OR REJECTIONS WITH RESPECT TO A CHAPTER 11 PLAN OF REORGANIZATION MAY NOT BE SOLICITED EXCEPT IN ACCORDANCE WITH THE BANKRUPTCY CODE.**

---

## SHORELINE ENERGY LLC

## RESTRUCTURING SUPPORT AGREEMENT

### November 2, 2016

---

This Restructuring Support Agreement dated as of November 2, 2016, together with the exhibits hereto (**Exhibits A-1, A-2, and A-3** attached hereto being the plan term sheet (the "***Plan Term Sheet***"), the debtor in possession senior secured credit agreement (the "***DIP Credit Agreement***"), and the acquisition term sheet (the "***Acquisition Term Sheet***"), and such exhibits collectively, the "***Term Sheets***"),[1] together with all schedules attached hereto, and as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof (the "***Agreement***"),[2] is entered into by and among: (a) Shoreline Energy LLC ("***Shoreline***"), Shoreline EH LLC ("***Holdco***") and those certain additional subsidiaries of Shoreline and Holdco listed on **Schedule 1** of this Agreement (such subsidiaries, Shoreline, and Holdco each a "***Debtor***" and, collectively, the "***Debtors***");[3] (b) the lenders party (the "***First Lien Lenders***") to that certain Third Amended and Restated Credit Agreement dated as of October 16, 2015 (as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date, the "***First Lien Credit Agreement***"), by and among Shoreline, the First Lien Lenders, and Morgan Stanley Energy Capital Inc. as administrative agent (in such capacity the "***First Lien Agent***"); and (c) HPS Investment Partners, LLC, to be the parent of Purchaser (defined below)[4] ("***HB Parent***", together with the Purchaser and the First Lien Lenders, the "***Restructuring Support Parties***").  This Agreement collectively refers to the Debtors and the Restructuring Support Parties as the "***Parties***" and each individually as a "***Party***."

---

[1]  The Term Sheets are incorporated herein by reference pursuant to Section 2 hereof.

[2]  Unless otherwise noted, capitalized terms used but not immediately defined herein shall have the meanings ascribed to them at a later point in this Agreement or in the Term Sheet (as defined herein), as applicable.

[3]  Until the occurrence of the Termination Date, every entity that is a Debtor in the Chapter 11 Cases shall be a party to this Agreement.

[4]  "***Purchaser***" means an entity treated as a partnership for tax purposes established by the HB Parent on or before November 18, 2016 for the purpose of facilitating the Restructuring Transactions (as defined below).  HB Parent shall have all consent, approval, and agreement rights granted to Purchaser herein.

# RECITALS

WHEREAS, it is anticipated that certain restructuring transactions (collectively, the "***Restructuring Transactions***") will be implemented through jointly-administered voluntary cases commenced by the Debtors (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Bankruptcy Court***"), including (a) a joint pre-arranged plan of liquidation (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with this Agreement, the "***Plan***")[5] for the Debtors on terms consistent with the Plan Term Sheet attached hereto as **Exhibit A-1**, (b) a debtor-in-possession financing facility provided pursuant to the DIP Credit Agreement attached hereto as **Exhibit A-2** and DIP Orders (as defined below) attached as **Exhibit G** to the DIP Credit Agreement, and (c) a sale of the Debtors' assets designated by the Restructuring Support Parties (such designated assets, the "***Designated Assets***") to the Purchaser on terms consistent with the Acquisition Term Sheet attached hereto as **Exhibit A-3**, which sale may be implemented through the Plan.

NOW, THEREFORE, in consideration of the promises, mutual covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

# AGREEMENT

1. **RSA Effective Date**. This Agreement shall become effective, and the obligations contained herein shall become binding upon the Parties, upon the first date (such date, the "***RSA Effective Date***") that this Agreement has been executed by each Debtor, HB Parent and First Lien Lenders holding 100% of the loans under the First Lien Credit Agreement.

2. **Exhibits and Schedules Incorporated by Reference**. Each of the exhibits attached hereto and any schedules to such exhibits (collectively, the "***Exhibits and Schedules***") is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Exhibits and Schedules. In the event of any inconsistency between this Agreement (without reference to the Exhibits and Schedules) and the Exhibits and Schedules, this Agreement (without reference to the Exhibits and Schedules) shall govern.

3. **Definitive Documentation**.

      (a)    The definitive documents and agreements governing the Restructuring Transactions (collectively, the "***Definitive Documentation***") shall include:

          (i)    the Plan (and all exhibits thereto), including any Plan supplement documents;

---

[5] The Plan shall be filed in accordance with the Milestones (as defined below) set forth in <u>Section 4</u> of this Agreement.

*US 4689818v.39*

(ii)     the confirmation order with respect to the Plan (the "**Confirmation Order**");

(iii)    the disclosure statement (and all exhibits thereto) with respect to the Plan (the "**Disclosure Statement**");

(iv)     the solicitation materials with respect to the Plan (collectively, the "**Solicitation Materials**");

(v)      the asset purchase agreement to consummate the sale of the Designated Assets to the Purchaser on terms consistent with the Acquisition Term Sheet (the "**APA**");

(vi)     an order authorizing the assumption of this Agreement (the "**RSA Assumption Order**");

(vii)    an order approving the sale of the Designated Assets to the Purchaser free and clear of liens, claims, encumbrances, and other interests (the "**Designated Assets Sale Order**");

(viii)   the DIP Credit Agreement;

(ix)     (A) the interim order authorizing use of cash collateral and approving debtor in possession financing pursuant to the DIP Credit Agreement (the "**Interim DIP Order**") substantially in the form attached to the DIP Credit Agreement as Exhibit G and (B) the final order authorizing use of cash collateral and approving the debtor in possession financing pursuant to the DIP Credit Agreement (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**");

(x)      Bidding procedures ("**Bid Procedures**") for the sale of the Designated Assets and other assets of the Debtors that are not Designated Assets (the "**Non-Designated Assets**");

(xi)     an order approving the Bid Procedures (the "**Bid Procedures Order**");

(xii)    the motions seeking approval of each of the above documents;

(xiii)   the Purchaser First Lien Credit Agreement, the Purchaser Second Lien Credit Agreement, the Purchaser Shareholders Agreement and any certificates of designation governing the terms of the preferred equity of Purchaser (to the extent such terms are not included in the Purchaser Shareholders Agreement); and

(xiv)    such other documents that the Debtors and the Restructuring Support Parties may determine to be necessary or advisable to facilitate the Restructuring Transactions.

(b)    The Definitive Documentation identified in Section 3(a) shall, after the RSA Effective Date, (i) contain terms, conditions, representations, warranties, and covenants consistent with the terms set forth in this Agreement and the Term Sheets and (ii) otherwise be in form and substance satisfactory to the Debtors and the Restructuring Support Parties, it being understood and agreed among the Parties that this Agreement and the Exhibits hereto are in a form and substance satisfactory to the Debtors and the Restructuring Support Parties.

4.    **Milestones**. As provided in and subject to Section 6, the Debtors shall implement the Restructuring Transactions on the following timeline (each deadline, a "***Milestone***"):

(a)    no later than November 2, 2016, the Debtors shall commence the Chapter 11 Cases by filing bankruptcy petitions with the Bankruptcy Court (such filing date, the "***Petition Date***");

(b)    on the Petition Date, the Debtors shall file with the Bankruptcy Court a motion seeking entry of the Interim DIP Order and the Final DIP Order;

(c)    no later than November 4, 2016, the Bankruptcy Court shall have entered the Interim DIP Order;

(d)    no later than November 8, 2016, the Debtors shall file with the Bankruptcy Court a motion seeking to assume this Agreement (the "***RSA Assumption Motion***");

(e)    no later than November 18, 2016, the Debtors shall file with the Bankruptcy Court: (i) a motion (the "***Sale Motion***") seeking entry of the Designated Assets Sale Order, and (ii) a motion seeking entry of the Bid Procedures and the Bid Procedures Order (the "***Bid Procedures Motion***");

(f)    no later than December 1, 2016, the Debtors shall file with the Bankruptcy Court: (i) the Plan; (ii) the Disclosure Statement; (iii) a motion (the "***Disclosure Statement and Solicitation Motion***") seeking, among other things, (A) approval of the Disclosure Statement, (B) approval of procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan, and (C) to schedule the hearing to consider confirmation of the Plan (the "***Confirmation Hearing***");

(g)  no later than December 2, 2016, the Bankruptcy Court shall have entered (i) the Final DIP Order and (ii) the RSA Assumption Order;

(h)  no later than December 13, 2016, the Bankruptcy Court shall have entered the Bid Procedures Order;

(i)  the deadline for third parties to submit higher and better cash offers for all or substantially all of the Debtors' assets, shall be no later than January 27, 2016 (the "**Bid Deadline**"), and any auction, if required, shall be held no later than February 1, 2016;

(j)  no later than January 6, 2016, (i) the Bankruptcy Court shall have entered an order approving the Disclosure Statement and the relief requested in the Disclosure Statement and Solicitation Motion; and (ii) no later than five (5) business days after entry of the order approving the Disclosure Statement and Solicitation Motion, the Debtors shall have commenced solicitation on the Plan by mailing the Solicitation Materials to parties eligible to vote on the Plan;

(k)  no later than February 8, 2017, the Bankruptcy Court shall have commenced the Confirmation Hearing and the hearing to consider entry of the Designated Assets Sale Order;

(l)  no later than February 10, 2017, the Bankruptcy Court shall have entered the Designated Assets Sale Order;

(m)  no later than February 10, 2017, the Bankruptcy Court shall have entered the Confirmation Order;

(n)  no later than February 17, 2017, the Debtors shall consummate the transactions contemplated by the Plan (the date of such consummation, the "**Effective Date**"), it being understood that the satisfaction of the conditions precedent to the Effective Date (as set forth in the Plan and the Term Sheet) shall be conditions precedent to the occurrence of the Effective Date; and

(o)  no later than February 17, 2017, the Debtors shall consummate the transactions contemplated by the APA (the date of such consummation, the "**Sale Closing Date**"), it being understood that the satisfaction of the conditions precedent in the APA shall be conditions precedent to the occurrence of the Sale Closing Date.

The Debtors may extend or waive a Milestone only with the express prior written consent each Restructuring Support Party.

5.  **Commitment of Restructuring Support Parties.**

(a)     Each Restructuring Support Party (severally and not jointly) shall from the RSA Effective Date until the occurrence of a Termination Date (as defined in and subject to the terms of <u>Section 10</u>) applicable to such Restructuring Support Party:

(i)     use commercially reasonable efforts to support and cooperate with the Debtors to take all commercially reasonable actions necessary to consummate the Restructuring Transactions in accordance with the Plan and the terms and conditions of this Agreement and the applicable Term Sheets (but without limiting consent, approval, or termination rights provided in this Agreement and the Definitive Documentation), including: (A) voting all of its claims against, or interests in, as applicable, the Debtors now or hereafter owned by such Restructuring Support Party (or for which such Restructuring Support Party now or hereafter has voting control over) to accept the Plan in accordance with the applicable procedures set forth in the Disclosure Statement and the Solicitation Materials, as approved consistent with the Bankruptcy Code upon receipt of Solicitation Materials approved by the Bankruptcy Court; (B) timely returning a duly-executed ballot in connection therewith; and (C) not "opting out" of any releases under the Plan;

(ii)     use commercially reasonable efforts to support and cooperate with the Debtors to take all commercially reasonable actions necessary to obtain entry of the Designated Assets Sale Order and to sell the Designated Assets to the Purchaser in accordance with terms and conditions of this Agreement, the Acquisition Term Sheet, and the APA;

(iii)     not withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) its tender, consent, or vote with respect to the Plan; *provided*, *however*, that the votes of the Restructuring Support Parties shall be immediately revoked and deemed void *ab initio* upon termination of this Agreement;

(iv)     negotiate in good faith all Definitive Documentation that is subject to negotiation as of the RSA Effective Date and to which it shall be a party and take any and all necessary and appropriate actions in furtherance of the Acquisition Term Sheet, the Plan, the APA, and this Agreement;

(v)    use commercially reasonable efforts to support and not object to, delay, impede, or take any other action to interfere with the Restructuring Transactions (including the entry by the Bankruptcy Court of the Interim DIP Order or the Final DIP Order), or propose, file, support, or vote for any restructuring, workout, or chapter 11 plan or any sale or merger transaction for any of the Debtors other than the Restructuring Transactions and the Plan (but without limiting consent, approval, or termination rights provided in this Agreement and the Definitive Documentation);

(vi)    consult with the HB Parent regarding any consent, approval, or implementation matter concerning the Interim DIP Order, the Final DIP Order, or the DIP Credit Agreement; and

(vii)    not extend the "Commitment Termination Date" or "Maturity Date" (as such terms are defined in the DIP Credit Agreement) or any payment owed as a result thereof, including an extension effectuated by any amendment, waiver or modification to the definitions of "Commitment Termination Date" or "Maturity Date" (as such terms are defined in the DIP Credit Agreement), in each case without the consent of HB Parent.

(b)    HB Parent hereby represents and warrants that it directly or indirectly will hold 100% of the equity of Purchaser prior to closing the Restructuring Transactions. HB Parent hereby agrees (i) that it shall cause the Purchaser to comply with its obligations hereunder, (ii) will arrange to provide Purchaser First Lien Facility to execute and deliver to Purchaser (with a copy to the First Lien Agent) no later than November 11, 2016, a commitment letter with respect to the Purchaser First Lien Facility having terms consistent with the Acquisition Term Sheet and otherwise in form and substance satisfactory to the Purchaser and the First Lien Lenders (the "***Commitment Letter***"), and (iii) that it will contemporaneously provide a copy of such Commitment Letter to the Debtors.

(c)    First Lien Lender represents and warrants that it is presently the only First Lien Lender and that it owns all claims against the Debtors under the First Lien Credit Agreement.

Notwithstanding anything herein to the contrary, nothing in this Agreement and neither a vote to accept the Plan by any Restructuring Support Party nor the acceptance of the Plan by any Restructuring Support Party shall (w) be construed to prohibit any Restructuring Support Party from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this

Agreement or the Definitive Documentation, or exercising rights or remedies specifically reserved herein, (x) be construed to limit any Restructuring Support Party's rights under any applicable indenture, credit agreement, other loan document, and/or applicable law or to prohibit any Restructuring Support Party from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, from the RSA Effective Date until the occurrence of a Termination Date, such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring Transactions, *provided*, *however*, that any delay or other impact on consummation of the Restructuring Transactions contemplated by the Plan caused by a Restructuring Support Party's opposition to any relief that is inconsistent with such Restructuring Transactions shall not constitute a violation of this Agreement, or (y) impair or waive the rights of any Restructuring Support Party to assert or raise any objection permitted under this Agreement in connection with any hearing on confirmation of the Plan or in the Bankruptcy Court.

6.      **Commitment of the Debtors**.

(a)      Subject to Subsection (e) of this Section 6, each of the Debtors (i) agrees to (A) support and make reasonable best efforts to complete the Restructuring Transactions set forth in the Plan, the APA, and this Agreement, (B) negotiate in good faith all Definitive Documentation that is subject to negotiation as of the RSA Effective Date and to which it shall be a party and take any and all necessary and appropriate actions in furtherance of the Acquisition Term Sheet, the Plan, the APA, and this Agreement, and (C) make reasonable best efforts to complete the Restructuring Transactions in accordance with each Milestone set forth in Section 4 of this Agreement, and (ii) shall not undertake any action inconsistent with the adoption and implementation of the Plan and the APA and the consummation thereof as soon as feasible, including, without limitation, filing any motion to reject this Agreement.

(b)      The Debtors shall timely file a formal objection, in form and substance reasonably acceptable to the Restructuring Support Parties, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Chapter 11 Cases.

(c)      The Debtors shall timely file a formal objection, in form and substance reasonably acceptable to the Restructuring Support Parties, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable.

(d)     Except pursuant to or permitted by the DIP Credit Agreement and DIP Orders, the Debtors shall not: (i) incur or suffer to exist any material indebtedness, except indebtedness existing and outstanding immediately prior to the date hereof, trade payables, and liabilities arising and incurred in the ordinary course of business; or (ii) incur any material liens or security interests, except in the ordinary course of business.

(e)     at any time prior to the Bid Deadline, the Debtors may solicit and receive cash proposals and offers for any Alternative Transaction[6] from other parties (other than any Restructuring Support Party) and discuss such Alternative Transactions received; *provided, however,* that the Debtors shall  hold update calls with the Restructuring Support Parties upon request to update the Restructuring Support Parties on any Alternative Transaction and keep the Restructuring Support Parties informed of any material negotiations, discussions, amendments, modifications, or other matters regarding any such Alternative Transaction.

For the avoidance of doubt, nothing in this Section 6 shall be construed to limit or affect in any way any Restructuring Support Party's rights under this Agreement, including upon occurrence of any Termination Event.

7.     **Restructuring Support Party Termination Events**. Each Restructuring Support Party shall have the right subject to Section 10, but not the obligation, upon notice to the Debtors and the other Restructuring Support Parties, to terminate the obligations of such Restructuring Support Party as to itself under this Agreement upon the occurrence of any of the following events, unless waived, in writing, by such Restructuring Support Party on a prospective or retroactive basis (each, a "***Restructuring Support Party Termination Event***"), provided only (i) the First Lien Lenders may terminate this Agreement or waive such termination event described in Subsections (p) and (t) of this Section 7 and (ii) the Purchaser may terminate this Agreement or waive such termination event described in Subsection (q) of this Section 7:

(a)     the failure to meet any of the Milestones described in Section 4 unless (i) such failure is the direct result of any act, omission, or delay on the part of any Restructuring Support Party seeking to terminate this Agreement pursuant to this Subsection (a) in violation of its obligations under this Agreement or (ii) such Milestone is extended in accordance with Section 4;

---

[6] "***Alternative Transaction***" means, other than the transactions contemplated herein or in the Term Sheets, any (a) sale, transfer, or other disposition, directly or indirectly, of any Designated Assets, (b) issuance, sale, transfer, or other disposition, in each case by any Debtor, of any class of equity securities, ownership interests, or voting securities of any Debtor, (c) merger, consolidation, recapitalization, business combination, or other similar transaction involving any Debtor, or (d) chapter 11 plan of reorganization or other restructuring or reorganization for, or liquidation of, any Debtor.  For the avoidance of doubt, the sale of Non-Designated Assets will not constitute an Alternative Transaction.

(b)     the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or any of the Chapter 11 Cases is dismissed;

(c)     the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(d)     any Debtor (i) files, amends or modifies, or files a pleading seeking authority to amend or modify, the Definitive Documentation in a manner that (X) is materially inconsistent with this Agreement or (Y) would cause such Definitive Documentation not to meet the requirements of Paragraph 3(b) hereof, (ii) suspends or revokes the Restructuring Transactions without the prior consent of the Restructuring Support Parties, or (iii) publicly announces its intention to take any such acts listed in (i) or (ii) of this Subsection (d);

(e)     any Debtor files or publicly announces that it will file or joins in or supports any plan of reorganization other than the Plan or any motions in furtherance of an Alternative Transaction, or files any motion or application seeking authority to sell any assets (other than the motion for entry of the Designated Assets Sale Order described hereinabove or pursuant to the Bid Procedures), without the prior written consent of the Restructuring Support Parties;

(f)     the issuance of any ruling or order by any governmental authority, including the Bankruptcy Court, or any other court of competent jurisdiction, or other regulatory authority, enjoining the substantial consummation of the APA on the terms and conditions set forth therein and in the applicable Term Sheets, or the commencement of any action by any governmental authority or other regulatory authority that could reasonably be expected to enjoin or otherwise make impractical the substantial consummation of the APA on the terms and conditions set forth therein and in the Term Sheets;

(g)     the Debtors file any motion authorizing the use of cash collateral that is not in the form of the DIP Orders or otherwise consented to by the Restructuring Support Parties;

(h)     a breach by any Debtor of any agreement, representation, warranty, or covenant of such Debtor set forth in this Agreement that (to the extent curable) remains uncured for a period of five (5) business days after the receipt by the Restructuring Support Parties or the Debtors (as applicable) of written notice of such breach; *provided*, *however*, that the Debtors shall provide written notice of such

breach promptly upon becoming aware of such breach following reasonable inquiry;

(i)    either (i) any Debtor files a motion, application, or adversary proceeding (or any Debtor supports any such motion, application, or adversary proceeding filed or commenced by any third party) (A) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of the liens securing the First Lien Credit Agreement, or (B) asserting any other cause of action against and/or with respect or relating to such claims or the prepetition liens securing such claims; or (ii) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order providing relief against the interests of the First Lien Lenders or the First Lien Agent with respect to any of the foregoing causes of action or proceedings;

(j)    any Debtor terminates its obligations under and in accordance with this Agreement;

(k)    if one or more Restructuring Support Parties have breached any of its covenants set forth in this Agreement (it being understood and agreed that any actions required to be taken by the Restructuring Support Parties that are included in the Term Sheets attached to this Agreement but not in this Agreement are to be considered "covenants" of the Restructuring Support Parties, and therefore covenants of this Agreement, notwithstanding the failure of any specific provision in the Term Sheets to be re-copied in this Agreement) and such breach (x) materially and adversely affects the interests of the non-breaching Restructuring Support Party in connection with the Restructuring Transactions or this Agreement and (y) (to the extent curable) remains uncured for a period of five (5) business days after the receipt by the applicable Restructuring Support Parties of written notice of such breach; provided, however, that the breaching Restructuring Support Party shall provide written notice of such breach promptly upon becoming aware of such breach following reasonable inquiry in any respect and no Restructuring Support Party may terminate this Agreement pursuant to this <u>Subsection (k)</u> to the extent such Restructuring Support Party is in material breach of any provision hereof; provided further, for the avoidance of doubt, no Restructuring Support Party shall be able to terminate this Agreement on account of its own breach of any of the foregoing covenants;

(l)    upon the occurrence and continuation of any event of default under the DIP Orders or DIP Credit Agreement that is not waived or cured within the requisite cure period provided by the DIP Orders or DIP Credit Agreement;

(m) the Designated Assets Sale Order is reversed, stayed, dismissed, vacated, or reconsidered without the consent of the Restructuring Support Parties, is modified or amended in a manner that is inconsistent with this Agreement or not reasonably satisfactory to the Restructuring Support Parties, or a motion for reconsideration, reargument, or rehearing is granted;

(n) any debtor in possession financing not already contemplated by this Agreement is entered into on terms that are not reasonably acceptable to the Restructuring Support Parties;

(o) the failure of any of the documents identified as Definitive Documentation in Section 3 to meet the standard of Section 3(b) of this Agreement;

(p) HB Parent fails to comply with or breaches its representations in Subsection (b) of Section 5, or the Commitment Letter is amended, modified, or terminated; *provided* only the First Lien Lenders may terminate this Agreement pursuant to this Subsection (p) of Section 7, or waive such Termination Event;

(q) The First Lien Agent breaches its representations in Subsection (c) of Section 5; *provided* only the Purchaser may terminate this Agreement pursuant to this Subsection (q) of Section 7, or waive such Termination Event;

(r) the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any of the Debtors' exclusive rights to file a plan or plans of reorganization pursuant to section 1121 of the Bankruptcy Code;

(s) the Bankruptcy Court denies the approval of the motion seeking entry of the RSA Assumption Order;

(t) in the event HB Parent or any of its affiliates, or any successor or assignee of HB Parent or any of its affiliates, unreasonably take or refrain from taking, as the case may be, in any capacity, including as a holder of any Second Lien Facility Claims or as if any such entity were party hereto and bound by such obligations contained herein, any action in contravention of the transactions contemplated by this Agreement; *provided* only the First Lien Lenders may terminate this Agreement pursuant to this Subsection (t) of Section 7, or waive such Termination Event; or

(u) in the event the APA is not finalized by November 18, 2016, including a schedule of Designated Assets (provided that such schedule may thereafter be revised by the First Lien Lender, HB Parent, and the Purchaser (by mutual consent) to the extent set

forth in the Acquisition Term Sheet), and provide for a structure of the acquisition, in each case in form and substance satisfactory to the Restructuring Support Parties.

Following the commencement of the Chapter 11 Cases and unless and until there is an unstayed order of the Bankruptcy Court providing that the giving of notice under and/or termination of this Agreement in accordance with its terms is not prohibited by the automatic stay imposed by section 362 of the Bankruptcy Code, the occurrence of any of the Termination Events in this <u>Section 7</u> shall result in an automatic termination of this Agreement, to the extent the Restructuring Support Parties would otherwise have the ability to terminate this Agreement in accordance with this <u>Section 7</u>, five (5) business days following such occurrence unless waived in writing by the Restructuring Support Parties.

8. **<u>The Debtors' Termination Events</u>**. Each Debtor may, upon notice to the Restructuring Support Parties, and subject to the terms of <u>Section 10</u>, terminate its obligations under this Agreement upon the occurrence of any of the following events (each a "***Debtor Termination Event***," and together with the Restructuring Support Party Termination Events, the "***Termination Events***"), in which case this Agreement shall terminate with respect to all Parties, subject to the rights of the Debtors to fully or conditionally waive, in writing, on a prospective or retroactive basis, the occurrence of a Debtor Termination Event:

(a)     upon notice to the Restructuring Support Parties, if the board of directors or board of managers, as applicable, of a Debtor determines, after receiving advice from counsel, that proceeding with the Restructuring Transactions (including, without limitation, the Plan or solicitation of the Plan) would be inconsistent with the exercise of its fiduciary duties;

(b)     the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring Transactions; *provided*, *however*, that the Debtors have made commercially reasonable, good faith efforts to cure, vacate, or have overruled such ruling or order prior to terminating this Agreement; or

(c)     a breach by any Restructuring Support Party of any representation, warranty, or covenant of such Restructuring Support Party set forth in this Agreement that (to the extent curable) remains uncured for a period of five (5) business days after the receipt by the Restructuring Support Parties or the Debtors (as applicable) of written notice of such breach; *provided*, *however*, that the Restructuring Support Parties shall provide written notice of such breach promptly upon becoming aware of such breach following reasonable inquiry and the Debtors shall not be able to terminate this Agreement pursuant to this <u>Subsection (c)</u> to the extent any Debtor is in material breach of any provision hereof;

9.      **Mutual Termination; Automatic Termination**. This Agreement and the obligations of all Parties hereunder may be terminated by mutual written agreement by and among (a) each of the Debtors and (b) the Restructuring Support Parties.  This Agreement shall terminate automatically upon the occurrence of the Effective Date or, if earlier, the Sale Closing Date, subject to the terms of <u>Section 10</u>.

10.      **Effect of Termination**. The earliest date on which termination of this Agreement as to a Party is effective in accordance with <u>Sections 7</u>, <u>8</u>, or <u>9</u> of this Agreement shall be referred to, with respect to such Party, as a "***Termination Date***."  Upon the occurrence of a Termination Date, the terminating Party's and, solely in the case of a Termination Date in accordance with <u>Section 9</u>, all Parties' obligations under this Agreement shall be terminated effective immediately, and such Party or Parties hereto shall be released from all commitments, undertakings, and agreements hereunder; *provided*, *however*, that each of the following shall survive any such termination: (a) any claim for breach of this Agreement that occurs prior to such Termination Date, and all rights and remedies with respect to such claims shall not be prejudiced in any way; (b) the Debtors' obligations in <u>Section 14</u> of this Agreement accrued up to and including such Termination Date (except if the Termination Date was caused by a Termination Event under <u>Subsections 7(h)</u>, <u>7(p)</u>, or <u>8(c)</u> as a result of a breach by Purchaser or HB Parent); and (c) <u>Sections 10</u>, <u>15</u>, <u>17(b)</u> (to the extent set forth therein), <u>18</u>, <u>19</u>, <u>20</u>, <u>21</u>, <u>21</u>, <u>23</u>, <u>24</u>, <u>25</u>, <u>31</u>, <u>32</u>, and <u>33</u> hereof.  The automatic stay applicable under section 362 of the Bankruptcy Code shall not prohibit a Party from committing any act or taking any action necessary to effectuate the termination of this Agreement pursuant to and in accordance with the terms hereof, and the order approving assumption of this Agreement shall expressly provide relief from section 362 of the Bankruptcy Code to permit such termination.

11.      **Cooperation and Support**. The Debtors will attempt in good faith to provide draft copies of all material pleadings any Debtor intends to file with the Bankruptcy Court to counsel to the Restructuring Support Parties at least two (2) business days prior to filing such pleading to the extent practicable. Counsel to the Restructuring Support Parties shall use commercially reasonable efforts to provide all comments to such pleadings as soon as practicable prior to the date when the Debtors intend to file such document, and counsel to the respective Parties shall consult in good faith regarding the form and substance of any such proposed pleading.  For the avoidance of doubt, the Parties agree to negotiate in good faith the Definitive Documentation that is subject to negotiation and completion, consistent with <u>Subsection (b)</u> of <u>Section 3</u> hereof and that notwithstanding anything herein to the contrary, the Definitive Documentation, including any motions or orders related thereto, shall be consistent with this Agreement and otherwise shall be in form and substance reasonably satisfactory to the Restructuring Support Parties.  The Debtors shall make reasonable best efforts to (i) provide to the Restructuring Support Parties' advisors, and direct its employees, officers, advisors and other representatives to provide the Restructuring Support Parties' advisors, (A) reasonable access (without any material disruption to the conduct of the Debtors' businesses) during normal business hours to the Debtors' books and records, (B) reasonable access to the management and advisors of the Debtors for the purposes of evaluating the Debtors' assets, liabilities, operations, businesses, finances, strategies, prospects and affairs, and (C) timely and reasonable responses to all reasonable diligence requests; and (ii) promptly notify the Restructuring Support Parties of any governmental or third party litigations, investigations, hearings, or any material communications related to the Designated Assets or any liabilities assumed under the APA.

12.    **Transforms of Claims and Interests**.

      (a)    No Restructuring Support Party shall (i) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Restructuring Support Party's claims against any Debtor subject to this Agreement, as applicable, in whole or in part, or (ii) deposit any of such Restructuring Support Party's claims against any Debtor, as applicable, into a voting trust, or grant any proxies, or enter into a voting agreement with respect to any such claims or interests (the actions described in clauses (i) and (ii) are collectively referred to herein as a "*Transfer*" and the Restructuring Support Party making such Transfer is referred to herein as the "*Transferor*"), unless such Transfer is to another Restructuring Support Party or any other entity that first agrees in writing to be bound by the terms of this Agreement by executing and delivering to the Debtors a Transferee Joinder substantially in the form attached hereto as **Exhibit B** (the "*Transferee Joinder*"). With respect to claims against or interests in a Debtor held by the relevant transferee (the "*Consenting Transferee*") upon consummation of a Transfer in accordance herewith, the Consenting Transferee is deemed to make all of the representations, warranties, and covenants of a Restructuring Support Party, as applicable, set forth in this Agreement.  Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations.  Any Transfer made in violation of this Subsection (a) of this Section 12 shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the Debtors and/or any Restructuring Support Party, and shall not create any obligation or liability of any Debtor or any other Restructuring Support Party to the purported transferee.

          Notwithstanding anything contained in this Agreement to the contrary, (i) a Restructuring Support Party may transfer any right, title or interest in respect of any of the Restructuring Support Party's claims against any Debtor subject to this Agreement to a Qualified Marketmaker,[7] acting in its capacity as a Qualified

---

[7]  "*Qualified Marketmaker*" means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers debt securities or debt obligations or enter with customers into long and short positions in debt securities or debt obligations, in its capacity as a dealer or market maker in such debt securities or obligation; and (y) is in fact regularly in the business of making a market in debt securities or debt obligations.

Marketmaker, without the requirement that such Qualified Marketmaker be or become a Consenting Transferee; *provided* that (i) such Qualified Marketmaker subsequently transfers such right, title or interest in the in such claims to a Consenting Transferee (or a party that becomes a Consenting Transferee by execution of a Transferee Joinder as contemplated by the immediately preceding paragraph) within the date that is ten (10) days after such Qualified Marketmaker's acquisition of such right, title or interest, (ii) to the extent that a Consenting Transferee is acting in its capacity as a Qualified Marketmaker, it may transfer any right, title or interest in claims against any Debtor that the Qualified Marketmaker acquires from a holder of such claims that is not a Consenting Transferee without the requirement that the transferee be or become a Consenting Transferee, and (iii) no such transfer shall be effective until the Transferee Joinder is executed and delivered to the other parties hereto.

13.   **Further Acquisition of Claims or Interests**. Except as set forth in <u>Section 12</u>, nothing in this Agreement shall be construed as precluding any Restructuring Support Party from acquiring additional interests in or claims against the Debtors; *provided*, *however*, that any additional claims against, or interests in the Debtors acquired by any Restructuring Support Party and with respect to which such Restructuring Support Party is the legal owner, beneficial owner, and/or investment advisor or manager of or with power and/or authority to bind any claims or interests held by it shall automatically be subject to the terms and conditions of this Agreement.

14.   **Fees and Expenses**. The Debtors shall pay or reimburse all reasonable and documented[8] out of pocket fees and expenses when due of the following (regardless of whether such fees and expenses were incurred before or after the Petition Date):  (a) Simpson Thacher & Bartlett LLP ("***Simpson***"), as counsel to the First Lien Lenders and First Lien Agent, (b) FTI Consulting, as financial advisor to the First Lien Lenders and First Lien Agent; and (c) any local counsel, industry consultants, or specialists as may reasonably be necessary to advise the First Lien Lenders or First Lien Agent in connection with the Restructuring Transactions, including the enforcement thereof.  The Debtors also agree (regardless of whether such fees and expenses were incurred before or after the Petition Date): (w) to pay or reimburse the Purchaser, HB Parent, and its affiliates upon execution of this Agreement and thereafter on demand for any reasonable and documented out-of-pocket costs and expenses of Vinson & Elkins LLP ("***V&E***") and one Louisiana licensed law firm as counsel to such parties (collectively, the "***Expenses***") incurred in connection with the Restructuring Transactions, regardless of whether any of the transactions contemplated by this Agreement are consummated; (x) to pay to each of the Purchaser on demand all Expenses of V&E and one Louisiana licensed law firm incurred in connection with the enforcement of any of its rights and remedies under this Agreement, so long as such Expenses are not incurred in connection with litigation or claims against any other Restructuring Support Party and only if the Purchaser is successful in the enforcement its rights and remedies under this Agreement; (y) that, once paid, all of the foregoing fees and Expenses or

---

[8]   Restructuring Support Parties will provide summary statements reflecting fees and expenses with topical description, and subject to all privileges.

any part thereof shall not be refundable under any circumstances, regardless of whether the transactions or financings contemplated by this Agreement are consummated, and shall not be creditable against any other amount payable in connection with this Agreement or otherwise; and (z) upon the earlier of the commencement of the Chapter 11 Cases or one (1) business day following execution of this Agreement, to pay to V&E an expense deposit of $250,000, which V&E may apply to the payment of Expenses payable by the Debtors  pursuant to this <u>Section 14</u> from time to time.  Following the commencement of the Chapter 11 Cases, none of the fees and expenses payable pursuant to this paragraph 14 shall be subject to separate approval by the Bankruptcy Court (but the United States Trustee, the Debtors and any official committee may object to the reasonableness of such fees and expenses within ten (10) business days of the receipt of an invoice detailing such fees and expenses, and the Bankruptcy Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto. Promptly following the completion of the ten (10) business day objection period, if no objection is made or following the resolution of any dispute regarding the fees and expenses payable pursuant to this paragraph 14 in the Court, the Debtors shall pay the professional fees and expenses provided for in this paragraph 14 promptly after receipt of monthly invoices therefor.

15.    **Consents and Acknowledgments**. Each Party irrevocably acknowledges and agrees that this Agreement is not and shall not be deemed to be a solicitation for consents to the Plan. The acceptance of the Plan by each of the Restructuring Support Parties will not be solicited until such Parties have received the Disclosure Statement and related ballots in accordance with applicable law, and will be subject to sections 1125, 1126, and 1127 of the Bankruptcy Code.

16.    **Representations and Warranties**.

(a)    Each Restructuring Support Party hereby represents and warrants to the Debtors on a several and not joint basis for itself and not any other person or entity that the following statements are true, correct, and complete to the best of its actual knowledge, as of the date hereof:

(i)    it has the requisite organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

(iii)    the execution, delivery and performance by it of this Agreement does not violate any provision of law, rule, or regulation applicable to it, or its certificate of incorporation,

or bylaws, or other organizational documents in any material respect;

(iv)    subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability;

(v)    it is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended (the "***Securities Act***"), with sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement and to consult with its legal and financial advisors with respect to its investment decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement; and

(vi)    it (A) either (1) is the sole owner of any claims and interests identified below its name on its signature page hereof and in the amounts set forth therein, or (2) has all necessary investment or voting discretion with respect to the principal amount of claims and interests identified below its name on its signature page hereof, and has the power and authority to bind the owner(s) of such claims and interests to the terms of this Agreement; (B) is entitled (for its own accounts or for the accounts of such other owners) to all of the rights and economic benefits of such claims and interests; or (C) does not directly or indirectly own any claims against any Debtor other than as identified below its name on its signature page hereof.

(b)    Each Debtor hereby represents and warrants on a joint and several basis (and not any other person or entity other than the Debtors) that the following statements are true, correct, and complete as of the date hereof:

(i)    it has the requisite corporate or other organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)     the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part, including approval of each of the independent director(s) or manager(s), as applicable, of each of the corporate entities that comprise the Debtors;

(iii)    the execution and delivery by it of this Agreement does not (A) violate its certificates of incorporation, or bylaws, or other organizational documents, or those of any of its affiliates, or (B) result in a breach of, or constitute (with due notice or lapse of time or both) a default (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases or any Debtor's undertaking to implement the Restructuring Transactions through the Chapter 11 Cases) under any material contractual obligation to which it or any of its affiliates is a party;

(iv)     the execution and delivery by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body, other than, for the avoidance of doubt, the actions with governmental authorities or regulatory bodies required in connection with implementation of the Restructuring Transactions;

(v)      subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code and, to the extent applicable, approval by the Bankruptcy Court, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability; and

(vi)     it has sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement, and has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction.

17.    **Survival of Agreement**. (a) Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible restructuring of the Debtors and sale of assets and in contemplation of possible chapter 11 filings by the Debtors and the rights granted in this Agreement are enforceable by each signatory hereto without approval of any court, including the Bankruptcy Court.

(b) Notwithstanding anything to the contrary in this Agreement, and its attachments and schedules including the Term Sheets, but subject to the following proviso, the agreement of the Restructuring Support Parties to pursue and consummate the transactions contemplated in the APA and the Acquisition Term Sheet based upon the agreed upon resulting capital structure of the Purchaser (as described in the Acquisition Term Sheet), by any commercially reasonable means including the Plan, the Designated Assets Sale Order, or a subsequent enforcement of rights and remedies (including foreclosure), shall survive any failure of the Debtors to assume this Agreement or any termination of this Agreement unless otherwise agreed to in writing by the Restructuring Support Parties, and the Restructuring Support Parties agree to cooperate and take commercially reasonable steps to effectuate and consummate such transactions by such means, including the credit bidding of up to the full amount of such of the claims under the DIP Credit Agreement and First Lien Credit Agreement, in the event any other higher and better bids are received by  the Debtors  that could result in an Alternative Transaction (the "***Surviving Obligations***"); *provided* that, the foregoing Surviving Obligations of the Restructuring Support Parties shall terminate and no longer be binding on any party (i) after May 15, 2017, (ii) at the election of the First Lien Lenders, and only after the credit bidding of the full amount the claims under the DIP Credit Agreement and First Lien Credit Agreement (unless HB Parent consents in writing otherwise), if this Agreement was terminated pursuant to Subsection 7(e) and such Alternative Transaction is consummated within 60 days of the Bankruptcy Court entering an order approving same or the date of termination if earlier, during which 60 day period the First Lien Lenders may cooperate to consummate such Alternative Transaction, or Subsection 8(a), (iii) if this Agreement was terminated pursuant to Subsection 7(b) as a result of a conversion or dismissal approved over the objection of the First Lien Lenders that has been prosecuted in good faith by the First Lien Lenders, or (iv) if this Agreement was terminated pursuant to Subsections 7(t) or 7(u) so long as such Restructuring Support Party Termination Event is not a result of any breach of this Agreement by the party seeking to terminate the Surviving Obligations pursuant to this clause (iv)*; provided* further if the Surviving Obligations are terminated under the preceding clause (ii), or clause (iii) as a result of a conversion of the Chapter 11 Cases to Chapter 7 cases, provided that HB Parent and the Purchaser shall not have filed a motion to convert the Chapter 11 Cases, or supported any such motion, any proceeds or consideration received by the First Lien Lenders (or any entity designated by the First Lien Lenders) from the consummation of an Alternative Transaction, and only after the credit bidding of the full amount the claims under the DIP Credit Agreement and First Lien Credit Agreement, whether in the Chapter 11 Cases or, if applicable, any Chapter 7 cases of the Debtors, shall be allocated as between the First Lien Lenders and the Purchaser as follows:

(i)  first, to the First Lien Lenders in an amount equal to the principal amount outstanding under the DIP Credit Agreement as of such date, less the Rolled-Up Loans (as defined

below), together with all accrued and unpaid interest thereon, including any PIK interest, and commitment fees and other amounts due to the First Lien Lenders under the DIP Credit Agreement;[9]

(ii) after the amount set forth in the immediately preceding clause (i) is paid in full, to the First Lien Lenders in an amount equal to (A) the "rolled up" loans under the DIP Credit Agreement of $30 million (the "***Rolled-Up Loans***"),[10] (B) all accrued and unpaid PIK interest thereon and (C) the remainder, if any, of $35 million less the amounts described in the foregoing clauses (A) and (B);

(iii) after the amounts set forth in the immediately preceding clauses (i) and (ii) are paid in full, the next $60 million shall be allocated 78% to the First Lien Lenders and 22% to the Purchaser;

(iv) after the amounts set forth in the immediately preceding clauses (i), (ii) and (iii) are paid in full, the next $60 million shall be allocated 50% to the First Lien Lenders and 50% to the Purchaser; and

(v) after the amounts set forth in the immediately preceding clauses (i), (ii), (iii) and (iv) are paid in full, any remaining proceeds shall be allocated 4.9% to the First Lien Lenders and 95.1% to the Purchaser.

18.     **Settlement Discussions**. The Parties acknowledge that this Agreement, the Plan, and all negotiations relating hereto and thereto are part of a proposed settlement of matters that could otherwise be the subject of litigation. Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, the Term Sheets, this Agreement, the Plan, any related documents, and all negotiations relating hereto and thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

19.     **Relationship Among Parties**. Notwithstanding anything herein to the contrary, the duties and obligations of the Restructuring Support Parties under this Agreement shall be several, not joint. No Party shall have any responsibility by virtue of this Agreement for any trading by any other entity. No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement. The Parties acknowledge that this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Debtors and do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended. No action taken by any Restructuring Support Party pursuant to this Agreement shall be deemed to constitute or to create a

---

[9] The Restructuring Support Parties agree that in the event the Bankruptcy Court does not permit any "roll-up" of loans under the First Lien Credit Agreement into the DIP loans, this shall instead be an amount equal to the principal amount outstanding under the DIP Credit Agreement, plus $2 million, together with all accrued and unpaid interest thereon, including any PIK interest, and commitment fees and other amounts due to the First Lien Lenders under the DIP Credit Agreement, in each case including any interest that would have accrued on such additional $2 million as if it has been outstanding under the DIP Credit Agreement from the Petition Date

[10] If the Bankruptcy Court approves the roll-up of loans under the First Lien Credit Agreement into DIP loans in an amount less than $32 million, the defined term "Rolled-Up Loans" shall mean such lesser amount approved to roll up, less $2 million.

presumption by any of the Parties that the Restructuring Support Parties are in any way acting in concert or as such a "group."

20.     **Specific Performance**. It is understood and agreed by the Parties that money damages may be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

21.     **Governing Law and Jurisdiction**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require or permit the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each Party irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, shall be brought in the federal or state courts located in the City of New York, Borough of Manhattan, and by executing and delivering this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement. By executing and delivering this Agreement, and upon commencement of the Chapter 11 Cases, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court solely for purposes of any action, suit, proceeding, or other contested matter arising out of or relating to this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter.

22.     **Waiver of Right to Trial by Jury**. EACH OF THE PARTIES WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN ANY OF THE PARTIES ARISING OUT OF, CONNECTED WITH, RELATING TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN ANY OF THEM IN CONNECTION WITH THIS AGREEMENT. INSTEAD, ANY DISPUTES RESOLVED IN COURT SHALL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

23.     **Successors and Assigns**. Except as otherwise provided in this Agreement or the Term Sheets, none of the rights or obligations of any Party may be assigned without the consent of the other Parties hereto.  This Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective permitted successors, assigns, heirs, executors, administrators, and representatives.

24.     **No Third-Party Beneficiaries**. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.

25. **Notices**. All notices (including, without limitation, any notice of termination or breach) and other communications from any Party hereunder shall be in writing and shall be deemed to have been duly given if personally delivered by courier service, messenger, email, or facsimile to the other Parties at the applicable addresses below, or such other addresses as may be furnished hereafter by notice in writing. Any notice of termination or breach shall be delivered to all other Parties.

    (a)    If to any Debtor:

Shoreline Energy LLC
Attn:  Toby Hamrick
16801 Greenspoint Park Drive #380
Houston, Texas 77060
Tel:   281-872-0051
Email: toby.hamrick@shorelineenergy.com

*With a copy to:*

Jones Day
Attn:   Tom Howley
717 Texas Suite 3300
Houston, TX 77019
Tel:    832-239-3790
Email: tahowley@jonesday.com

    (b)    If to Morgan Stanley:

To the address set forth on its signature page hereto

*with a copy to*

Simpson Thacher & Bartlett LLP
Attn:   Sandy Qusba
425 Lexington Avenue
New York, NY 10017
Tel:    212.455.3760
Email: squsba@stblaw.com

    (c)    If to HB Parent or the Purchaser:

To the address set forth on its signature page hereto

HPS Investment Partners, LLC
Attn: Jeffrey Fitts
40 West 57th Street, 33rd Floor
New York, NY 10019

Tel: 212.287.4633
Email: jeffrey.fitts@hpspartners.com

*with a copy to*

Vinson & Elkins LLP
Attn:   William L. Wallander
Attn: David S. Meyer
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, TX 75201-2975
Tel:    214.220.7700
Fax:    214.220.7716
Email: bwallander@velaw.com

26.  **Entire Agreement**. This Agreement (including the Exhibits and Schedules) constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

27.  **Amendments**. Except as otherwise provided herein, this Agreement may not be modified, amended, or supplemented without the prior written consent of the Debtors and the Restructuring Support Parties, provided that modifications, amendments or supplements to Subsection 17(b) shall not require the consent of the Debtors.

28.  **Reservation of Rights**. If this Agreement is terminated for any reason, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses, subject to Subsection 17(b) of this Agreement. The Term Sheets, this Agreement, the Plan, and any related document shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.  Nothing in this Agreement, including Subsection 17(b), shall require any Party to provide any financing to the Debtors, including any financing under the DIP Credit Agreement other than as expressly contemplated (and subject to the terms and conditions) thereunder, and nothing in this Agreement, including Subsection 17(b), shall require a Party to consent to the incurrence of any liens or claims that are pari passu or senior to the liens and claims provided to the lenders under the DIP Credit Agreement, other than as contemplated by the DIP Credit Agreement and the DIP Orders.

29.  **Counterparts**. This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument, and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

30.  **Public Disclosure**. This Agreement, as well as its terms, its existence, and the existence of the negotiation of its terms are expressly subject to any existing confidentiality

agreements executed by and among any of the Parties as of the date hereof; *provided*, *however*, that, after the Petition Date, the Parties may disclose the existence of, or the terms of, this Agreement or any other material term of the transaction contemplated herein without the express written consent of the other Parties, including, without limitation, in connection with the filing of the motion seeking the RSA Assumption Order; *provided further*, *however*, that no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Party) the holdings information of any Restructuring Support Party without such Restructuring Support Party's prior written consent.

31.    **Headings**. The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

32.    **Interpretation**. This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof, shall not be effective in regard to the interpretation hereof.

33.    **Construction.** Each Party acknowledges that it has received adequate information to enter into this Agreement and that this Agreement and the Exhibits and Schedules attached hereto have been prepared through the joint efforts of all of the Parties.  Neither the provisions of this Agreement or the Exhibits and Schedules attached hereto nor any alleged ambiguity herein or therein shall be interpreted or resolved against any Party on the ground that such Party's counsel drafted this Agreement or the Exhibits and Schedules attached hereto, or based on any other rule of strict construction.

34.    **Time of Essence**. Time is of the essence in the performance of each of the obligations of the Parties and with respect to all covenants and conditions to be satisfied by the Parties.

*[Signatures and exhibits follow.]*

DEBTORS:

**SHORELINE ENERGY LLC**
**SHORELINE CENTRAL CORPORATION**
**SHORELINE OFFSHORE LLC**
**SHORELINE GP LLC**
**SHORELINE SOUTHEAST LLC**
**SHORELINE EH LLC**
**HARVEST DEVELOPMENT LLC**

Each By: _____
Name: RANDY E. WHEELER
Title: Vice President

**SHORELINE ENERGY PARTNERS, LP**

By:  Shoreline GP LLC, its general partner

By: _____
Name: RANDY E. WHEELER
Title: Vice President

**FIRST LIEN LENDERS:**

**MORGAN STANLEY CAPITAL GROUP INC.**

By: _____

Name:          Brett Humphreys

Title:          Authorized Signatory

Address:

**Principal Amount of Loans Under the
First Lien Credit Agreement:**

$ 150,401,300.00

**HB PARENT:**                          **HPS INVESTMENT PARTNERS, LLC**

By:_____

Name:  Jeffrey Fitts

Title:    Managing Director

## Schedule 1 to Restructuring Support Agreement

### Additional Debtors

1. Shoreline Southeast LLC, a Delaware limited liability company
2. Shoreline Offshore LLC, a Delaware limited liability company
3. Harvest Development LLC, a Delaware limited liability company
4. Shoreline GP LLC, a Delaware limited liability company
5. Shoreline Energy Partners, LP, a Delaware limited partnership
6. Shoreline Central Corporation, a Delaware corporation

*US 4689818v.39*

**Exhibit A-1 to the Restructuring Support Agreement**

**Plan Term Sheet**

# SHORELINE ENERGY LLC

**PLAN TERM SHEET**

This plan term sheet (the "***Term Sheet***"), attached as **Exhibit A-1** to the Restructuring Support Agreement referenced below, sets forth the principal terms and conditions of a proposed chapter 11 plan of Shoreline Energy LLC ("***Shoreline***") Shoreline EH LLC ("***Holdco***"), and each subsidiary of Shoreline and Holdco (the "***Shoreline Subsidiaries***," together with Shoreline and Holdco, the "***Debtors***").[1]   The Debtors intend to file chapter 11 cases in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Bankruptcy Court***") in accordance with the Restructuring Support Agreement.  This Term Sheet is not a complete list of all the terms and conditions of the restructuring transaction contemplated herein and shall not constitute an offer to sell or buy, nor the solicitation of an offer to sell or buy any of the securities referred to herein or the solicitation of acceptances of a chapter 11 plan.  Any such solicitation shall be made only in compliance with any applicable securities laws and chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").  Without limiting the generality of the foregoing, this Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution, and delivery of the Definitive Documentation consistent herewith and the Restructuring Support Agreement.  In the event of an inconsistency between this Term Sheet and the Definitive Documentation, the provisions of the Definitive Documentation shall govern.  This Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions and is entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and other rules of similar import.

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN.  ANY SUCH OFFER OR SOLICITATION WILL ONLY BE MADE IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAWS AND THE BANKRUPTCY CODE.**

**THIS TERM SHEET IS BEING PROVIDED AS PART OF A PROPOSED COMPREHENSIVE COMPROMISE AND SETTLEMENT, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED RESTRUCTURING.  THE STATEMENTS CONTAINED HEREIN ARE PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE, AND NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, WITH A FULL RESERVATION OF ALL RIGHTS, REMEDIES, CLAIMS, AND DEFENSES OF THE FIRST LIEN LENDERS (AS DEFINED BELOW), THE PURCHASER, THE DEBTORS, AND ANY CREDITOR PARTY.**

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Restructuring Support Agreement.

US 4699102v.18

| | |
|---|---|
| **Plan of Liquidation:** | The Debtors will file voluntary petitions commencing cases under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***") no later than November 2, 2016 (the "***Petition Date***"). |
| | The Debtors assets remaining after the sale of the Designated Assets and any Non-Designated Assets will be liquidated and distributed through a pre-arranged chapter 11 plan of liquidation (the "***Plan***") on the terms and subject to the conditions set forth in this Term Sheet and that certain Restructuring Support Agreement dated as of November 2, 2016 between the Debtors, the First Lien Lenders and HB Parent (the "***Restructuring Support Agreement***"). |
| **Effective Date:** | The date the Plan becomes effective (the "***Effective Date***") shall be the date on which all the conditions to consummation of the Plan have been satisfied in full or waived. |
| **The Designated Asset Sale:** | As set forth in the acquisition term sheet attached as **Exhibit A-3** to the Restructuring Support Agreement, the Debtors will sell to the Purchaser or a bidder submitting a higher and better cash offer as an Alternative Transaction pursuant to section 363 of the Bankruptcy Code and an asset purchase agreement (the "***Agreement***") all of the Debtors' right, title and interest in, to and under certain properties ("the "***Designated Assets***") identified by the Purchaser (with the consent of the First Lien Agent) free and clear of any and all liens, encumbrances, claims, and other interests, subject to certain agreed upon title exceptions. The Designated Assets are initially set forth on ***Schedule 1*** of the Acquisition Term Sheet; provided that Schedule 1 of the Acquisition Term Sheet (and the corresponding schedule of Designated Assets in the Agreement) may be revised by the Purchaser and First Lien Lender (by mutual consent) to the extent set forth in the Acquisition Term Sheet.  The capital structure of the Purchaser and the allocation of the credit bid as to particular Designated Assets shall be as set forth in the Acquisition Term Sheet. The Agreement and sale of the Designated Assets shall not be conditioned on consummation of the Plan and the occurrence of the Effective Date, and the Debtors agree to consummate the sale of the Designated Assets pursuant to the Agreement regardless of whether the Plan is confirmed, consummated, or the Effective Date occurs. |
| **The Non-Designated Asset Sales:** | The Debtors will market all of their assets that are not Designated Assets (the "***Non-Designated Assets***") for sale pursuant to section 363 of the Bankruptcy Code free and clear of any and all liens, encumbrances, claims, and other interests and will endeavor to consummate the sale of the Non-Designated Assets on or before the Effective Date.  The sale of the Non-Designated assets will not be conditioned on confirmation or consummation of the Plan. To the extent the Non-Designated Assets are subject to liens securing the DIP |

1

Credit Agreement, the First Lien Credit Agreement or any adequate protection liens granted to the First Lien Lenders or First Lien Agent, such liens shall attach to the sale proceeds of the Non-Designated Assets with the same priority as such liens existed on the Non-Designated Assets; provided, however, that in the event the Cases convert to cases under chapter 7 of the Bankruptcy Code or the Plan is confirmed, such liens shall be subject to the Non-Designated Asset Proceeds Carve-Out (as defined below).

**Current Capital Structure:**

The current capital structure of the Debtors is as follows:

1. Indebtedness under that certain Third Amended and Restated Credit Agreement dated as of October 16, 2015 (as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date, the "***First Lien Facility***"), by and among Shoreline, each of the lenders party thereto, and Morgan Stanley Energy Capital Inc. (in such capacity, the "***First Lien Agent***"), as administrative agent. The First Lien Facility is secured by a first priority lien on substantially all assets of Shoreline and the Guarantors (as defined below).

2. Indebtedness under that certain Second Lien Credit Agreement dated as of September 30, 2013 (the "***Second Lien Facility***") among Shoreline, as the Borrower, the financial institutions as party thereto, including the Purchaser, as lenders, The Bank of Tokyo-Mitsubishi UFJ, Ltd., as administrative agent for such lenders, MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.), as collateral agent, and certain subsidiaries of Shoreline (collectively, the "***Guarantors***").  The Second Lien Facility is secured by a second priority lien on substantially all assets of Shoreline and the Guarantors.

3. Indebtedness under that certain Note Purchase Agreement dated as of September 30, 2014 among Holdco, the purchasers from time to time party thereto, and Sankaty Advisors, LLC (as amended, restated, supplemented or otherwise modified from time to time, the "***Holdco Notes***").

4. Trade and vendor claims.

5. All preferred and common equity interests in Shoreline (the "***Existing Equity***").

**Treatment of Claims and Interests:**

1. **DIP Facility Claims.**  In the event that the Purchaser is the successful bidder for the Designated Assets, the DIP Agent, on behalf of the holders of the DIP Facility Claims will credit bid all of the outstanding obligations under the DIP Credit

2

Agreement, satisfying the Debtors' obligations under the DIP Credit Agreement in full.   In the event of an Alternative Transaction, the holders of DIP Facility Claims will receive cash equal to the amount of such allowed DIP Facility Claim no later than the Effective Date.

2.   **First Lien Facility Claims.** The First Lien Agent will credit bid up to 100% of the claims under the First Lien Credit Facility (the "***First Lien Facility Claims***") to purchase the Designated Assets pursuant to the Agreement, with the Purchaser designated as the owner of such Designated Assets. To the extent less than all First Lien Facility Claims are credit bid, holders of the remaining First Lien Facility Claims will receive the following treatment: Any liens securing such First Lien Facility Claims shall remain attached to the Liquidating Trust Assets (as defined below) and such First Lien Facility Claims shall be paid from the proceeds of the liquidation of the Non-Designated Assets and the liquidation of the applicable Liquidating Trust Assets after payment of the costs of administration of the Liquidating Trust from the proceeds of the Liquidating Trust Assets. Any such proceeds paid to the holders of First Lien Facility Claims shall be transferred to the Purchaser for use as working capital or such other use as the Purchaser deems advisable and in its best interest.   Any unsecured portion of the First Lien Facility Claims shall be treated as General Unsecured Claims.   In the event that an Alternative Transaction is not consummated, the Non-Designated Asset Proceeds Carve-Out shall not be paid to the holders of First Lien Claims and shall instead be available for distribution to other creditors in accordance with the Plan. In the event of an Alternative Transaction, holders of First Lien Facility Claims will receive cash equal to the amount of such First Lien Facility Claims, which shall be allowed in full.

Impaired – Entitled to vote.

3.   **Second Lien Facility Claims.**   Holders of claims under the Second Lien Facility (the "***Second Lien Facility Claims***") shall receive the following treatment: Any liens securing the Second Lien Facility Claims shall remain attached to the Liquidating Trust Assets and the Second Lien Facility Claims shall be paid from any remaining proceeds of the liquidation of such applicable Liquidating Trust Assets after payment of the costs of administration of the Liquidating Trust and after the payment in full of all First Lien Facility Claims full. Any such proceeds paid to any affiliate of HB Parent shall be transferred to the Purchaser for use as working capital or such other use as the

3

Purchaser deems advisable and in its best interest. In the event of an Alternative Transaction, holders of Second Lien Facility Claims will receive a pro rata share of cash from the sale of the Core Assets following the payment of all administrative, priority, DIP Facility Claims and First Lien Facility Claims. Any Second Lien Facility Claims not paid in cash from an Alternative Transaction will receive treatment as a General Unsecured Claim.

Impaired – Entitled to vote.

4. **Other Priority Claims.** Each holder of an allowed priority claim (other than a priority tax claim or administrative claim) shall receive at the election of the Restructuring Support Parties (as defined in the Restructuring Support Agreement) (a) cash equal to the full amount of such allowed priority claim, (b) such other treatment as may otherwise be agreed to by such holder, the Debtors, and the Restructuring Support Parties, or (c) such other treatment as may be permitted under section 1129 of the Bankruptcy Code.

Unimpaired – Deemed to accept.

5. **Other Secured Claims.** Each holder of an allowed secured claim (other than a priority tax claim, DIP Facility Claim, First Lien Facility Claim, or Second Lien Facility Claim) shall receive, at the Debtors' election and with the consent of the Restructuring Support Parties, either (a) cash equal to the full amount of such secured claim, (b) the return or abandonment of the collateral securing such secured claim to such holder, or (c) such other treatment as may otherwise be agreed to by such holder, the Debtors, and the Restructuring Support Parties. Unimpaired – Deemed to accept.

6. **General Unsecured Claims.** Holders of General Unsecured Claims will receive their *pro rata* share of any proceeds from the liquidation of the Liquidating Trust Assets remaining after the payment of the costs of administering the Liquidating Trust and the payment in full of all First Lien Facility Claim and Second Lien Facility Claims.

Impaired – Entitled to vote.

7. **Holdco Notes.** Holders of Holdco Note claims shall receive treatment as a General Unsecured Claim.

Impaired – Entitled to vote.

4

8.    **Equity Interests.** Existing Equity shall be cancelled and extinguished, and holders of Existing Equity shall not receive or retain any property or assets on account of their interests.

Impaired – Deemed to reject.

**Conditions Precedent to the Effective Date:**

The Plan shall contain customary conditions to effectiveness in form and substance to be agreed upon by the Restructuring Support Parties and the Debtors, including, but not limited to:  (a) the Confirmation Order shall have been entered by the Bankruptcy Court and shall have become a final order that is not stayed; and (b) the Definitive Documentation shall be filed or executed, as applicable, and any conditions precedent to the closing of the Agreement shall have been satisfied or waived.

**Releases:**

The Plan shall include, to the fullest extent permitted by applicable law, a full release by the Debtors in favor of the Restructuring Support Parties, the First Lien Agent, any provider of hedges to the Debtors that is an affiliate of the First Lien Agent, all affiliates of HB Parent (including any affiliate that is a lender under the Second Lien Facility) and their respective affiliates, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives from liability for any act or omission in connection with, related to, or arising out of, the Debtors, the Restructuring, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, the consummation of the Agreement, the administration of the Chapter 11 Cases, the property to be distributed under the Plan, and the property transferred pursuant to the Agreement, except for (a) claims resulting from fraud, gross negligence, or willful misconduct as determined by a final order of the Bankruptcy Court and (b) obligations under the Definitive Documentation that arise after the Effective Date.

The Plan shall also include, to the fullest extent permitted by applicable law, a full release by third parties in favor of the Debtors, the Restructuring Support Parties, the First Lien Agent, any provider of hedges to the Debtors that is an affiliate of the First Lien Agent,  and their respective equity holders, affiliates, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives from liability for any act or omission in connection with, related to, or arising out of, the Debtors, the transactions contemplated under the Restructuring Support Agreement, the Chapter 11 Cases, the pursuit of confirmation of the Restructuring, the consummation of the Plan, the consummation of the Agreement, the administration of the Cases, the property to be distributed under the Plan, and the property transferred pursuant to the Agreement, except for (a) claims resulting from fraud, gross

5

negligence, or willful misconduct as determined by a final order of the Bankruptcy Court and (b) obligations under the Definitive Documentation that arise after the Effective Date; *provided, however*, such third parties that vote against the Plan or are deemed to reject the Plan shall have the opportunity to opt out of such releases.

**Injunction and Exculpation:**

The Plan and the Confirmation Order shall include ordinary and customary injunction and exculpation provisions.

**Executory Contracts and Unexpired Leases:**

All executory contracts and unexpired leases will be rejected unless previously assumed and assigned in connection with the sale of the Designated Assets or the Non-Designated Assets.

**Liquidating Trust:**

A liquidating trust (the "***Liquidating Trust***") shall be established on the Effective Date. All assets of the Debtors not sold or abandoned pursuant to an order of the Bankruptcy Court shall be transferred to the Liquidating Trust on the Effective Date (the "***Liquidating Trust Assets***"). The Liquidating Trust Assets shall include cash in an amount to be agreed by the Debtors and the Restructuring Support Parties that will fund the administration of the Liquidation Trust plus an amount equal to 50% of the sale proceeds of the Non-Designated Assets up to a maximum amount to be determined by the Debtors and the Restructuring Support Parties (the "***Non-Designated Asset Proceeds Carve-Out***").

**Other Provisions:**

Other provisions set forth in the Plan and any related disclosure statement shall be reasonably acceptable to the Restructuring Support Parties and the Debtors; *provided, however*, no provision in the Plan or any related disclosure statement shall be materially inconsistent with the terms in this Term Sheet.

6

**Exhibit A-2 to the Restructuring Support Agreement**

**DIP Credit Agreement**

**$50,000,000**

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

Among

SHORELINE EH LLC,
A DEBTOR AND DEBTOR-IN-POSSESSION,

SHORELINE ENERGY LLC,
A DEBTOR AND DEBTOR-IN-POSSESSION
as Borrower,

**THE LENDERS PARTY HERETO FROM TIME TO TIME**

as Lenders,

**MORGAN STANLEY ENERGY CAPITAL INC.,**

as Administrative Agent and Sole Lead Arranger,

[_____], 2016

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ........................................................ 2

    Section 1.01   Certain Defined Terms......................................................... 2
    Section 1.02   Computation of Time Periods ........................................... 24
    Section 1.03   Accounting Terms; Changes in GAAP.............................. 24
    Section 1.04   Miscellaneous .................................................................. 24

ARTICLE II CREDIT FACILITIES ........................................................................................ 25

    Section 2.01   Commitment for Advances ............................................... 25
    Section 2.02   [Reserved].......................................................................... 25
    Section 2.03   Method of Borrowing ...................................................... 25
    Section 2.04   Reduction of the Commitments ....................................... 26
    Section 2.05   Prepayment of Advances ................................................. 27
    Section 2.06   Repayment of Advances .................................................. 28
    Section 2.07   [Reserved].......................................................................... 28
    Section 2.08   Fees .................................................................................. 29
    Section 2.09   Interest.............................................................................. 29
    Section 2.10   Payments and Computations ........................................... 30
    Section 2.11   Sharing of Payments, Etc. ............................................... 31
    Section 2.12   Breakage Costs ................................................................ 31
    Section 2.13   Increased Costs ................................................................ 32
    Section 2.14   Taxes ............................................................................... 33
    Section 2.15   Designation of Different Lending Office.......................... 37
    Section 2.16   Defaulting Lender ........................................................... 37
    Section 2.17   Priority and Liens............................................................ 38
    Section 2.18   Payment of Obligations................................................... 39
    Section 2.19   No Discharge ................................................................... 39
    Section 2.20   Incremental Facility ........................................................ 39

ARTICLE III CONDITIONS ................................................................................................... 39

    Section 3.01   Conditions Precedent to Initial Borrowings...................... 39
    Section 3.02   Conditions Precedent to All Borrowings .......................... 42

Article IV REPRESENTATIONS AND WARRANTIES ......................................................... 43

    Section 4.01   Existence; Subsidiaries .................................................... 43
    Section 4.02   Power; No Violation ........................................................ 43
    Section 4.03   Authorization and Approvals........................................... 44
    Section 4.04   Enforceable Obligations................................................... 44
    Section 4.05   Financial Statements ....................................................... 44
    Section 4.06   True and Complete Disclosure......................................... 45
    Section 4.07   Litigation; Compliance with Laws................................... 45
    Section 4.08   Use of Proceeds............................................................... 45

# TABLE OF CONTENTS
### (continued)

Section 4.09 Investment Company Act ................................................................... 45
Section 4.10 Federal Power Act ............................................................................. 45
Section 4.11 Taxes ................................................................................................. 46
Section 4.12 Pension Plans ..................................................................................... 46
Section 4.13 Condition of Property; Casualties; Oil and Gas Properties ..................... 47
Section 4.14 No Burdensome Restrictions; No Defaults or Events of Default ............ 47
Section 4.15 Environmental Condition ..................................................................... 48
Section 4.16 Permits, Licenses, Etc. ....................................................................... 48
Section 4.17 [Reserved] .......................................................................................... 49
Section 4.18 Liens; Titles, Leases, Etc. .................................................................. 49
Section 4.19 Insurance ............................................................................................ 49
Section 4.20 Hedging Agreements ........................................................................... 49
Section 4.21 Material Agreements ........................................................................... 49
Section 4.22 Foreign Operations .............................................................................. 49
Section 4.23 Location of Business and Offices ......................................................... 49
Section 4.24 Gas Imbalances; Prepayments ............................................................. 50
Section 4.25 Marketing of Production ...................................................................... 50
Section 4.26 Loan Documents ................................................................................. 50
Section 4.27 OFAC ................................................................................................ 50
Section 4.28 Anti-Terrorism Laws .......................................................................... 50
Section 4.29 Money Laundering .............................................................................. 51
Section 4.30 Foreign Corrupt Practices ................................................................... 51

ARTICLE V AFFIRMATIVE COVENANTS ................................................................. 51

Section 5.01 Compliance with Laws, Etc. ................................................................ 52
Section 5.02 Maintenance of Insurance .................................................................... 52
Section 5.03 Preservation of Existence, Etc. ........................................................... 53
Section 5.04 Payment of Taxes, Etc. ....................................................................... 53
Section 5.05 Visitation and Review Rights .............................................................. 53
Section 5.06 Reporting Requirements ...................................................................... 54
Section 5.07 Maintenance of Property ..................................................................... 59
Section 5.08 Agreement to Pledge; Additional Guarantors ....................................... 59
Section 5.09 Use of Proceeds .................................................................................. 60
Section 5.10 Title Evidence and Opinions ............................................................... 60
Section 5.11 Further Assurances; Cure of Title Defects ............................................ 61
Section 5.12 [Reserved] .......................................................................................... 61
Section 5.13 Leases; Development and Maintenance .................................................. 61
Section 5.14 Deposit Accounts and Securities Accounts ............................................ 62
Section 5.15 Environmental Matters ......................................................................... 62
Section 5.16 Marketing Activities ........................................................................... 63
Section 5.17 Patriot Act, OFAC, FCPA ................................................................... 64

ARTICLE VI NEGATIVE COVENANTS ..................................................................... 64

Section 6.01 Liens, Etc. .......................................................................................... 64

Error! Unknown document property name.

# TABLE OF CONTENTS

(continued)

Page

Section 6.02    Debts, Guaranties, and Other Obligations ............................................... 65
Section 6.03    Agreements Restricting Liens and Distributions ..................................... 66
Section 6.04    Merger or Consolidation; Asset Sales...................................................... 67
Section 6.05    Restricted Payments................................................................................ 67
Section 6.06    Investments ............................................................................................. 67
Section 6.07    Affiliate Transactions.............................................................................. 68
Section 6.08    Compliance with ERISA......................................................................... 68
Section 6.09    Sale-and-Leaseback ................................................................................ 69
Section 6.10    Change of Business; Accounting Change................................................ 69
Section 6.11    Organizational Documents, Name Change.............................................. 69
Section 6.12    Use of Proceeds....................................................................................... 70
Section 6.13    Gas Imbalances, Take-or-Pay or Other Prepayments ............................. 70
Section 6.14    Hedging Requirements............................................................................ 70
Section 6.15    Additional Subsidiaries .......................................................................... 70
Section 6.16    Account Payables.................................................................................... 70
Section 6.17    Environmental Matters............................................................................ 71
Section 6.18    Anti-Terrorism Laws .............................................................................. 71
Section 6.19    Budget Variance...................................................................................... 71
Section 6.20    Superpriority Claims ............................................................................... 71

Article VII EVENTS OF DEFAULT; REMEDIES ............................................................ 72

Section 7.01    Events of Default .................................................................................... 72
Section 7.02    Acceleration of Maturity......................................................................... 76
Section 7.03    [Reserved]............................................................................................... 77
Section 7.04    Right of Set-off ....................................................................................... 77
Section 7.05    Non-exclusivity of Remedies.................................................................. 77
Section 7.06    Application of Proceeds .......................................................................... 77

Article VIII THE ADMINISTRATIVE AGENT ............................................................... 78

Section 8.01    Appointment; Powers.............................................................................. 78
Section 8.02    Duties and Obligations of Administrative Agent.................................... 78
Section 8.03    Action by Administrative Agent.............................................................. 79
Section 8.04    Reliance by Administrative Agent........................................................... 80
Section 8.05    Subagents ................................................................................................ 80
Section 8.06    Resignation of Administrative Agent...................................................... 80
Section 8.07    Administrative Agent as Lender .............................................................. 81
Section 8.08    No Reliance ............................................................................................. 81
Section 8.09    [Reserved]............................................................................................... 81
Section 8.10    Indemnification ....................................................................................... 81
Section 8.11    Collateral Matters.................................................................................... 82
Section 8.12    No Other Duties, Etc................................................................................ 83

ARTICLE IX MISCELLANEOUS ...................................................................................... 83

Error! Unknown document property name.

## TABLE OF CONTENTS
(continued)

**Page**

Section 9.01   Amendments, Etc. .................................................................... 83
Section 9.02   Notices, Etc. ........................................................................... 84
Section 9.03   No Waiver; Remedies ............................................................... 84
Section 9.04   Costs and Expenses .................................................................. 84
Section 9.05   Binding Effect ......................................................................... 85
Section 9.06   Lender Assignments and Participations....................................... 85
Section 9.07   Indemnification; Waiver ........................................................... 89
Section 9.08   Execution in Counterparts.......................................................... 91
Section 9.09   Survival of Representations, Etc. ............................................... 92
Section 9.10   Severability ............................................................................. 92
Section 9.11   Governing Law; Submission to Jurisdiction................................. 92
Section 9.12   WAIVER OF JURY TRIAL........................................................ 93
Section 9.13   USA Patriot Act ....................................................................... 93
Section 9.14   ORAL AGREEMENTS.............................................................. 93
Section 9.15   Acknowledgement and Consent to Bail-In of EEA Financial
                Institutions............................................................................... 93
Section 9.16   Confidentiality ......................................................................... 94

Error! Unknown document property name.

## TABLE OF CONTENTS
### (continued)

**Page**

**EXHIBITS:**

| Exhibit A | - | Form of Assignment and Acceptance |
| Exhibit B | - | Form of Guaranty |
| Exhibit C | - | Form of Note |
| Exhibit D | - | Form of Notice of Borrowing |
| Exhibit E | - | Form of Tax Forms |
| Exhibit F | - | Form of Increased Facility Activation Notice |
| Exhibit G | - | Form of Interim DIP Order |
| Exhibit H | - | Form of Initial Budget |

**SCHEDULES:**

| Schedule I | - | Notice Information and Commitments |
| Schedule 1.01 | - | Oil and Gas Properties |
| Schedule 4.01 | - | Subsidiaries of Borrower |
| Schedule 4.07 | - | Litigation |
| Schedule 4.20 | - | Hedge Contracts |
| Schedule 4.21 | - | Material Agreements |
| Schedule 4.24 | - | Gas Imbalances; Prepayments |
| Schedule 4.25 | - | Marketing of Production |
| Schedule 6.01 | - | Existing Liens |
| Schedule 6.02 | - | Existing Debt |

Error! Unknown document property name.

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This Debtor-in-Possession Credit Agreement dated as of [_____], 2016, is among Shoreline EH LLC, a Delaware limited liability company ("Holdco"), and Shoreline Energy LLC, a Delaware limited liability company ("Borrower"), each of which is a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (as defined below), the Lenders (as defined below), and Morgan Stanley Energy Capital Inc., as administrative agent for such Lenders.

A.      Reference is made to that certain (a) Third Amended and Restated Credit Agreement, dated as of October 16, 2015 (as amended, supplemented, restated or otherwise modified prior to the date hereof, the "Existing Credit Agreement"), among the Borrower, the lenders and other parties from time to time party thereto (the "Existing Lenders") and Morgan Stanley Energy Capital, Inc., as administrative agent (in such capacity, the "Existing Administrative Agent") and (b) Forbearance Agreement, dated as of July 5, 2016, in respect of the Existing Credit Agreement (as amended, supplemented or otherwise modified prior to the date hereof, the "Forbearance Agreement").

B.      On November 2, 2016 (the "Petition Date"), Holdco, the Borrower and all their respective Subsidiaries (collectively, the "Debtors") filed voluntary petitions to commence cases (the "Chapter 11 Cases") under Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas Houston Division (the "Bankruptcy Court") and continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

C.      In connection with the Chapter 11 Cases, the Borrower has requested that the Lenders provide a senior secured debtor-in-possession credit facility (the "DIP Facility") in an aggregate principal amount not to exceed $50 million, of which $32 million consists of Existing Advances outstanding under the Existing Credit Agreement and, upon entry of the Final Order, shall be deemed funded and outstanding hereunder.

D.      The Lenders have agreed to provide the DIP Facility upon the terms and conditions set forth herein.

E.      To provide guarantees and security for the repayment of the Loans and the payment of the other Obligations of the Borrower hereunder and under the other Loan Documents, the Debtors are providing to the Administrative Agent and the Lenders, pursuant to this Agreement, the Guaranty Agreement and the DIP Order, the following (each as more fully described herein, in the DIP Order and subject to the qualifications set forth herein and in the DIP Order):

(i)      a guarantee from each of the Guarantors of the due and punctual payment and performance of the Obligations of the Borrower hereunder;

(ii)      with respect to the Obligations of the Loan Parties hereunder and under the other Loan Documents, the Superpriority Claims (subject to the Carve-Out);

(iii)     pursuant to Section 364(c)(2) of the Bankruptcy Code, a perfected first priority lien on, and security interest in, all present and after-acquired property of the Debtors not subject to a valid, perfected and non-avoidable lien or security interest in existence on the Petition Date or to a valid lien in existence on the Petition Date that is perfected subsequent to the Petition Date as permitted by Bankruptcy Code Section 546(b) (including, on and after the entry of the Final Order, the Borrower's and the Guarantors' rights in respect of avoidance actions under the Bankruptcy Code and the proceeds thereof), in each case, subject to the Carve-Out;

(iv)     pursuant to Section 364(c)(3) of the Bankruptcy Code, except as provided in the immediately following clause (v), a perfected junior lien on, and security interest in, all present and after-acquired property of the Debtors that is otherwise subject to a valid, perfected and non-avoidable lien or security interest in existence on the Petition Date or a valid lien in existence on the Petition Date that is perfected subsequent to the Petition Date as permitted by Bankruptcy Code Section 546(b), in each case, subject to the Carve-Out; and

(v)     pursuant to Section 364(d)(1) of the Bankruptcy Code, a perfected first priority priming lien on, and security interest in, all Prepetition Collateral (as defined in the DIP Order) to the extent of the security interests in, and liens on, the Prepetition Collateral of the Prepetition Secured Parties (as defined in the DIP Order), subject to the Carve-Out.

F.     All of the claims and the Liens granted hereunder and pursuant to the Guaranty Agreement and the DIP Order in the Chapter 11 Cases to the Administrative Agent, the Lenders and the other Secured Parties shall be subject to the Carve-Out and Permitted Subject Liens, but in each case only to the extent provided in <u>Section 2.17</u> and the DIP Order.

G.     Pursuant to terms of the DIP Order, all Obligations will be secured by valid perfected Liens on substantially all of Borrower's and each Guarantor's assets, having the priorities set forth in the DIP Order, subject to the Carve-Out.

H.     In consideration of the mutual covenants and agreements herein contained and of the loans, extensions of credit and commitments hereinafter referred to, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

Section 1.01   <u>Certain Defined Terms</u>.   As used in this Agreement, the terms defined above shall have the meanings set forth therein and the following terms shall have the following meanings (unless otherwise indicated, such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"<u>Acceptable Plan</u>" means a plan of reorganization consistent in all material respects with the terms of the Restructuring Support Agreement.

Error! Unknown document property name.

"<u>Acceptable Security Interest</u>" in any Property means a Lien which (a) exists in favor of the Administrative Agent for the benefit of the Secured Parties, (b) is superior to all Liens or rights of any other Person in the Property encumbered thereby, other than Permitted Subject Liens and the Carve-Out, (c) secures the Obligations, and (d) is perfected and enforceable, in each case as set forth in the DIP Order.

"<u>Account Control Agreement</u>" shall mean, as to any Deposit Account or Securities Account of any Loan Party held with a bank or a securities intermediary, as applicable, an agreement or agreements in form and substance reasonably acceptable to the Administrative Agent, among the applicable Loan Party owning such Deposit Account or Securities Account, the Administrative Agent and such other bank or securities intermediary governing such Deposit Account or Securities Account.

"<u>Acquisition</u>" means any transaction or series of related transactions that result in, directly or indirectly, the purchase by the Borrower, any Guarantor or any of their respective Subsidiaries of any Person or business or division of a Person, including the purchase of all or substantially all of the associated assets or operations or of stock (or other ownership interests) of a Person (other than of a wholly-owned Subsidiary of the Borrower) and including the purchase of more than 50% of any class of Voting Securities or similar ownership combination.

"<u>Administrative Agent</u>" means MSECI in its capacity as administrative agent pursuant to <u>Article VIII</u>, and any successor agent pursuant to <u>Section 8.06</u>.

"<u>Administrative Questionnaire</u>" means an administrative questionnaire in a form supplied by the Administrative Agent or such other form provided by a Lender and acceptable to the Administrative Agent.

"<u>Advance</u>" means an advance by a Lender to the Borrower pursuant to <u>Section 2.01(a)</u> as part of a Borrowing and refers to a Eurodollar Rate Advance.

"<u>Affiliate</u>" means, as to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person or any Subsidiary of such Person.  The term "control" (including the terms "controlled by" or "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of a Control Percentage, by contract, or otherwise.

"<u>Aggregate Net Operating Expenditures</u>" means the Aggregate Operating Expenditures, less general and administrative expenses of the Debtors.

"<u>Aggregate Operating Expenditures</u>" means disbursements of the Debtors, including capital expenditures, in the ordinary course of business, other than disbursements on account of Aggregate Professional Fees, deposits made to utilities pursuant to an order of the Bankruptcy Court, checks outstanding on the Petition Date that are re-issued in accordance with an order of the Bankruptcy Court, adequate protection or fees paid in accordance with the DIP Orders, and interest and fees paid in accordance with this Agreement.

Error! Unknown document property name.

"Aggregate Professional Fees" means the aggregate amount of all fees and expenses of professionals retained by the Debtors, Committee Fees and all other professionals with respect to which the Debtors are responsible for payment or reimbursement (other than any such fees and expenses payable pursuant to this Agreement).

"Aggregate Total Receipts" means all cash or other collections received from operations in the ordinary course of business, excluding, in each case, the effect of changes in commodity prices, Extraordinary Cash Proceeds and the proceeds of any Advances.

"Agreement" means this Debtor-in-Possession Credit Agreement, as the same may be further amended, supplemented, restated, and otherwise modified from time to time.

"Anti-Terrorism Laws" has the meaning specified in Section 4.28.

"Applicable Margin" means, with respect to any Advance, (a) during any time when an Event of Default exists, 3% per annum plus the rate per annum set forth in clause (b) below, and (b) at any other time, a rate per annum equal to 9%.  The Applicable Margin for any Advance shall change when and as any such Event of Default commences or terminates.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignment and Acceptance" means an assignment and acceptance entered into by a Lender and an Eligible Assignee, and accepted by the Administrative Agent, in substantially the form of the attached Exhibit A.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" has the meaning assigned to such term in the recitals hereto.

"Bankruptcy Court" has the meaning assigned to such term in the recitals hereto.

"Borrowing" means a borrowing consisting of Advances made on the same day by the Lenders pursuant to Section 2.01(a).

"Budget" means (a) initially, a 13-week forecast of receipts and disbursements (for the 13 weeks commencing on the Petition Date) of the Debtors on a consolidated basis, broken down by week, including (i) individual line items for "Aggregate Total Receipts," "Aggregate Operating Expenditures," "Aggregate Net Operating Expenditures," and "Aggregate Professional Fees," and (ii) anticipated uses of the DIP Facility for such period in the form

attached hereto as Exhibit H (the "Initial Budget"), and (b) thereafter, at the end of the then 13-week period (or such earlier time as may be agreed to by the Administrative Agent and the Borrower) while the DIP Facility is outstanding, an updated 13-week forecast of receipts and disbursements, in the form of the Initial Budget, for the subsequent 13-week period (which in each case the substance of which must be reasonably acceptable to the Administrative Agent) (a "13-week Projection"); provided, that upon approval of any revised budget by the Administrative Agent pursuant to Section 5.06(d), such revised budget shall thereafter constitute the Budget (as such budget shall be modified pursuant to Section 5.06(d)).

"Budget Certificate" has the meaning assigned to such term in Section 5.06(d).

"Business Day" means a day of the year on which banks are not required or authorized to close in New York, New York and, on which dealings are carried on by banks in the London interbank market.

"Capital Leases" means, as applied to any Person, any lease of any Property by such Person as lessee which would, in accordance with GAAP, be required to be classified and accounted for as a capital lease on the balance sheet of such Person.

"Carve-Out" has the meaning assigned to such term in the DIP Order.

"Casualty Event" means the damage, destruction or condemnation, including by process of eminent domain or any transfer or disposition of property in lieu of condemnation, as the case may be, of property of any Person or any of its Subsidiaries.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, state and local analogs, and all rules and regulations and requirements thereunder in each case as now or hereafter in effect.

"Change in Control" means the occurrence of any of the following:  (a) a purchase or acquisition, directly or indirectly, by any "person" or "group" within the meaning of Section 13(d)(3) and 14(d)(2) of the Securities and Exchange Act of 1934 (a "Group") of "beneficial ownership" (as such term is defined in Rule 13d-3 under the Securities and Exchange Act of 1934) of securities of Holdco which, together with any securities owned beneficially by any "affiliates" or "associates" of such Group (as such terms are defined in Rule 12b-2 under the Securities and Exchange Act of 1934), shall represent more than thirty percent (30%) of the combined voting power of Holdco's Voting Securities which are outstanding on the date immediately prior to the date of such purchase or acquisition; (b) the first day on which a majority of the directors (or managers, in the case of a limited liability company) of Holdco are not Continuing Directors; (c) a change of senior management that is not reasonably acceptable to the Administrative Agent and the Majority Lenders; or (d) Holdco shall cease to own and control, of record and beneficially, directly, 100% of each class of outstanding capital stock of the Borrower.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any Legal Requirement, (b) any change in any Legal Requirement or in the administration, interpretation, implementation or application thereof by any Governmental Authority, or (c) the making or issuance of any request, guideline

Error! Unknown document property name.

or directive (whether or not having the force of law) by any Governmental Authority; <u>provided</u> that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith or in implementation thereof, and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "<u>Change in Law</u>", regardless of the date enacted, adopted or issued.

"<u>Chapter 11 Cases</u>" has the meaning assigned to such term in the recitals hereto.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended, and any successor statute.

"<u>Collateral</u>" means all "DIP Collateral" as defined in the DIP Order.

"<u>Commitment</u>" means the amount set opposite such Lender's name on <u>Schedule I</u> hereof as its Commitment, or if such Lender has entered into any Assignment and Acceptance, as set forth for such Lender as its Commitment in the Register maintained by the Administrative Agent pursuant to <u>Section 9.06(b)(iv)</u>, as such amount may be (x) increased pursuant to Section 2.20 or (y) reduced or terminated pursuant to <u>Section 2.04</u> or <u>Article VII</u> or otherwise under this Agreement. The aggregate amount of the Commitments on the date hereof is $46,000,000 which, for avoidance of doubt, (x) includes Commitments in an amount equal to the principal amount of the Existing Advances and (y) may be increased by the Incremental Commitment provided from time to time by the Lenders in their sole discretion pursuant to Section 2.20.

"<u>Commitment Fee</u>" has the meaning assigned to such term in Section 2.08(a).

"<u>Commitment Termination Date</u>" means the earliest to occur of (a) the Maturity Date, (b) the effective date of a plan of reorganization in the Chapter 11 Cases and (c) the earlier termination in whole of the Commitments pursuant to <u>Section 2.04</u> or <u>Article VII</u>.

"<u>Committee Fees</u>" means any fees payable to professionals retained by any committee of unsecured creditors in the Chapter 11 Cases.

"<u>Confidential Information</u>" means all information received or derived from information received from any Loan Party relating to any Loan Party or their respective businesses or assets, other than any such information that is available on a non-confidential basis prior to disclosure by such Loan Party, provided that such information is clearly identified at the time of delivery as confidential.

"<u>Connection Income Taxes</u>" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"<u>Continuing Directors</u>" means any director or manager of Holdco who is a director or manager of Holdco as of the Effective Date.

"Control Percentage" means, with respect to any Person, the percentage of the outstanding Equity Interest (including any options, warrants or similar rights to purchase such Equity Interest) of such Person having ordinary voting power which gives the direct or indirect holder of such Equity Interest the power to elect a majority of the board of directors (or other applicable governing body) of such Person. For the purposes of this definition, and without limiting the generality of the foregoing, any Person that owns directly or indirectly 30% or more of the Equity Interests having ordinary voting power for the election of the directors or other governing body of a Person (other than as a limited partner of such other Person) will be deemed to hold a "Control Percentage" of such other Person.

"Controlled Group" means all members of a controlled group of corporations and all businesses (whether or not incorporated) under common control which, together with the Borrower, are treated as a single employer under Section 414 of the Code.

"Credit Extension" means an Advance made by any Lender.

"Debt", for any Person, means without duplication:

(a)     indebtedness of such Person for borrowed money;

(b)     obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(c)     obligations of such Person to pay the deferred purchase price of Property or services (including, without limitation, obligations that are non-recourse to the credit of such Person but are secured by the assets of such Person, but excluding trade accounts payable outstanding for no more than ninety days (provided that for the avoidance of doubt that any trade payables or other accounts payable outstanding longer than ninety days shall constitute "Debt" for purposes of this definition to the extent that such account is not being disputed in good faith with adequate reserves under GAAP established));

(d)     obligations of such Person as lessee under Capital Leases and obligations of such Person in respect of synthetic leases;

(e)     obligations of such Person under letters of credit and agreements relating to the issuance of letters of credit or acceptance financing;

(f)     net obligations of such Person under any individual Hedge Contract;

(g)     obligations of such Person owing in respect of redeemable preferred stock or other preferred Equity Interest of such Person;

(h)     any obligations of such Person owing in connection with any volumetric or production prepayments;

Error! Unknown document property name.

(i)      obligations of such Person under direct or indirect guaranties in respect of, and obligations (contingent or otherwise) of such Person to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (a) through (h) above;

(j)      indebtedness or obligations of others of the kinds referred to in clauses (a) through (i) above secured by any Lien on or in respect of any Property of such Person; and

(k)      all liabilities of such Person in respect of unfunded vested benefits under any Plan.

"Debtor Relief Laws" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means (a) an Event of Default or (b) any event or condition which with notice or lapse of time or both would become an Event of Default.

"Defaulting Lender" means, subject to Section 2.16, any Lender that (a) has failed to (i) fund all or any portion of the Advances required to be funded by it hereunder within two Business Days of the date such Advances were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund an Advance hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law or Bail-in Action, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, or assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the FDIC or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result

-8-

in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to the Borrower and each Lender.

"Deposit Account" shall have the meaning given to the term in the Uniform Commercial Code (or any successor statute), as adopted and in force in the State of New York or, when the laws of any other state govern the method or manner of the perfection or enforcement of any Lien in any of the Collateral, the Uniform Commercial Code (or any successor statute) of such other state.

"DIP Facility" has the meaning assigned to such term in the recitals hereto.

"DIP Order" means the Interim Order and, upon entry thereof, the Final Order.

"Disposition" or "Dispose" means any sale, lease, transfer, assignment, farm-out, conveyance, or other disposition of any Property (including any working interest, overriding royalty interest, production payments, net profits interest, royalty interest, or mineral fee interest).

"Dollars" and "$" means lawful money of the United States of America.

"EEA Financial Institution" means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the first date upon which all conditions in Section 3.01 have been satisfied or waived.

"Eligible Assignee" has the meaning specified in Section 9.06(b).

"Engineering Report" means either an Independent Engineering Report or an Internal Engineering Report.

Error! Unknown document property name.

"Environment" or "Environmental" shall have the meanings set forth in 42 U.S.C. 9601(8).

"Environmental Claim" means any third party (including governmental agencies and employees) action, lawsuit, claim, demand, regulatory action or proceeding, order, decree, consent agreement or notice of potential or actual responsibility or violation (including claims or proceedings under the Occupational Safety and Health Acts or similar laws or requirements relating to health or safety of employees) which seeks to impose liability under any Environmental Law.

"Environmental Law" means, as to the Borrower, the Guarantors or their respective Subsidiaries, all Legal Requirements or common law theories applicable to the Borrower, the Guarantors or their respective Subsidiaries arising from, relating to, or in connection with the Environment, health, or safety, including without limitation CERCLA, relating to (a) pollution, contamination, injury, destruction, loss, protection, cleanup, reclamation or restoration of the air, surface water, groundwater, land surface or subsurface strata, or other natural resources; (b) solid, gaseous or liquid waste generation, treatment, processing, recycling, reclamation, cleanup, storage, disposal or transportation; (c) exposure to pollutants, contaminants, hazardous, or toxic substances, materials or wastes; (d) the safety or health of employees; or (e) the manufacture, processing, handling, transportation, distribution in commerce, use, storage or disposal of hazardous or toxic substances, materials or wastes.

"Environmental Permit" means any permit, license, order, approval, registration or other authorization under Environmental Law.

"Equity Interest" means with respect to any Person, any shares, interests, participation, or other equivalents (however designated) of corporate stock, membership interests or partnership interests (or any other ownership interests) of such Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Eurocurrency Liabilities" has the meaning assigned to that term in Regulation D of the Federal Reserve Board (or any successor), as in effect from time to time.

"Eurodollar Base Rate" means, for any date of determination, the greater of (a) 0.00% and (b) the rate (rounded upwards, if necessary, to the next 1/100 of 1%) appearing on the applicable Reuters screen (or on any successor or substitute screen of such service, or any successor to or substitute for such service, providing rate quotations comparable to those currently provided on such screen of such service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 A.M., London time, two Business Days prior to such date of determination, as the rate for dollar deposits with a maturity of three months.  In the event that such rate is not available at such time for any reason, then the

Error! Unknown document property name.

"Eurodollar Base Rate" with respect to such Advance shall be the rate (rounded upwards, if necessary, to the next 1/100 of 1%) at which dollar deposits of an amount comparable to such Advance and for a maturity of three months are offered by the principal London office of the Administrative Agent (or such other commercial bank reasonably selected by the Administrative Agent) in immediately available funds in the London interbank market at approximately 11:00 A.M., London time, two Business Days prior to such date of determination.

"Eurodollar Rate" means for purposes of determining the rate applicable for any Interest Period with respect to any Eurodollar Rate Advance, a rate per annum equal to the greater of 1% per annum and the rate per annum determined by the Administrative Agent (which determination shall be conclusive in the absence of manifest error) pursuant to the following formula:

$$\text{Eurodollar Rate} = \frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurodollar Rate Reserve Percentage}}$$

"Eurodollar Rate Advance" means an Advance which bears interest as provided in Section 2.09(a).

"Eurodollar Rate Reserve Percentage" of any Lender for the Interest Period for any Eurodollar Rate Advance means the reserve percentage applicable during such Interest Period (or if more than one such percentage shall be so applicable, the daily average of such percentages for those days in such Interest Period during which any such percentage shall be so applicable) under regulations issued from time to time by the Federal Reserve Board for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental, or other marginal reserve requirement) for such Lender with respect to liabilities or assets consisting of or including Eurocurrency Liabilities having a term equal to such Interest Period.

"Event of Default" has the meaning specified in Section 7.01.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in an Advance or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Advance or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.15) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.14, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in an Advance or Commitment or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.14(g) and (d) any U.S. federal withholding Taxes imposed under FATCA.

Error! Unknown document property name.

"<u>Executive Order</u>" has the meaning specified in Section <u>4.28</u>.

"<u>Existing Administrative Agent</u>" has the meaning assigned to such term in the recitals hereto.

"<u>Existing Advances</u>" has the meaning specified in Section 2.01(a).

"<u>Existing Credit Agreement</u>" has the meaning assigned to such term in the recitals hereto.

"<u>Existing Lenders</u>" has the meaning assigned to such term in the recitals hereto.

"<u>Extraordinary Cash Proceeds</u>" means (a) with respect to any Disposition of assets, all cash and Liquid Investments received by the Borrower, any Guarantor or any of their respective Subsidiaries from such Disposition after payment of, or provision for, all estimated cash taxes attributable to such Disposition and payable by the Borrower, such Guarantor or such Subsidiary, and other out of pocket fees and expenses actually incurred by the Borrower, such Guarantor or such Subsidiary directly in connection with such Disposition, (b) with respect to any settlement or litigation proceeding, the proceeds of such settlement or litigation proceeding after payment of all out of pocket fees and expenses actually incurred in connection with such settlement or proceeding, (c) with respect to any Casualty Event, the insurance proceeds or award or other compensation as a result of a Casualty Event after payment of all out of pocket fees and expenses actually incurred by the applicable Loan Party to receive such proceeds, and (d) with respect to any novation, assignment, unwinding, termination, or amendment of any hedge position or any other Hedge Contract, the sum of the cash and Liquid Investments received by the Borrower, any Guarantor or any of their respective Subsidiaries in connection with such transaction after giving effect to any netting agreements.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to such intergovernmental agreement.

"<u>FCPA</u>" means the Foreign Corrupt Practices Act of 1977, as amended.

"<u>Federal Funds Rate</u>" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for any such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

Error! Unknown document property name.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System or any of its successors.

"Final Order" means the final order of the Bankruptcy Court authorizing and approving the Debtors' entry into and performance under the DIP Facility on a final basis, including the granting of the Liens and Superpriority Claims in respect of the DIP Facility in favor of the Administrative Agent and the Secured Parties, in substantially the form of the Interim Order, with such changes as the Administrative Agent and the Majority Lenders reasonably approve.

"Final Order Entry Deadline" means, as to the Final Order, entry thereof by the Bankruptcy Court on or before the date that is thirty days following the entry of the Interim Order, unless such date is extended with the consent of the Administrative Agent and the Majority Lenders.

"Financial Statements" means the audited financial statements of Holdco and its consolidated Subsidiaries, including the audited consolidated balance sheet, as of the fiscal year ended December 31, 2013, December 31, 2014 and December 31, 2015 and the related audited consolidated statements of income, cash flow, and retained earnings of Holdco and its consolidated Subsidiaries, in each case, for the fiscal year then ended, copies of which have been delivered to the Administrative Agent and the Lenders.

"Foreign Lender" means (a) if the Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if the Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Fund" means any Person (other than a natural Person or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course of its activities

"GAAP" means United States generally accepted accounting principles as in effect from time to time, applied on a basis consistent with the requirements of Section 1.03.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantors" means, collectively, Holdco and the Subsidiary Guarantors.

"Guaranty" means a Guaranty in substantially the form of the attached Exhibit B and executed by a Guarantor, and "Guaranties" shall mean all such guaranties collectively, as the same may be modified from time to time.

-13-

"Hazardous Substance" means the substances identified as such pursuant to CERCLA and those regulated under any other Environmental Law, including without limitation pollutants, contaminants, petroleum, petroleum products, radionuclides, radioactive materials, and medical and infectious waste.

"Hazardous Waste" means the substances regulated as such pursuant to any Environmental Law.

"Hedge Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, puts, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement; provided that a "Hedge Contract" shall not include any "Master Agreement" or other agreement that provides solely for the sale by the Borrower or its Subsidiaries of physical Hydrocarbons in exchange for cash in the ordinary course of its business.

"Holdco" has the meaning assigned to such term in the preamble hereto.

"Holdco Note Documents" means, collectively, the Holdco Note Purchase Agreement, the guaranties in respect thereof, the other "Note Documents" (as defined in the Holdco Note Purchase Agreement) and all other agreements, documents or instruments executed and delivered by Holdco or any Loan Party in connection with, or pursuant to, the incurrence of the obligations in respect thereof, as amended, restated, supplemented or otherwise modified as of the Petition Date.

"Holdco Note Purchase Agreement" means the Note Purchase Agreement dated as of September 30, 2014 among Holdco, Sankaty Advisors, LLC in its capacity as administrative agent and the purchasers party thereto from time to time, as amended, restated, supplemented or otherwise modified but only to the extent permitted under the terms of this Agreement and the Holdco Note Subordination Agreement.

"Hydrocarbons" means oil, gas, coal seam gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, and all other liquid and gaseous hydrocarbons produced or to be produced in conjunction therewith from a well bore and all products, by-products, and other substances derived therefrom or the processing thereof, and all other minerals and substances produced in conjunction with such substances, including, but not limited to, sulfur,

Error! Unknown document property name.

geothermal steam, water, carbon dioxide, helium, and any and all minerals, ores, or substances of value and the products and proceeds therefrom.

"Increased Facility Activation Notice" means a notice substantially in the form of Exhibit F.

"Increased Facility Closing Date" means any Business Day designated as such in an Increased Facility Activation Notice.

"Incremental Commitment" shall have the meaning assigned thereto in Section 2.20.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower, any Guarantor or any of their respective Subsidiaries under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" has the meaning specified in Section 7.01.

"Independent Engineer" means Cawley, Gillespie & Associates, Inc. and/or DeGolyer and MacNaughton, or any other engineering firm reasonably acceptable to the Administrative Agent.

"Independent Engineering Report" means a report, in form and substance satisfactory to the Administrative Agent, prepared by an Independent Engineer, addressed to the Administrative Agent with respect to the Oil and Gas Properties owned by the Borrower or its Subsidiaries (or to be acquired by the Borrower or any of its Subsidiaries, as applicable) set forth on Schedule 1.01, which report shall (a) specify the location, quantity, and type of the estimated Proven Reserves attributable to such Oil and Gas Properties, (b) contain a projection of the rate of production of such Oil and Gas Properties, (c) contain an estimate of the net operating revenues to be derived from the production and sale of Hydrocarbons from such Proven Reserves based on product price and cost escalation assumptions specified by the Administrative Agent, and (d) contain such other information as is customarily obtained from and provided in such reports or is otherwise reasonably requested by the Administrative Agent or any Lender.

"Interest Period" means, for each Eurodollar Rate Advance comprising part of the same Borrowing, the period commencing on the date of such Eurodollar Rate Advance and ending on the date three months therefrom; provided, however, that whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day, provided that if such extension would cause the last day of such Interest Period to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day.

"Interim Order" means an order of the Bankruptcy Court in substantially the form attached hereto as Exhibit G and otherwise reasonably satisfactory in form and substance to the Administrative Agent and the Majority Lenders.

-15-

"Interim Period" means the time period commencing on the date of the Bankruptcy Court's entry of the Interim Order and ending on the Final Order Entry Deadline.

"Internal Engineering Report" means a report, in form and substance satisfactory to the Administrative Agent, prepared by the Borrower and certified by a Responsible Officer of the Borrower, addressed to the Administrative Agent, with respect to the Oil and Gas Properties owned by the Borrower or any of its Subsidiaries (or to be acquired by the Borrower or any of its Subsidiaries, as applicable) set forth on Schedule 1.01, which report shall (a) specify the location, quantity, and type of the estimated Proven Reserves attributable to such Oil and Gas Properties, (b) contain a projection of the rate of production of such Oil and Gas Properties, (c) contain an estimate of the net operating revenues to be derived from the production and sale of Hydrocarbons from such Proven Reserves based on product prices and cost escalation assumptions specified by the Administrative Agent, and (d) contain such other information as is customarily obtained from and provided in such reports (including customary information with respect to probable reserves attributable to such Oil and Gas Properties) or is otherwise reasonably requested by the Administrative Agent or any Lender.

"Leases" means all oil and gas leases, oil, gas and mineral leases, oil, gas and casinghead gas leases or any other instruments, agreements, or conveyances under and pursuant to which the owner thereof has or obtains the right to enter upon lands and explore for, drill, and develop such lands for the production of Hydrocarbons.

"Legal Requirement" means, as to any Person, any law, statute, ordinance, decree, requirement, order, judgment, rule, regulation (or official interpretation of any of the foregoing) of, and the terms of any license or permit issued by, any Governmental Authority, including, but not limited to, Regulations D, T, U, and X, which is applicable to such Person.

"Lenders" means a party hereto that is (a) a lender listed on the signature pages of this Agreement on the date hereof or (b) an Eligible Assignee that became a lender under this Agreement pursuant to Section 2.15 or 9.06.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"Lien" means any mortgage, lien, pledge, assignment, charge, deed of trust, security interest, hypothecation, preference, deposit arrangement or encumbrance (or other type of arrangement having the practical effect of the foregoing) to secure or provide for the payment of any obligation of any Person, whether arising by contract, operation of law, or otherwise (including, without limitation, the interest of a vendor or lessor under any conditional sale agreement, synthetic lease, Capital Lease, or other title retention agreement).

"Liquid Investments" means:

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States maturing within 180 days from the date of any acquisition thereof;

Error! Unknown document property name.

(b)      (i) negotiable or nonnegotiable certificates of deposit, time deposits, or other similar banking arrangements maturing within 180 days from the date of acquisition thereof ("bank debt securities"), issued by (A) any Lender (or any Affiliate of any Lender) or (B) any other bank or trust company so long as such certificate of deposit is pledged to secure the Borrower's or any Subsidiaries' ordinary course of business bonding requirements, or any other bank or trust company which has primary capital of not less than $500,000,000, if at the time of deposit or purchase, such bank debt securities are rated not less than "AA" (or the then equivalent) by the rating service of Standard & Poor's Ratings Group or of Moody's Investors Service, Inc., and (ii) commercial paper issued by (A) any Lender (or any Affiliate of any Lender) or (B) any other Person if at the time of purchase such commercial paper is rated not less than "A-1" (or the then equivalent) by the rating service of Standard & Poor's Ratings Group or not less than "P-1" (or the then equivalent) by the rating service of Moody's Investors Service, Inc., or upon the discontinuance of both of such services, such other nationally recognized rating service or services, as the case may be, as shall be selected by the Borrower with the consent of the Majority Lenders;

(c)      Deposits in money market funds investing exclusively in investments described in clauses (a) and (b) above;

(d)      repurchase agreements relating to investments described in clauses (a) and (b) above with a market value at least equal to the consideration paid in connection therewith, with any Person who regularly engages in the business of entering into repurchase agreements and has a combined capital surplus and undivided profit of not less than $500,000,000, if at the time of entering into such agreement the debt securities of such Person are rated not less than "AA" (or the then equivalent) by the rating service of Standard & Poor's Ratings Group or of Moody's Investors Service, Inc.; and

(e)      such other instruments (within the meaning of Article 9 of the Uniform Commerce Code (or any successor statute) as adopted in and in force in the State of New York) as the Borrower may request and the Administrative Agent may approve in writing.

"Loan Documents" means this Agreement, the Notes, the Guaranties, the DIP Order and each other agreement, instrument, or document executed by the Borrower, any Guarantor, or any of the Borrower's or a Guarantor's Subsidiaries or any of their officers at any time in connection with this Agreement.

"Loan Parties" means, collectively, the Borrower and the Guarantors.

"Majority Lenders" means, (a) at any time when there are more than two Lenders, Lenders holding more than 50% of the then aggregate unpaid principal amount of the Notes held by the Lenders at such time; provided that, if no such principal amount is then outstanding, "Majority Lenders" shall mean Lenders having more than 50% of the aggregate amount of the Commitments at such time and (b) at any time when there are one or two Lenders, all of the Lenders; provided further that, if there are two or more Lenders, the Commitment of, and the

-17-

portion of the Advances held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Majority Lenders unless all of the Lenders are Defaulting Lenders.

"Material Adverse Change" means (a) a material adverse change in the business, assets (including the Oil and Gas Properties of the Borrower or any of its Subsidiaries), condition (financial or otherwise), or results of operations of Holdco, the Borrower and their respective Subsidiaries, taken as a whole (i) other than as a result of changes in commodity prices), (b) a material adverse effect on the Borrower's, any Guarantor's or any of their respective Subsidiary's ability to perform its obligations under this Agreement, any Note, any Guaranty or any other Loan Document, or (c) a material adverse effect upon the legality, validity, biding effect or enforceability against the Borrower, any Guarantor or any of their respective Subsidiaries of any Loan Documents; provided, however, that, in the case of each of clause (a) and (b) only, Material Adverse Change shall expressly exclude (i) any matters publicly disclosed prior to the filing of the Chapter 11 Cases, (ii) any matters disclosed in writing on or prior to the date hereof to the Lenders in connection herewith (including the Schedules hereto) or any other Loan Documents, (iii) any matters disclosed in any first day pleadings or declarations that have been reviewed by, and are reasonably acceptable to, the Majority Lenders, and (iv) the customary effect of filing the Chapter 11 Cases, the customary events and conditions related to, resulting from and/or leading up thereto and the customary effects thereon and any action required to be taken under the Loan Documents or the DIP Order.

"Maturity Date" means [●], 2017, which is the five-month anniversary of the Effective Date.

"Maximum Rate" has the meaning set forth in Section 2.09(c).

"Milestones" has the meaning set forth in the Restructuring Support Agreement.

"Money Laundering Law" means any law governing conduct or acts designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of money (including currency or equivalents, e.g., checks, electronic transfers, etc.) to avoid a transaction reporting requirement under state or federal law or to disguise the fact that the money was acquired by illegal means.

"MSECI" means Morgan Stanley Energy Capital Inc.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Note" means a promissory note of the Borrower payable to the order of any Lender, in substantially the form of the attached Exhibit C, evidencing indebtedness of the Borrower to such Lender resulting from Advances owing to such Lender.

-18-

"Notice of Borrowing" means a notice of borrowing in the form of the attached Exhibit D signed by a Responsible Officer of the Borrower.

"NYMEX Pricing" means, as of any date of determination with respect to any crude oil and natural gas futures contract for any month, (a) for crude oil, the closing settlement price for the crude oil (WTI Cushing) futures contract for such month, and (b) for natural gas, the closing settlement price for the Henry Hub Natural Gas futures contract for such month, in each case, as published by New York Mercantile Exchange (NYMEX) on its website, currently located at www.nymex.com, or any successor thereto (as such price may be corrected or revised from time to time by the NYMEX in accordance with its rules and regulations).

"Obligations" means all principal, interest, fees, reimbursements, indemnifications, and other amounts payable by the Borrower, any Guarantor or any of their respective Subsidiaries to the Administrative Agent, the Lenders or any other Person (including any Indemnitee) under the Loan Documents, including without limitation, all Advances and PIK Interest.

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Oil and Gas Properties" means fee mineral interests, term mineral interests, Leases, subleases, farm-outs, royalties, overriding royalties, net profit interests, carried interests, production payments and similar mineral interests, and all unsevered and unextracted Hydrocarbons in, under, or attributable to such oil and gas Properties and interests.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Advance or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 9.06).

"Patriot Act" means the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"PBGC" means the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

"Permit" means any approval, certificate of occupancy, consent, waiver, exemption, variance, franchise, order, permit, authorization, right or license of or from any Governmental Authority, including without limitation, an Environmental Permit.

Error! Unknown document property name.

"Permitted Distributions" means Restricted Payments in the form of cash made by the Borrower to Holdco in an amount equal to its tax liabilities or corporate governance expenses; provided that (a) such amount may not exceed the amount actually required to be paid by Holdco, (b) prior to making such Restricted Payment, the Borrower shall provide notice to the Administrative Agent and (c) the Borrower shall provide the Administrative Agent with a calculation of such amount.

"Permitted Liens" means the Liens permitted under Section 6.01.

"Permitted Subject Liens" means the Liens permitted under paragraphs (b) through (i) of Section 6.01.

"Person" means an individual, partnership, corporation (including a business trust), joint stock company, limited liability corporation or company, limited liability partnership, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof or any trustee, receiver, custodian or similar official.

"PIK Interest" has the meaning assigned to such term in Section 2.09(a).

"Plan" means an employee benefit plan (other than a Multiemployer Plan) maintained for employees of the Borrower or any member of the Controlled Group and covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code.

"Prepetition Collateral" has the meaning assigned to such term in the DIP Order.

"Pro Rata Share" means, with respect to any Lender, (a) with respect to amounts owing under the Commitments, (i) if such Commitments have not been canceled, the ratio (expressed as a percentage) of such Lender's uncancelled Commitment at such time to the aggregate uncancelled Commitments at such time or (ii) if the aggregate Commitments have been terminated, the Pro Rata Share of such Lender as determined pursuant to the preceding clause (i) immediately prior to such termination, or (b) with respect to amounts owing generally under this Agreement and the other Loan Documents, the ratio (expressed as a percentage) of Commitment of such Lender to the aggregate Commitments of all the Lenders (or if such Commitments have been terminated, the ratio (expressed as a percentage) of Credit Extensions owing to such Lender to the aggregate Credit Extensions owing to all such Lenders).

"Property" of any Person means any property or assets (whether real, personal, or mixed, tangible or intangible) of such Person.

"Proven Reserves" means, at any particular time, the estimated quantities of Hydrocarbons which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs attributable to Oil and Gas Properties set forth on Schedule 1.01, under then existing economic and operating conditions (i.e., prices and costs as of the date the estimate is made).

"PV-9" means, as of any date of determination, with respect to any Proven Reserves expected to be produced from any of the Oil and Gas Properties of the Borrower and its

Error! Unknown document property name.

Subsidiaries evaluated in the most recently delivered Engineering Report, the net present value, discounted at 9% per annum, of the future net revenues expected to accrue to the Loan Parties' collective interests in such reserves during the remaining expected economic lives of such reserves, calculated using 4-year NYMEX Pricing on such date of determination adjusted for applicable differentials and Hedge Contracts and held flat after such 4-year period and adjusted by appropriate management adjustments for additions to reserves and depletion or sale of reserves since the date of the most recently delivered Engineering Report;.

"<u>Recipient</u>" means (a) the Administrative Agent and (b) any Lender, as applicable.

"<u>Register</u>" has the meaning specified in <u>Section 9.06(c)</u>.

"<u>Regulations D, T, U, and X</u>" mean Regulations D, T, U, and X of the Federal Reserve Board, as the same is from time to time in effect, and all official rulings and interpretations thereunder or thereof.

"<u>Related Parties</u>" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"<u>Release</u>" shall have the meaning set forth in CERCLA or under any other Environmental Law.

"<u>Response</u>" shall have the meaning set forth in CERCLA or under any other Environmental Law.

"<u>Responsible Officer</u>" means (a) with respect to any Person that is a corporation, such Person's Chief Executive Officer, President, Chief Financial Officer, or Vice President, (b) with respect to any Person that is a limited liability company, a manager, a managing member, the Responsible Officer of such Person's managing member or manager, and (c) with respect to any Person that is a general partnership or a limited liability partnership, the Responsible Officer of such Person's general partner or partners.

"<u>Restricted Payment</u>" means, with respect to any Person, (a) any direct or indirect dividend or distribution (whether in cash, securities or other Property) or any direct or indirect payment of any kind or character (whether in cash, securities or other Property) in consideration for or otherwise in connection with any retirement, purchase, redemption or other acquisition of any Equity Interest of such Person, or any options, warrants or rights to purchase or acquire any such Equity Interest of such Person or (b) principal or interest payments (in cash, Property or otherwise) on, or redemptions of, subordinated debt of such Person; <u>provided</u> that the term "Restricted Payment" shall not include any dividend or distribution payable solely in Equity Interests of the Borrower or warrants, options or other rights to purchase such Equity Interests.

"<u>Restructuring Support Agreement</u>" means the Restructuring Support Agreement, dated as of November [__], 2016, among the Borrower, Holdco, the subsidiaries of Holdco parties thereto, the lenders parties to the Existing Credit Agreement, the Purchaser (as defined

Error! Unknown document property name.

therein), and HPS Investment Partners, LLC, as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"SEC" means the United States Securities and Exchange Commission.

"Second Lien Credit Agreement" means the Second Lien Credit Agreement dated as of September 30, 2013 among Borrower, The Bank of Tokyo-Mitsubishi UFJ, Ltd. in its capacity as administrative agent, MUFG Union Bank, N.A., in its capacity as collateral agent and the lenders party thereto from time to time, as amended on or prior to the date hereof and as may be further amended, restated, supplemented or otherwise modified as of the Petition Date.

"Second Lien Loan Documents" means, collectively, the Second Lien Credit Agreement, all guarantees of the obligations in respect thereof the "Loan Documents" (as defined in the Second Lien Credit Agreement) and all other agreements, documents or instruments executed and delivered by any Loan Party in connection with, or pursuant to, the incurrence of the obligations in respect thereof, as all of such documents are from time to time amended, supplemented or restated in compliance with this Agreement.

"Secured Parties" means the Administrative Agent and the Lenders.

"Securities Account" shall have the meaning assigned to such term in the Uniform Commercial Code (or any successor statute), as adopted and in force in the State of New York or, when the laws of any other state govern the method or manner of the perfection or enforcement of any Lien in any of the Collateral, the Uniform Commercial Code (or any successor statute) of such other state.

"Sole Lead Arranger" means MSECI in its capacity as sole lead arranger.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any other Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any Person, a majority of whose outstanding Voting Securities (other than directors' qualifying shares) shall at any time be owned by such parent or one or more Subsidiaries of such parent.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Guarantor" means each Subsidiary of the Borrower executing a Guaranty.

"Superpriority Claims" shall have the meaning assigned to such term in the DIP Order.

"Taxes" means any and all present or future taxes, charges, levies, imposts, duties, deductions, charges, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including, without limitation, income, gross receipts, excise, real or personal property, sales, occupation, use, service, leasing, environmental, value added, transfer, payroll, and franchise taxes (and including any interest, additions to tax or penalties applicable thereto).

Error! Unknown document property name.

"Termination Event" means (a) a Reportable Event described in Section 4043 of ERISA and the regulations issued thereunder (other than a Reportable Event not subject to the provision for 30-day notice to the PBGC under such regulations), (b) the withdrawal of the Borrower or any of its Affiliates from a Plan during a plan year in which it was a "substantial employer" as defined in Section 4001(a)(2) of ERISA, (c) the filing of a notice of intent to terminate a Plan or the treatment of a Plan amendment as a termination under Section 4041 of ERISA, (d) the institution of proceedings to terminate a Plan by the PBGC, or (e) any other event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan.

"Testing Date" has the meaning assigned to such term in Section 6.19.

"Testing Period" has the meaning assigned to such term in Section 6.19.

"U.S. Borrower" means any Borrower that is a U.S. Person.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"Unused Commitment Amount" means, with respect to a Lender at any time, such Lender's Commitment at such time that is available to be drawn, minus, the sum of the aggregate outstanding principal amount of all Advances owed to such Lender at such time; provided that during the Interim Period, the amount of such Lender's Commitment available to be drawn shall be limited to such Lender's Pro Rata Share of $5,000,000.

"Variance Report" means a report in a form reasonably satisfactory to the Administrative Agent detailing any variance (whether plus or minus and expressed as a percentage) between (a) the "Aggregate Total Receipts" of the Borrower and its Subsidiaries during the relevant Testing Period against the "Aggregate Total Receipts" set forth in the Budget for the relevant Testing Period, (b) the "Aggregate Operating Expenditures made during the relevant Testing Period by the Borrower and its Subsidiaries against the "Aggregate Operating Expenditures" set forth in the Budget for the relevant Testing Period, (c) the "Aggregate Net Operating Expenditures" made during the relevant Testing Period by the Borrower and its Subsidiaries against the "Aggregate Operating Expenditures" set forth in the Budget for the relevant Testing Period, and (d) the "Aggregate Professional Fees" of the Borrower and its Subsidiaries during the relevant Testing Period against the "Aggregate Professional Fees" set forth in the Budget for the relevant Testing Period.

"Voting Securities" means (a) with respect to any corporation (including any unlimited liability company), capital stock of such corporation having general voting power under ordinary circumstances to elect directors of such corporation (irrespective of whether at the time stock of any other class or classes shall have or might have special voting power or rights by reason of the happening of any contingency), (b) with respect to any partnership, any partnership interest or other ownership interest having general voting power to elect the general partner or other management of the partnership or other Person, and (c) with respect to any limited liability company, membership certificates or interests having general voting power under ordinary circumstances to elect managers of such limited liability company.

-23-

"Withholding Agent" means the Borrower and the Administrative Agent.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02   Computation of Time Periods.   In this Agreement, with respect to the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding".

Section 1.03   Accounting Terms; Changes in GAAP.   Except as otherwise expressly provided herein, all accounting terms used herein shall be interpreted, and all financial statements and certificates and reports as to financial matters required to be delivered to the Lenders hereunder shall (unless otherwise disclosed to the Lenders in writing at the time of delivery thereof) be prepared, in accordance with GAAP applied on a basis consistent with those used in the preparation of the latest financial statements furnished to the Lenders hereunder (which prior to the delivery of the first financial statements under Section 5.06 hereof, shall mean the Financial Statements).   If at any time any change in GAAP would affect the computation of any requirement set forth herein, and either the Borrower or the Majority Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Majority Lenders); provided that, until so amended, (a) such requirement shall continue to be computed in accordance with GAAP prior to such change therein, and (b) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such requirement made before and after giving effect to such change in GAAP. In addition, all calculations and defined accounting terms used herein shall, unless expressly provided otherwise, when referring to any Person, refer to such Person on a consolidated basis and mean such Person and its consolidated subsidiaries.

Section 1.04   Miscellaneous.   Article, Section, Schedule, and Exhibit references are to Articles and Sections of and Schedules and Exhibits to this Agreement, unless otherwise specified.   All references to instruments, documents, contracts, and agreements are references to such instruments, documents, contracts, and agreements as the same may be amended, supplemented, and otherwise modified from time to time, unless otherwise specified.   The words "hereof", "herein", and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The term "including" means "including, without limitation,".   Paragraph headings have been inserted in this Agreement as a matter of convenience for reference only and it is agreed that such paragraph headings are not a part of this Agreement and shall not be used in the interpretation of any provision of this Agreement.

Error! Unknown document property name.

**ARTICLE II**
**CREDIT FACILITIES**

Section 2.01    Commitment for Advances.

(a)    Advances.  Upon entry of the Final Order, Advances and corresponding Commitments under, and as defined in, the Existing Credit Agreement, in an aggregate principal amount of $32,000,000 (the "Existing Advances") shall be deemed to be outstanding under this Agreement and shall constitute Advances and Commitments hereunder for all purposes under this Agreement and other Loan Documents.  On and after the Effective Date, each Lender severally agrees, on the terms and conditions set forth in this Agreement, to make Advances to the Borrower from time to time on any Business Day during the period from the date of this Agreement until the Commitment Termination Date in an amount for each Lender not to exceed such Lender's Unused Commitment Amount.  Each Borrowing shall be in an aggregate amount not less than $500,000 and in integral multiples of $100,000 in excess thereof, and in each case shall consist of Advances made by the Lenders ratably according to their respective Commitments.  There shall not at any time be more than a total of two (2) Eurodollar Rate Advances outstanding.  Within the limits of each Lender's Commitment, and subject to the terms of this Agreement, the Borrower may from time to time borrow, prepay, and reborrow Advances.

(b)    Notes.  The indebtedness of the Borrower to each Lender resulting from the Advances owing to such Lender may be evidenced by a Note of the Borrower payable to the order of such Lender upon the request of such Lender.

Section 2.02    [Reserved].

Section 2.03    Method of Borrowing.

(a)    Notice.  Each Borrowing shall be made pursuant to a Notice of Borrowing (or by telephone notice promptly confirmed in writing by a Notice of Borrowing), given not later than noon (New York, New York time) on the third Business Day before the date of the proposed Borrowing by the Borrower to the Administrative Agent, which shall in turn give to each Lender prompt notice of such proposed Borrowing in accordance with Section 9.02.  Each Notice of a Borrowing shall be given in accordance with Section 9.02, specifying the information required therein.  The Administrative Agent shall promptly notify each Lender of the applicable interest rate under Section 2.09(b).  Each Lender shall, before 2:00 pm (New York, New York time) on the date of such Borrowing, make available for the account of its Lending Office to the Administrative Agent at its address referred to in Section 9.02, or such other location as the Administrative Agent may specify by notice to the Lenders, in same day funds, in the case of a Borrowing, such Lender's Pro Rata Share of such Borrowing.  After the Administrative Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article III, the Administrative Agent shall make such funds available to the Borrower at its account with the Administrative Agent.

(b)    Continuations.  Other than with respect to the Maturity Date, to the extent the principal of any Eurodollar Rate Advance is not paid on the last day of the Interest Period

applicable to such Advance, such Advance shall automatically continue into a subsequent Interest Period commencing on the next succeeding day.

(c)     Notices Irrevocable.  Each Notice of Borrowing shall be irrevocable and binding on the Borrower.  In the case of any Borrowing, the Borrower shall indemnify each Lender against any loss, out-of-pocket cost, or expense incurred by such Lender as a result of any failure by the Borrower to fulfill on or before the date specified in such Notice of Borrowing for such Borrowing the applicable conditions set forth in Article III including, without limitation, any loss (including any loss of anticipated profits), cost, or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to fund the Advance to be made by such Lender as part of such Borrowing when such Advance, as a result of such failure, is not made on such date.

(d)     Administrative Agent Reliance.   Unless the Administrative Agent shall have received notice from a Lender before the date of any Borrowing that such Lender shall not make available to the Administrative Agent such Lender's Pro Rata Share of a Borrowing, the Administrative Agent may assume that such Lender has made its Pro Rata Share of such Borrowing available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (a) of this Section 2.03 and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount.  If and to the extent that such Lender shall not have so made its Pro Rata Share of such Borrowing available to the Administrative Agent, such Lender and the Borrower severally agree to immediately repay to the Administrative Agent on demand such corresponding amount, together with interest on such amount, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent, at (i) in the case of the Borrower, the interest rate applicable on such day to Advances comprising such Borrowing and (ii) in the case of such Lender, the Federal Funds Rate for such day.  If such Lender shall repay to the Administrative Agent such corresponding amount and interest as provided above, such corresponding amount so repaid shall constitute such Lender's Advance as part of such Borrowing for purposes of this Agreement even though not made on the same day as the other Advances comprising such Borrowing.

(e)     Lender Obligations Several.   The failure of any Lender to make the Advance to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, to make its Advance on the date of such Borrowing.  No Lender shall be responsible for the failure of any other Lender to make the Advance to be made by such other Lender on the date of any Borrowing.

Section 2.04   Reduction of the Commitments.

(a)     The Borrower shall have the right, upon at least three Business Days' irrevocable notice to the Administrative Agent, to terminate in whole or reduce ratably in part the unused portion of the Commitments; provided that each partial reduction shall be in the aggregate amount of $500,000 or in integral multiples of $100,000 in excess thereof.

Error! Unknown document property name.

(b)     Any reduction and termination of the Commitments pursuant to this Section 2.04 shall be applied ratably to each Lender's Commitment and shall be permanent, with no obligation of the Lenders to reinstate such Commitments.

Section 2.05    Prepayment of Advances.

(a)     Optional.  The Borrower may prepay the Advances, after giving by noon (New York, New York) at least three Business Days' irrevocable prior written notice to the Administrative Agent stating the proposed date and aggregate principal amount of such prepayment.  If any such notice is given, the Borrower shall prepay the Advances in whole or ratably in part in an aggregate principal amount equal to the amount specified in such notice, together with accrued interest to the date of such prepayment on the principal amount prepaid and amounts, if any, required to be paid pursuant to Section 2.12 as a result of such prepayment being made on such date; provided, however, that each partial prepayment with respect to:  (A) any amounts prepaid in respect of Eurodollar Rate Advances shall be applied to Eurodollar Rate Advances comprising part of the same Borrowing and (B) any prepayments shall be made in an aggregate principal amount of at least $500,000 and in integral multiples of $100,000 in excess thereof, and in an aggregate principal amount such that after giving effect thereto such Borrowing shall have a remaining principal amount outstanding with respect to such Borrowing of at least $500,000.  Full prepayments of any Borrowing are permitted without restriction of amounts.

(b)     Mandatory.

(i)     If, (A) any Loan Party (or the Administrative Agent as loss payee or assignee) receives Extraordinary Cash Proceeds, whether as one payment or a series of payments, or (B) any Loan Party receives proceeds from the incurrence of any Debt (other than Debt permitted under Section 6.02 (after giving effect to any waiver or amendment of Section 6.02 approved by the Majority Lenders in connection with such incurrence of Debt)) then the Borrower shall, on the date of receipt of such proceeds (or if not practicable, within one Business Day after receipt of such proceeds), prepay the Advances, in an aggregate amount equal to 100% of such proceeds; provided that, so long as no Event of Default has occurred and is continuing, no prepayment shall be required under this Section 2.05(b) to the extent that such Extraordinary Cash Proceeds resulting from a Casualty Event are, with the consent of the Administrative Agent which shall not be unreasonably withheld, reinvested in long term productive assets of the general type useful in the business of the Borrower and its Subsidiaries within thirteen (13) weeks after receipt of such Extraordinary Cash Proceeds.

(ii)     [Reserved].

(iii)     Each prepayment pursuant to this Section 2.05(b) shall be accompanied by accrued interest, as required under Section 2.09, on the amount prepaid to the date of such prepayment and amounts, if any, required to be paid pursuant to Section 2.12 as a result of such prepayment being made on such date.  Each prepayment under (x) Section 2.05(b)(i) above, solely to the extent that such Extraordinary Cash Proceeds result from a Disposition, shall be applied to the Advances with a permanent

-27-

reduction of the Commitments in like amount or as otherwise determined by the Administrative Agent and agreed to by the Lenders in their sole discretion and (y) Section 2.05(b)(ii) shall be applied to the Advances without a permanent reduction of the Commitments in like amount.

(c)    Commitments.  If on any day the sum of the aggregate unpaid principal amount of all Advances exceeds the aggregate Commitments, the Borrower shall, on such day (or if not practical, within one Business Day), prepay the outstanding amount of the Advances to the extent, if any, that the aggregate unpaid principal amount of all Advances exceeds the aggregate Commitments.  Each prepayment pursuant to this Section 2.05(c) shall be accompanied by accrued interest on the amount prepaid to the date of such prepayment and amounts, if any, required to be paid pursuant to Section 2.12 as a result of such prepayment being made on such date.  Each prepayment under this Section 2.05(c) shall be applied, as determined by the Administrative Agent and agreed to by the Lenders in their sole discretion.

(d)    Illegality.  If any Lender shall notify the Administrative Agent and the Borrower that the introduction of or any change in or in the interpretation of any applicable Legal Requirement makes it unlawful, or that any central bank or other Governmental Authority asserts that it is unlawful for such Lender or its Lending Office to perform its obligations under this Agreement to maintain any Eurodollar Rate Advances of such Lender then outstanding hereunder, (i) the Borrower shall, no later than noon (New York, New York time) (A) if not prohibited by law, on the last day of the Interest Period for each outstanding Eurodollar Rate Advance made by such Lender or (B) if required by such notice, on the second Business Day following its receipt of such notice, prepay all of the Eurodollar Rate Advances made by such Lender then outstanding, together with accrued interest on the principal amount prepaid to the date of such prepayment and amounts, if any, required to be paid pursuant to Section 2.12 as a result of such prepayment being made on such date, (ii) such Lender shall simultaneously make an Advance to the Borrower on such date in an amount equal to the aggregate principal amount of the Eurodollar Rate Advances prepaid to such Lender at an alternate rate of interest reasonably determined by the Majority Lenders or the applicable Lender(s), in consultation with the Borrower, as their cost of funds, and (iii) the right of the Borrower to select Eurodollar Rate Advances from such Lender for any subsequent Borrowing shall be suspended until such Lender gives notice referred to above shall notify the Administrative Agent that the circumstances causing such suspension no longer exist.

(e)    No Additional Right; Ratable Prepayment.  The Borrower shall have no right to prepay any principal amount of any Advance except as provided in this Section 2.05. Each payment of any Advance pursuant to this Section 2.05 shall be made in a manner such that all Advances comprising part of the same Borrowing are paid in whole or ratably in part.

Section 2.06    Repayment of Advances.  The Borrower shall repay to the Administrative Agent for the ratable benefit of the Lenders the outstanding principal amount of each Advance, together with all outstanding PIK Interest and any accrued interest on the Advances and the PIK Interest, on the Maturity Date or such earlier date pursuant to Section 7.02.

Section 2.07    [Reserved].

-28-

Section 2.08    Fees.

(a)    Commitment Fees.  The Borrower agrees to pay to the Administrative Agent for the account of each Lender a commitment fee at a per annum rate equal to 0.75% on the average daily Unused Commitment Amount of such Lender, from the Effective Date until the Commitment Termination Date (the "Commitment Fee"); provided that no Commitment Fee shall accrue on the Commitment of a Defaulting Lender during the period such Lender remains a Defaulting Lender.  The Commitment Fee shall be due and payable monthly in arrears on the last day of each calendar month, and continuing thereafter through and including the Commitment Termination Date.

(b)    [Reserved].

(c)    Upfront Fees.  The Borrower agrees to pay, for the account of the Lenders, a fee equal to $160,000, which fee shall be due and payable on the Effective Date.  If at any time, the Lenders agree to make all or any portion of the Incremental Commitment available to the Borrower pursuant to Section 2.20, the Borrower agrees to pay, for the account of the Lenders, a fee equal to 100 basis points on the amount of such increase so made available, which fee shall be due and payable on each applicable Increased Facility Closing Date.

(d)    Administrative Agent Fees.  The Borrower agrees to pay to the Administrative Agent, for its own account, an annual administration fee equal to $50,000, which fee will be payable annually, in advance, commencing on the Effective Date and thereafter on each anniversary thereof.

Section 2.09    Interest.

(a)    The Borrower shall pay interest on the unpaid principal amount of each Advance made by each Lender from the date of such Advance until such principal amount shall be paid in full, at a rate per annum equal at all times during the Interest Period for such Advance to the Eurodollar Rate for such Interest Period plus the Applicable Margin in effect from time to time, payable on the last day of each calendar month, provided that (x) prior to entry of the Final Order, 50% of the interest on Advances outstanding shall be paid in cash, with the balance of such interest to be paid in kind and (y) on and after entry of the Final Order 50% of the interest on Advances outstanding in excess of $30,000,000 shall be paid in cash, with the balance of such interest to be paid in kind, and all interest on Advances up to and including $30,000,000 shall be paid in kind (all of the interest paid in kind in accordance with this proviso, the "PIK Interest"); provided further that on the first such interest payment date occurring after the entry of the Final Order, the Borrower shall pay an additional amount of interest on $2 million of Existing Advances in the manner set forth in this paragraph (a), and the Administrative Agent shall adjust its records to give effect to the foregoing, as if such $2 million were outstanding as of the Effective Date.  The PIK Interest shall accrue interest at the same rate as the Advances and all amount of PIK Interest, and accrued interest thereon, shall be paid in cash on the Maturity Date or such earlier date pursuant to Section 7.02.

(b)    Interest Rate Limitation.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan

Error! Unknown document property name.

Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Advances or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 2.10   Payments and Computations.

(a)   Payment Procedures.  The Borrower shall make each payment under this Agreement and under the Notes not later than noon (New York, New York time) on the day when due in Dollars to the Administrative Agent at the location referred to in the Notes (or such other location as the Administrative Agent shall designate in writing to the Borrower) in same day funds without deduction, setoff, or counterclaim of any kind, except as may be applicable to any Defaulting Lender.  The Administrative Agent shall promptly thereafter cause to be distributed like funds relating to the payment of principal, interest or fees ratably (other than amounts payable solely to the Administrative Agent or a specific Lender pursuant to Section 2.08(c), 2.09(b), 2.12, 2.13, 2.14, 8.05, or 9.07, but after taking into account payments effected pursuant to Section 9.04) in accordance with each Lender's Pro Rata Share to the Lenders for the account of their respective Lending Offices, and like funds relating to the payment of any other amount payable to any Lender for the account of its Lending Office, in each case to be applied in accordance with the terms of this Agreement.

(b)   Computations.  All computations of interest based on the Eurodollar Rate and the Federal Funds Rate shall be made by the Administrative Agent, on the basis of a year of 360 days, in each case for the actual number of days (including the first day, but excluding the last day) occurring in the period for which such interest or fees are payable.  Each determination by the Administrative Agent of an interest rate or fee shall be conclusive and binding for all purposes, absent manifest error.

(c)   Non-Business Day Payments.  Whenever any payment shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or fees, as the case may be; provided, however, that if such extension would cause payment of interest on or principal of Eurodollar Rate Advances to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

(d)   Administrative Agent Reliance.  Unless the Administrative Agent shall have received written notice from the Borrower prior to the date on which any payment is due to the Lenders that the Borrower shall not make such payment in full, the Administrative Agent may assume that the Borrower has made such payment in full to the Administrative Agent on such date and the Administrative Agent may, in reliance upon such assumption, cause to be distributed to each Lender on such date an amount equal to the amount then due such Lender.  If

Error! Unknown document property name.

and to the extent the Borrower shall not have so made such payment in full to the Administrative Agent, each Lender shall repay to the Administrative Agent forthwith on demand such amount distributed to such Lender, together with interest, for each day from the date such amount is distributed to such Lender until the date such Lender repays such amount to the Administrative Agent, at the Federal Funds Rate for such day.

Section 2.11   Sharing of Payments, Etc.   If any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of the Advances made by it in excess of its Pro Rata Share of payments on account of the Advances obtained by all the Lenders, such Lender shall notify the Administrative Agent and forthwith purchase from the other Lenders such participations in the Advances made by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided, however, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and such Lender shall repay to the purchasing Lender the purchase price to the extent of such Lender's ratable share (according to the proportion of (a) the amount of the participation sold by such Lender to the purchasing Lender as a result of such excess payment to (b) the total amount of such excess payment) of such recovery, together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to the purchasing Lender to (ii) the total amount of all such required repayments to the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered.   The Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this Section 2.11 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.   The provisions of this Section 2.11 shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Advances to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this Section 2.11 shall apply).   If a Lender fails to make an Advance with respect to a Borrowing as and when required hereunder and the Borrower subsequently makes a repayment of any Advances, such repayment shall be split among the Non-Defaulting Lenders ratably in accordance with their respective Commitment percentages until each Lender (including the Defaulting Lender) has its percentage of all of the outstanding Advances and the balance of such repayment shall be applied among the Lenders in accordance with their Pro Rata Share.

Section 2.12   Breakage Costs.   If (a) any payment of principal of any Eurodollar Rate Advance is made other than on the last day of the Interest Period for such Advance, whether as a result of any payment pursuant to Section 2.05, the acceleration of the maturity of the Obligations pursuant to Article VII, or otherwise, or (b) the Borrower fails to make a principal or interest payment with respect to any Eurodollar Rate Advance on the date such payment is due and payable, the Borrower shall, within 10 days of any written demand sent by any Lender to the Borrower through the Administrative Agent, pay to the Administrative Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, out-of-pocket costs or expenses which it may reasonably incur as a result of such payment or nonpayment, including, without limitation, any loss (including loss of anticipated profits), cost or

-31-

expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such Advance.

Section 2.13    Increased Costs.

(a)    Increased Costs Generally.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the Eurodollar Rate);

(ii)    subject any Lender to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Eurodollar Rate Advances made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Rate Advance (or of maintaining its obligation to make any such Loan), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    Capital and Liquidity Requirements.  If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Advances made by, held by, such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy or liquidity), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    [Reserved].

(d)    Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than nine months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise

-32-

to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)     Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

Section 2.14     Taxes.

(a)     Defined Terms.  For purposes of this Section 2.14, the term "applicable law" includes FATCA.

(b)     Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Borrower, any Guarantor or any of their respective Subsidiaries under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower, any Guarantor or any of their respective Subsidiaries shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)     Payment of Other Taxes.   The Borrower, the Guarantors or their respective Subsidiaries shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)     Indemnification.   The Borrower, the Guarantors and their respective Subsidiaries shall jointly and severally indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

Error! Unknown document property name.

(e)     Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Taxes attributable to such Lender (but only to the extent that the Borrower, the Guarantors and their respective Subsidiaries have not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower, the Guarantors and their respective Subsidiaries to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.06 relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)     Evidence of Payments.  As soon as practicable after any payment of Taxes by the Borrower, the Guarantors or any of their respective Subsidiaries to a Governmental Authority pursuant to this Section 2.14, the Borrower, such Guarantor or such Subsidiary, as applicable, shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)     Status of Lenders.  (i)  Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.14(g)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Borrower,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such

Error! Unknown document property name.

Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or W-8BEN-E, as applicable (or any successor form), establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E, as applicable (or any successor form), establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2) executed copies of IRS Form W-8ECI (or any successor form);

(3) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit E-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E, as applicable (or any successor form); or

(4) to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI (or any successor form), IRS Form W-8BEN (or any successor form), IRS Form W-8BEN-E (or any successor form), a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-2 or Exhibit E-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender

Error! Unknown document property name.

may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-4 on behalf of each such direct and indirect partner;

(C) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h) Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.14 (including by the payment of additional amounts pursuant to this Section 2.14), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this

Error! Unknown document property name.

paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)    Survival.  Each party's obligations under this Section 2.14 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 2.15    Designation of Different Lending Office.    If any Lender requests compensation under Section 2.13, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.14, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Advances hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.13 or 2.14, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

Section 2.16    Defaulting Lender.

(a)    Defaulting Lender Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)    Waivers and Amendments.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definitions of "Majority Lenders".

(ii)    Defaulting Lender Waterfall. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article 7 or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 7.04 shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Advance in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, if so determined by the Administrative Agent and the Borrower, to be

-37-

held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Advances under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; <u>provided</u> that if (x) such payment is a payment of the principal amount of any Advances in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Advances were made at a time when the conditions set forth in <u>Section 3.02</u> were satisfied or waived, such payment shall be applied solely to pay the Advances of all Non-Defaulting Lenders on a *pro rata* basis prior to being applied to the payment of any Advances of such Defaulting Lender until such time as all Advances are held by the Lenders *pro rata* in accordance with the Commitments without giving effect to <u>Section 2.16(a)(iv)</u>. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this <u>Section 2.16</u> shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    <u>Certain Fees</u>.  No Defaulting Lender shall be entitled to receive any Commitment Fee for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)    <u>Defaulting Lender Cure</u>.  If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Advances of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Advances to be held *pro rata* by the Lenders in accordance with the Commitments (without giving effect to <u>Section 2.16(a)(iv)</u>, whereupon such Lender will cease to be a Defaulting Lender; <u>provided</u> that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and <u>provided</u>, <u>further</u>, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 2.17   <u>Priority and Liens</u>.  The Loan Parties hereby covenant, represent and warrant that, upon entry of the DIP Order, the Obligations of the Loan Parties hereunder and under the other Loan Documents and the DIP Order, shall have the priority and liens set forth in the DIP Order, subject to the Carve-Out and Permitted Subject Liens as further described therein. Notwithstanding anything herein to the contrary, all proceeds received by the Administrative

Error! Unknown document property name.

Agent and the Lenders from the Collateral subject to the Liens granted in the DIP Order and/or the other Loan Documents shall be subject to the Carve-Out.

Section 2.18   <u>Payment of Obligations</u>.  Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, the Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

Section 2.19   <u>No Discharge</u>.  The Borrower and each Guarantor agrees that (a) any confirmation order entered in the Chapter 11 Cases shall not discharge or otherwise affect in any way any of the Obligations of the Loan Parties to the Secured Parties under this Agreement and the related Loan Documents, other than after the payment in full in cash to the Secured Parties of all Obligations under the DIP Facility and the related Loan Documents on or before the effective date of a plan of reorganization and termination of the Commitments and (b) to the extent the Obligations hereunder and under the other Loan Documents are not satisfied in full, (i) the Obligations arising hereunder shall not be discharged by the entry of a confirmation order (and each Loan Party, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Administrative Agent and the Lenders pursuant to the DIP Order and the Liens granted to the Administrative Agent pursuant to the DIP Order shall not be affected in any manner by the entry of a confirmation order.

Section 2.20   <u>Incremental Facility</u>.  (a)  The Borrower and any one or more Lenders may from time to time agree that such Lenders shall provide, in their sole discretion, additional Commitments of up to $4,000,000 (the "<u>Incremental Commitment</u>") by executing and delivering to the Administrative Agent an Increased Facility Activation Notice specifying (i) the amount of such increase, and (ii) the applicable Increased Facility Closing Date.

(b)     Notwithstanding anything to the contrary in this Agreement, each of the parties hereto hereby agrees that, on each Increased Facility Closing Date, this Agreement shall be amended to the extent (but only to the extent) necessary to reflect the existence and terms of the increased Commitment evidenced thereby.  Any such deemed amendment may be effected in writing by the Administrative Agent with the Borrower's consent and furnished to the other parties hereto.

**ARTICLE III**
**CONDITIONS**

Section 3.01   <u>Conditions Precedent to Initial Borrowings</u>.  This Agreement shall become effective upon the occurrence of the following conditions precedent on or before the Effective Date:

(a)     <u>Documentation</u>.  The Administrative Agent shall have received the following duly executed by all the parties thereto, in form and substance satisfactory to the Administrative Agent and the Lenders, and, where applicable, in sufficient copies for each Lender:

Error! Unknown document property name.

(i)        this Agreement, to the extent requested a Note payable to the order of each Lender in the amount of its Commitment, the Guaranty, and each of the other Loan Documents, and all attached exhibits and schedules;

(ii)       [Reserved];

(iii)      copies, certified as of the date of this Agreement by a Responsible Officer or the secretary or an assistant secretary of the Borrower of (A) the resolutions of the board of managers of the Borrower approving each Loan Document to which the Borrower is a party, (B) the certificate of formation of the Borrower, (C) the limited liability company agreement of the Borrower, and (D) all other documents evidencing other necessary limited liability and partnership action and governmental approvals, if any, with respect to this Agreement, the Notes, and the other Loan Documents;

(iv)       certificates of a Responsible Officer or the secretary or an assistant secretary of the Borrower certifying the names and true signatures of the officers of the Borrower authorized to sign this Agreement, the Notes, Notices of Borrowing, and the other Loan Documents to which the Borrower is a party;

(v)        copies, certified as of the date of this Agreement by a Responsible Officer or the secretary or an assistant secretary of each Guarantor of (A) the resolutions of the Board of Directors (or other applicable governing body) of such Guarantor approving the Loan Documents to which it is a party, and (B) the articles or certificate (as applicable) of incorporation (or organization) and bylaws (or other governing document) of such Guarantor;

(vi)       a certificate of a Responsible Officer or the secretary or an assistant secretary of each Guarantor certifying the names and true signatures of officers of such Guarantor authorized to sign the Guaranty and the other Loan Documents to which such Guarantor is a party;

(vii)      [Reserved];

(viii)     appropriate UCC-1 Financing Statements covering the Collateral for filing with the appropriate authorities;

(ix)       certificates, if any, evidencing the Equity Interests constituting Collateral pursuant to the DIP Order and related powers executed in blank for each such certificate;

(x)        insurance certificates naming the Administrative Agent as loss payee or additional insured, as applicable, and evidencing insurance which meets the requirements of this Agreement and the Loan Documents, and which is otherwise satisfactory to the Administrative Agent;

(xi)       certificates of good standing for the Borrower and the Guarantors in each state in which each such Person is organized or qualified to do business, which

-40-

certificate shall be (A) dated a date not sooner than 10 days prior to the date of this Agreement or (B) otherwise effective on the Effective Date;

(xii)    a certificate dated as of the date of this Agreement from the Responsible Officer of the Borrower stating that (A) all representations and warranties set forth in the Loan Documents are true and correct as of such date (except in the case of representations and warranties that are made solely as of an earlier date or time, which representations and warranties shall be true and correct as of such earlier date or time); (B) no Default has occurred and is continuing; (C) no Loan Party shall have any material Debt for borrowed money other than under this Agreement and Debt permitted under Sections 6.02(b) or 6.02(c); and (D) the conditions in this Section 3.01 have been met; and

(xiii)   such other documents, governmental certificates, agreements and lien searches as the Administrative Agent may reasonably request.

(b)    Payment of Fees.  On the date of this Agreement, the Borrower shall have paid the fees required by Section 2.08(c) and all costs and expenses that have been invoiced and are payable pursuant to Section 9.04.

(c)    Delivery of Financial Statements.   The Administrative Agent and the Lenders shall have received true and correct copies of (i) the Financial Statements and (ii) such other financial information as the Lenders may reasonably request.

(d)    [Reserved].

(e)    [Reserved].

(f)    [Reserved].

(g)    No Default.  No Default shall have occurred and be continuing.

(h)    Representations and Warranties.   The representations and warranties contained in Article IV hereof and in each other Loan Document shall be true and correct.

(i)    Material Adverse Change.  Since June 30, 2016, no event or circumstance that could reasonably be expected to cause a Material Adverse Change shall have occurred.

(j)    No Proceeding or Litigation; No Injunctive Relief.  Except for actions, suits, investigations or other proceedings (i) stayed by 11 U.S.C. §362 and (ii) set forth on Schedule 4.07, no action, suit, investigation or other proceeding (including, without limitation, the enactment or promulgation of a statute or rule) by or before any arbitrator or any Governmental Authority shall be threatened in writing or pending and no preliminary or permanent injunction or order by a state or federal court shall have been entered (i) in connection with this Agreement or any transaction contemplated hereby or (ii) which, in any case, could reasonably be expected to result in a Material Adverse Change.

(k)    [Reserved].

Error! Unknown document property name.

(l)     USA Patriot Act.  At least five (5) days prior to the Effective Date, the Borrower has delivered to each Lender that is subject to the Patriot Act such information requested by such Lender in order to comply with the Patriot Act.

(m)     [Reserved].

(n)     [Reserved].

(o)     [Reserved].

(p)     [Reserved].

(q)     Chapter 11 Cases. (i) The Chapter 11 Cases shall have been commenced and (ii) the motion to approve the DIP Order and, and all "first day orders" entered at the time of commencement of the Chapter 11 Cases shall be reasonably satisfactory in form and substance to the Administrative Agent, including with respect to any employee retention or incentive plans or other arrangements.

(r)     Interim Order.  The Administrative Agent shall have received a signed copy of the Interim Order which shall have been entered by the Bankruptcy Court on or before the third day after the Petition Date, and the Interim Order shall not have been vacated, reversed, modified, amended or stayed.

(s)     Initial Budget.  The Administrative Agent shall have received the Initial Budget.

(t)     Perfected Security Interest.  The Administrative Agent for the benefit of the Secured Parties shall have a valid and perfected security interest in substantially all of the assets of the Loan Parties pursuant to the Interim Order, subject to the priorities set forth in the DIP Order and to the Carve-Out.

Section 3.02   Conditions Precedent to All Borrowings.  The obligation of each Lender to make an Advance on the occasion of each Borrowing shall be subject to the further conditions precedent that on the date of such Borrowing:

(a)     the following statements shall be true (and each of the giving of the applicable Notice of Borrowing and the acceptance by the Borrower of the proceeds of such Borrowing shall constitute a representation and warranty by the Borrower that on the date of such Borrowing such statements are true):

(i)     the representations and warranties contained in Article IV of this Agreement and the representations and warranties contained in the other Loan Documents are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such Borrowing, before and after giving effect to such Borrowing and to the application of the proceeds from such Borrowing, as though made on and as of such date except to the extent that any such representation or warranty expressly relates solely to an earlier

-42-

date, in which case it shall have been true and correct in all material respects as of such earlier date;

(ii)   no Default or Event of Default has occurred and is continuing or would result from such Borrowing or from the application of the proceeds therefrom;

(iii)   at the time and immediately after giving *pro forma* effect to such Advance, there exists no event or circumstance that could reasonably be expected to cause a Material Adverse Change; and

(iv)   (A) during the Interim Period, the Interim Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without the consent of the Majority Lenders or (B) for any Advance occurring on or after the Final Order Entry Deadline, the Final Order, shall have been entered by the Bankruptcy Court and shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without the consent of the Majority Lenders.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

The Borrower and each Guarantor represents and warrants as follows:

Section 4.01   Existence; Subsidiaries.   Holdco and the Borrower each is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware and in good standing and, subject to any restrictions arising on account of Holdco's or the Borrower's status as a "debtor" under the Bankruptcy Code, qualified to do business in each other jurisdiction where its ownership or lease of Property or conduct of its business requires such qualification, except where the failure to so qualify, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Change.   Each Subsidiary of the Borrower is duly organized, validly existing, and in good standing under the laws of its jurisdiction of formation and in good standing and, subject to any restrictions arising on account of such Subsidiary's status as a "debtor" under the Bankruptcy Code, qualified to do business in each jurisdiction where its ownership or lease of Property or conduct of its business requires such qualification, except where the failure to so qualify, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Change.   As of the date hereof, the Borrower is the sole Subsidiary of Holdco and the Borrower has no Subsidiaries other than those identified in Schedule 4.01.

Section 4.02   Power; No Violation.   Subject to the entry of the DIP Order, the execution, delivery, and performance by the Borrower of this Agreement, the Notes, and the other Loan Documents to which it is a party and by the Guarantors of the Guaranties and the other Loan Documents to which they are a party and the consummation of the transactions contemplated hereby and thereby (a) are within the Borrower's and such Guarantors' governing powers, (b) have been duly authorized by all necessary governing action, (c) do not contravene (i) the Borrower's or any Guarantor's certificate or articles of incorporation, bylaws, limited liability company agreement, or other similar governance documents or (ii) any law or any contractual

-43-

restriction binding on or affecting the Borrower or any Guarantor, and (d) will not result in or require the creation or imposition of any Lien prohibited by this Agreement.  Subject to the entry of the DIP Order and subject to any restrictions arising on account of Holdco's, the Borrower's or any Subsidiaries' status as a "debtor" under the Bankruptcy Code, at the time of each Advance, such Advance, and the use of the proceeds of such Advance, will be within the Borrower's governing powers, will have been duly authorized by all necessary action, will not contravene (i) the Borrower's certificate of formation and limited liability company agreement or other organizational documents or (ii) any law or any contractual restriction binding on or affecting the Borrower and will not result in or require the creation or imposition of any Lien prohibited by this Agreement.

Section 4.03    Authorization and Approvals.  Except for entry of the DIP Order, (i) no consent, order, authorization, or approval or other action by, and no notice to or filing with, any Governmental Authority or any other Person is required for the due execution, delivery, and performance by the Borrower of this Agreement, the Notes, or the other Loan Documents to which the Borrower is a party or by each Guarantor of its Guaranty or the other Loan Documents to which it is a party or the consummation of the transactions contemplated thereby and (ii) at the time of each Borrowing, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority will be required for such Borrowing or the use of the proceeds of such Borrowing.

Section 4.04    Enforceable Obligations.  This Agreement, the Notes, and the other Loan Documents to which the Borrower is a party have been duly executed and delivered by the Borrower and the Guaranties and the other Loan Documents to which each Guarantor is a party have been duly executed and delivered by the Guarantors.  Subject to entry of the DIP Order, each Loan Document is the legal, valid, and binding obligation of the Borrower and each Guarantor which is a party to it enforceable against the Borrower and each such Guarantor in accordance with its terms.

Section 4.05    Financial Statements.

(a)    The Borrower has delivered to the Administrative Agent and the Lenders copies of the Financial Statements, and the Financial Statements are accurate and complete in all material respects and present fairly the financial condition of Holdco and its consolidated Subsidiaries for their respective period in accordance with GAAP.  As of the date of the Financial Statements, there were no material contingent obligations, liabilities for taxes, unusual forward or long-term commitments, or unrealized or anticipated losses of Holdco or any consolidated Subsidiary, except as disclosed therein and adequate reserves for such items have been made in accordance with GAAP.

(b)    Since June 30, 2016, no event or circumstance that could reasonably be expected to cause a Material Adverse Change has occurred.

(c)    As of the date hereof, the Borrower, the Guarantors and their respective Subsidiaries have no material Debt other than the Debt listed on Schedule 6.02.

-44-

Section 4.06   <u>True and Complete Disclosure</u>.   All factual information (excluding estimates and projections) heretofore or contemporaneously furnished by or on behalf of the Borrower or any of the Guarantors in writing to any Lender or the Administrative Agent for purposes of or in connection with this Agreement, any other Loan Document or any transaction contemplated hereby or thereby (including without limitation, documents filed with the Bankruptcy Court) is, and all other such factual information hereafter furnished by or on behalf of the Borrower and the Guarantors in writing to the Administrative Agent or any of the Lenders was or shall be, true and accurate in all material respects on the date as of which such information was or is dated or certified and did not or does not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements contained therein not misleading at such time.   All projections, estimates, and *pro forma* financial information furnished by the Borrower were prepared on the basis of assumptions, data, information, tests, or conditions believed to be reasonable at the time such projections, estimates, and *pro forma* financial information were furnished.

Section 4.07   <u>Litigation; Compliance with Laws</u>.

(a)   There is no pending or, to the best knowledge of the Borrower, action threatened in writing or proceeding affecting the Borrower or any of the Guarantors before any court, Governmental Authority or arbitrator (x) which is not subject to the automatic stay as a result of the Chapter 11 Cases or could reasonably be expected to cause a Material Adverse Change or (y) which purports to affect the legality, validity, binding effect or enforceability of this Agreement, any Note, or any other Loan Document.

(b)   The Borrower, the Guarantors and their respective Subsidiaries have complied in all material respects with all material statutes, rules, regulations, orders and restrictions of any Governmental Authority having jurisdiction over the conduct of their respective businesses or the ownership of their respective Property.

Section 4.08   <u>Use of Proceeds</u>.   The proceeds of the Advances will be used by the Borrower for the purposes described in <u>Section 5.09</u>.   None of the Borrower, the Guarantors or any of their respective Subsidiaries is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U).   No proceeds of any Advance will be used to purchase or carry any margin stock in violation of Regulations T, U or X.

Section 4.09   <u>Investment Company Act</u>.   Neither the Borrower nor any of the Guarantors is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

Section 4.10   <u>Federal Power Act</u>.   Neither the Administrative Agent nor any of the Lenders, solely by virtue of the execution, delivery and performance of, and the consummation of the transactions contemplated by, the Loan Documents shall be or become subject to regulation (a) under the Federal Power Act, as amended, (b) as a "public utility" or "public service corporation" or the equivalent under the applicable law of any state, or (c) under the applicable laws of any state relating to public utilities or public service corporations.

Error! Unknown document property name.

Section 4.11    Taxes.

(a)    Reports and Payments.  All Returns (as defined below in clause (c) of this Section) required to be filed by or on behalf of the Borrower, the Guarantors, or any member of the Controlled Group (hereafter collectively called the "Tax Group") have been duly filed on a timely basis or appropriate extensions have been obtained and such Returns are and will be true, complete and correct, except where the failure to so file would not be reasonably expected to cause a Material Adverse Change; and, subject to the approval of the Bankruptcy Court and the Budget, all Taxes shown to be payable on the Returns or on subsequent assessments with respect thereto will have been paid in full on a timely basis, and no other Taxes will be payable by the Tax Group with respect to items or periods covered by such Returns, except in each case to the extent of (i) reserves reflected in the Financial Statements, (ii) taxes that are being contested in good faith or (iii) taxes that have been excused or prohibited from being paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code.  The reserves for accrued Taxes reflected in the financial statements delivered to the Lenders under this Agreement are adequate in the aggregate for the payment of all unpaid Taxes, whether or not disputed, for the period ended as of the date thereof and for any period prior thereto, and for which the Tax Group may be liable in its own right, as withholding agent or as a transferee of the assets of, or successor to, any Person.

(b)    Returns Definition.  "Returns" in this Section 4.11 shall mean any material federal, state, local, or foreign report, declaration of estimated Tax, information statement or return relating to, or required to be filed in connection with, any Taxes, including any information return or report with respect to backup withholding or other payments of third parties.

Section 4.12    Pension Plans.  Except to the extent excused by the Bankruptcy Code or as a result of the filing of the Chapter 11 Cases, all Plans are in compliance in all material respects with all applicable provisions of ERISA.  Other than as a result of the Chapter 11 Cases, no Termination Event has occurred with respect to any Plan, and each Plan has complied with and been administered in all material respects in accordance with applicable provisions of ERISA and the Code.  Other than as a result of the Chapter 11 Cases, no "accumulated funding deficiency" (as defined in Section 302 of ERISA) has occurred and there has been no excise tax imposed under Section 4971 of the Code.  Other than as a result of the Chapter 11 Cases, no Reportable Event under Section 4043 of ERISA and the regulations issued thereunder has occurred with respect to any Multiemployer Plan, and each Multiemployer Plan has complied with and been administered in all material respects with applicable provisions of ERISA and the Code.  The present value of all benefits vested under each Plan (based on the assumptions used to fund such Plan) did not, as of the last annual valuation date applicable thereto, exceed the value of the assets of such Plan allocable to such vested benefits.  Neither the Borrower nor any member of the Controlled Group has had a complete or partial withdrawal from any Multiemployer Plan for which there is any withdrawal liability.  As of the most recent valuation date applicable thereto, neither the Borrower nor any member of the Controlled Group would become subject to any liability under ERISA if the Borrower or any member of the Controlled Group has received notice that any Multiemployer Plan is insolvent or in reorganization.  Based upon GAAP existing as of the date of this Agreement and current factual circumstances, the Borrower has no reason to believe that the annual cost during the term of this Agreement to the

-46-

Borrower or any member of the Controlled Group for post-retirement benefits to be provided to the current and former employees of the Borrower or any member of the Controlled Group under Plans that are welfare benefit plans (as defined in Section 3(1) of ERISA) could, in the aggregate, reasonably be expected to cause a Material Adverse Change.

Section 4.13    Condition of Property; Casualties; Oil and Gas Properties.

(a)    (i) Each of the Borrower and the Subsidiaries has good and defensible title to all of its Oil and Gas Properties as is customary in the oil and gas industry in all material respects, free and clear of all Liens except for Permitted Liens and the Carve-Out and (ii) each of the Borrower and its Subsidiaries has good and indefeasible title to all of its other material Properties, free and clear of all Liens except for Permitted Liens and the Carve-Out.  Subject to any necessary order or authorization of the Bankruptcy Court, the material Properties used or to be used in the continuing operations of the Borrower and its Subsidiaries are in good repair, working order and condition, normal wear and tear excepted.

(b)    Since December 31, 2015, neither the business nor the material Properties of the Borrower and each of its Subsidiaries taken as a whole has been materially and adversely affected as a result of any fire, explosion, earthquake, flood, drought, windstorm, accident, strike or other labor disturbance, embargo, requisition or taking of Property or cancellation of contracts, Permits, or concessions by a Governmental Authority, riot, activities of armed forces, or acts of God or of any public enemy, which effect has not been remedied or cured on the date this representation is made, re-made or deemed to be made.

(c)    Except for the Borrower's and its Subsidiaries' interests in certain Oil and Gas Properties, which do not constitute a material portion (with 2% or more being deemed material) of the value of the Collateral and all other Properties of the Borrower and its Subsidiaries securing the Obligations, all of the proceeds from the sale of Hydrocarbons produced from the Oil and Gas Properties are being properly paid within 60 days after the date of production to the Borrower or the applicable Subsidiary by the purchasers or other remitters of production proceeds without suspense.

(d)    There are no obligations under any Oil and Gas Property or any contract, Permit, lease or other agreement which require the drilling of additional wells or operations to earn or to continue to hold any of the Oil and Gas Properties in force and effect and which shall be binding on the Borrower or such Subsidiary after the Petition Date, except for oil and gas leases that are still within their primary term (each of which will require drilling operations to perpetuate it beyond its primary term) and the standard provision in certain oil and gas leases that requires either production or operations to perpetuate each respective lease after the expiration of its primary term.

Section 4.14    No Burdensome Restrictions; No Defaults or Events of Default.

(a)    None of the Borrower, the Guarantors or any of their respective Subsidiaries is a party and which shall be binding on the Borrower, such Guarantor or such Subsidiary after the Petition Date to any indenture, loan, or credit agreement or any lease or other agreement or instrument or subject to any charter or corporate restriction or provision of

Error! Unknown document property name.

applicable law or governmental regulation that could reasonably be expected to cause a Material Adverse Change.

(b)     No Default or Event of Default has occurred and is continuing.

Section 4.15   <u>Environmental Condition</u>.

(a)     <u>Permits, Etc</u>.  Subject to the entry of the DIP Order and subject to any restrictions arising on account of the Borrower's, any Guarantors' or any Subsidiaries' status as a "debtor" under the Bankruptcy Code, the Borrower, the Guarantors and their respective Subsidiaries (i) have obtained all material Environmental Permits necessary for the ownership and operation of their respective Properties and the conduct of their respective businesses; (ii) have at all times been and are in material compliance with all terms and conditions of such Permits and with all other material requirements of applicable Environmental Laws; (iii) have not received notice of any material violation or alleged violation of any Environmental Law or Permit; and (iv) are not subject to any actual, pending or to the Borrower's knowledge, threatened Environmental Claim, that could reasonably be expected to cause a Material Adverse Change.

(b)     <u>Certain Liabilities</u>.  To Holdco's or the Borrower's actual knowledge, none of the present or previously owned, leased or operated Property of the Borrower or any Guarantor or of any of their former Subsidiaries, wherever located, (i) has been placed on or proposed to be placed on the National Priorities List, the Comprehensive Environmental Response Compensation Liability Information System list, or their state or local analogs, or have been otherwise investigated, designated, listed, or identified as a potential site for removal, remediation, cleanup, closure, restoration, reclamation, or other response activity under any Environmental Laws; (ii) is subject to a Lien, arising under or in connection with any Environmental Laws, that attaches to any revenues or to any Property owned, leased or operated by the Borrower or any of the Guarantors, wherever located, which could reasonably be expected to cause a Material Adverse Change; or (iii) has been the site of any Release of Hazardous Substances or Hazardous Wastes from present or past operations which has caused at the site or at any third-party site any condition that has resulted in or could reasonably be expected to result in the need for Response that would cause a Material Adverse Change.

(c)     <u>Certain Actions</u>.  Without limiting the foregoing, (i) all necessary notices which are material have been properly filed, and no further action is required under current Environmental Law as to each Response or other restoration or remedial project undertaken by the Borrower, the Guarantors or their respective Subsidiaries on any of their presently or formerly owned, leased or operated Property and (ii) to Holdco's or the Borrower's actual knowledge, there are no facts, circumstances, conditions or occurrences with respect to any Property owned, leased or operated by the Borrower, the Guarantors or any of their respective Subsidiaries that could reasonably be expected to form the basis of an Environmental Claim under Environmental Laws that could reasonably be expected to result in a Material Adverse Change.

Section 4.16   <u>Permits, Licenses, Etc</u>.  Subject to the entry of the DIP Order and subject to any restrictions arising on account of the Borrower's, any Guarantors' or any Subsidiaries'

Error! Unknown document property name.

status as a "debtor" under the Bankruptcy Code, the Borrower, the Guarantors and their respective Subsidiaries possess all authorizations, Permits, licenses, patents, patent rights or licenses, trademarks, trademark rights, trade names rights and copyrights which are material to the conduct of their business.  The Borrower, the Guarantors and their respective Subsidiaries manage and operate their business in all material respects in accordance with all applicable Legal Requirements and good industry practices.

Section 4.17   [Reserved].

Section 4.18   Liens; Titles, Leases, Etc.  None of the Property of the Borrower, any Guarantor or any of their respective Subsidiaries is subject to any Lien other than Permitted Liens and the Carve-Out.  On the date of this Agreement subject to entry of the DIP Order, all governmental actions and all other filings, recordings, registrations, third party consents and other actions which are necessary to create and perfect the Liens provided for in the DIP Order and the other Loan Documents will have been (or will be) made, obtained and taken in all relevant jurisdictions.  None of the Borrower, any Guarantor or any of their respective Subsidiaries is a party to any agreement or arrangement (other than this Agreement, the DIP Order and the other Loan Documents), or, other than as a result of the Chapter 11 Cases, subject to any order, judgment, writ or decree, that either restricts or purports to restrict its ability to grant Liens to secure the Obligations against their respective Properties.

Section 4.19   Insurance.  Each of the Borrower, the Guarantors and their respective Subsidiaries carry insurance required under Section 5.02 of this Agreement.

Section 4.20   Hedging Agreements.  As of the date hereof, there are no Hedge Contracts of the Borrower, the Guarantors and their respective Subsidiaries.

Section 4.21   Material Agreements.  Schedule 4.21 sets forth a complete and correct list, as of the date of this Agreement, of all agreements and other instruments to which the Borrower, the Guarantors or any of their respective Subsidiaries are party and which shall be binding on the Borrower, such Guarantor or such Subsidiary after the Petition Date (excluding the Loan Documents) and oil and gas leases and other agreements customarily entered into by oil and gas exploration and production companies in the ordinary course of business), the breach, nonperformance or termination of which could reasonably be expected to cause a Material Adverse Change. To the extent requested, the Borrower has heretofore delivered to the Administrative Agent a complete and correct copy of all such agreements or other instruments, including any modifications or supplements thereto, as in effect on the date hereof.

Section 4.22   Foreign Operations.  The Borrower and the other Loan Parties do not own any Oil and Gas Properties outside the geographical boundaries of the United States of America or in the offshore federal waters of the United States of America.

Section 4.23   Location of Business and Offices.  The Borrower's jurisdiction of organization is Delaware; the name of the Borrower as listed in the public records of its jurisdiction of organization is Shoreline Energy LLC (or, in each case, as set forth in a notice delivered to the Administrative Agent.  The Borrower's principal place of business and chief executive offices are located at the address specified in Schedule I, which schedule may be

-49-

updated by the Borrower from time to time.  Each Loan Party's jurisdiction of organization, name as listed in the public records of its jurisdiction of organization and the location of its principal place of business and chief executive office is stated on <u>Schedule 4.01</u>, which schedule may be updated by the Borrower from time to time.

Section 4.24   <u>Gas Imbalances; Prepayments</u>.  Except as set forth on Schedule 4.24, on a net basis there are no gas imbalances, take-or-pay or other prepayments which would require any Loan Party to deliver Hydrocarbons produced from their Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor.

Section 4.25   <u>Marketing of Production</u>.  (a) Except for contracts listed and in effect on the date hereof on Schedule 4.25, the Loan Parties are receiving a price for all production sold thereunder which is computed substantially in accordance with the terms of the relevant contract and are not having deliveries curtailed substantially below the subject Property's delivery capacity and (b) no material agreements exist which are not cancelable on 90 days' notice or less without penalty or detriment for the sale of production from the Loan Parties' Hydrocarbons (including calls on or other rights to purchase, production, whether or not the same are currently being exercised) that (i) pertain to the sale of production at a fixed price and (ii) have a maturity or expiry date of longer than six (6) months from the date hereof.

Section 4.26   <u>Loan Documents</u>.  Upon the execution and delivery by the Borrower and the Guarantors party thereto and the entry of the applicable DIP Order by the Bankruptcy Court, the Loan Documents are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, an Acceptable Security Interest in the Collateral and proceeds thereof. Subject to the entry of the DIP Order, to the extent required herein and in the other Loan Documents, the Obligations are and shall be at all times secured by a legal, valid and enforceable perfected super priority Liens in favor of the Administrative Agent, covering and encumbering the Collateral with the priority set forth in the DIP Order.

Section 4.27   <u>OFAC</u>.  None of the Borrower, the Guarantors or any of their respective Subsidiaries nor, to Holdco's or the Borrower's knowledge, any of their directors, officers, agents, employees or Affiliates is currently subject to any material U.S. sanctions administered by OFAC, and the Borrower will not directly or indirectly use the proceeds from the Borrowings or lend, contribute or otherwise make available such proceeds to any Loan Party, joint venture partner or other Person, for the purpose of financing the activities of any Person currently subject to any U.S. sanctions administered by OFAC.

Section 4.28   <u>Anti-Terrorism Laws</u>.

(a)    None of the Borrower, the Guarantors or their respective Subsidiaries nor, to Holdco's or the Borrower's knowledge, any of their Affiliates is in violation of any laws relating to terrorism or money laundering ("Anti-Terrorism Laws"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order"), and the Patriot Act.

(b)    None of the Borrower, the Guarantors or their respective Subsidiaries nor, to Holdco's or the Borrower's knowledge, any of their Affiliates or their respective brokers or

Error! Unknown document property name.

other agents acting or benefiting in any capacity in connection with the Loans is any of the following:

(i)      a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)     a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)    a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)    a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(v)     a Person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or any replacement website or other replacement official publication or such list.

Section 4.29    Money Laundering.  The operations of the Borrower, the Guarantors and their respective Subsidiaries are and have been conducted at all times in material compliance with applicable financial recordkeeping and reporting requirements of the Money Laundering Laws, and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Borrower, the Guarantors or any of their respective Subsidiaries with respect to the Money Laundering Laws is pending or, to the best knowledge of Holdco or the Borrower, threatened in writing.

Section 4.30    Foreign Corrupt Practices.  None of the Borrower, the Guarantors or their respective Subsidiaries nor, to the knowledge of Holdco or the Borrower, any of their directors, officers, agents, or employees, is aware of or has taken any action, directly or indirectly, that would result in a material violation by any such Person of the FCPA, including without limitation, making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay or authorization of the payment of any money, or other property, gift, promise to give, or authorization of the giving of anything of value to any "foreign official" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, in contravention of the FCPA; and, the Borrower, the Guarantors and their respective Subsidiaries have conducted their business in material compliance with the FCPA and have instituted and maintain policies and procedures designed to ensure, and which are reasonably expected to continue to ensure, continued compliance therewith.

**ARTICLE V**
**AFFIRMATIVE COVENANTS**

So long as any Obligation (other than contingent indemnification obligations) shall remain unpaid, or any Lender shall have any Commitment hereunder, the Borrower agrees,

Error! Unknown document property name.

unless the Majority Lenders shall otherwise consent in writing, to comply with the following covenants.

Section 5.01    Compliance with Laws, Etc.    Subject to any necessary Bankruptcy Court approval, and except in the case of the Debtors, to the extent compliance with such Legal Requirement is excused, or is otherwise prohibited, by the Bankruptcy Code or an order of the Bankruptcy Court, Holdco and the Borrower shall comply, and shall cause each of their respective Subsidiaries to comply, in all material respects with:

(a)    all applicable Legal Requirements;

(b)    with all Environmental Laws; and

(c)    all laws, regulations, or directives with respect to equal employment opportunity and employee safety in all jurisdictions in which the Borrower, the Guarantors or any of their respective Subsidiaries do business; provided, however, that this Section 5.01 shall not prevent the Borrower, the Guarantors or any of their respective Subsidiaries from, in good faith and with reasonable diligence, contesting the validity or application of any such Legal Requirements by appropriate legal proceedings.

Without limitation of the foregoing, Holdco and the Borrower shall, and shall cause each of their respective Subsidiaries to, maintain and possess all authorizations, Permits, licenses, trademarks, trade names, rights and copyrights which are necessary to the conduct of its business, in each case, subject to any necessary Bankruptcy Court approval.

Section 5.02    Maintenance of Insurance.

(a)    Subject to any necessary Bankruptcy Court approval, Holdco and the Borrower shall, and shall cause each of their respective Subsidiaries to, procure and maintain or shall cause to be procured and maintained continuously in effect policies of insurance in form and amounts and issued by companies, associations or organizations reasonably satisfactory to the Administrative Agent covering such casualties, risks, perils, liabilities and other hazards reasonably required by the Administrative Agent.

(b)    All certified copies of policies or certificates thereof, and endorsements and renewals thereof shall be delivered to and retained by the Administrative Agent upon its request.  All policies of insurance shall either have attached thereto a lender's loss payable endorsement for the benefit of the Administrative Agent, as loss payee in form reasonably satisfactory to the Administrative Agent or shall name the Administrative Agent as an additional insured, as applicable.  All policies of insurance shall have attached thereto a waiver of subrogation endorsement for the benefit of the Administrative Agent. All policies or certificates of insurance shall set forth the coverage, the limits of liability, the name of the carrier, the policy number, and the period of coverage.  In addition, all policies of insurance required under the terms hereof shall contain an endorsement or agreement by the insurer that any loss shall be payable in accordance with the terms of such policy notwithstanding any act of negligence of the Borrower or a Guarantor or a Subsidiary of the foregoing, or any party holding under the Borrower or a Guarantor or a Subsidiary of the foregoing which might otherwise result in a forfeiture of the insurance and the further agreement of the insurer waiving all rights of setoff,

-52-

counterclaim or deductions against the Borrower and any Guarantor and any Subsidiary of the foregoing.  All such policies shall contain a provision that notwithstanding any contrary agreements between the Borrower or any Guarantor or any Subsidiary of the foregoing and the applicable insurance company, such policies will not be canceled, allowed to lapse without renewal, surrendered or amended (which provision shall include any reduction in the scope or limits of coverage) without at least 30 days' prior written notice to the Borrower, and the Borrower shall promptly forward any such notice to the Administrative Agent.  In the event that, notwithstanding the "lender's loss payable endorsement" requirement of this <u>Section 5.02</u>, the Extraordinary Cash Proceeds of any insurance policy described above are paid to the Borrower or any Guarantor or any Subsidiary of the foregoing, as applicable, shall deliver such Extraordinary Cash Proceeds to the Administrative Agent immediately upon receipt pursuant to and in accordance with <u>Section 2.05</u>.

Section 5.03   <u>Preservation of Existence, Etc.</u>   Subject to any restrictions of the Borrower's or Holdco's status as a "debtor" under the Bankruptcy Code, Holdco and the Borrower shall preserve and maintain, and, except as otherwise permitted herein, cause each of their respective Subsidiaries to, preserve and maintain its limited liability company, corporate or limited partnership, as applicable, existence, rights, franchises, and privileges in the jurisdiction of its organization and qualify and remain qualified, and cause each such Subsidiary to qualify and remain qualified, as a foreign entity in each jurisdiction in which qualification is necessary or desirable in view of its business and operations or the ownership of its Properties, except where the failure to so qualify, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Change.

Section 5.04   <u>Payment of Taxes, Etc.</u>   Subject to approval of the Bankruptcy Court, Holdco and the Borrower shall pay and discharge, and cause each of their respective Subsidiaries to pay and discharge before the same shall become delinquent, (a) all taxes, assessments, and governmental charges or levies imposed upon it or upon its income or profits or Property that are material in amount, prior to the date on which penalties attach thereto and (b) all lawful claims that are material in amount which, if unpaid, might by law become a Lien upon its Property; <u>provided</u>, <u>however</u>, that none of Holdco, the Borrower or any such Subsidiary shall be required to pay or discharge any such tax, assessment, charge, levy, or claim which is (x) being contested in good faith and by appropriate proceedings, and with respect to which reserves in conformity with GAAP have been provided or (y) excused, or otherwise prohibited, by the Bankruptcy Code or an order of the Bankruptcy Court.

Section 5.05   <u>Visitation and Review Rights.</u>

(a)   At any reasonable time and from time to time, and at the expense of the Borrower, upon reasonable notice, Holdco and the Borrower shall, and shall cause their respective Subsidiaries to, permit (i) the Administrative Agent or any of its agents or representatives thereof, to examine and make copies of and abstracts from the records and books of account of, and visit and inspect at their reasonable discretion the Properties of, Holdco, the Borrower and any such Subsidiary, (ii) at the request of the Majority Lenders, a third party review of such Internal Engineering Report to be performed by the Independent Engineer who prepared the most recent Independent Engineering Report delivered to the Administrative Agent, and (iii) the Administrative Agent and any Lender or any of their respective agents or

Error! Unknown document property name.

representatives thereof to discuss the affairs, finances and accounts of Holdco, the Borrower and any such Subsidiary with any of their respective officers or directors.

(b)     At the expense of the Borrower, the Borrower shall have hired a financial advisor reasonably satisfactory to the Administrative Agent (it being understood and agreed that as of the Effective Date Imperial Capital, LLC reasonably satisfactory to the Administrative Agent) to assist the Borrower and the Administrative Agent with respect to reviewing financial information related to the Borrower; provided that the Administrative Agent, may at its reasonable discretion, determine that any financial advisor (including Imperial Capital, LLC) is no longer satisfactory and, subject to any necessary order or authorization of the Bankruptcy Court, require the Borrower to hire a replacement financial advisor).

Section 5.06   Reporting Requirements.   The Borrower shall furnish to the Administrative Agent and each Lender:

(a)     Annual Financials.  As soon as available and in any event not later than 120 days after the end of each fiscal year of the Borrower and its consolidated Subsidiaries, commencing with fiscal year ending December 31, 2016, (i) a copy of the complete annual audit report for such year for the Borrower and its consolidated Subsidiaries, including therein the Borrower's and its consolidated Subsidiaries' balance sheets as of the end of such fiscal year and the Borrower's and its consolidated Subsidiaries' statements of income, cash flows, and retained earnings, in each case certified by Ernst & Young LLP or an independent certified public accountants of national standing reasonably acceptable to the Administrative Agent, and (ii) any management letters delivered by such accountants to the Borrower.

(b)     Quarterly Financials.  As soon as available and in any event not later than 45 days after the end of each fiscal quarter of each fiscal year of the Borrower and its consolidated Subsidiaries, commencing with the fiscal quarter ending September 30, 2016, the unaudited balance sheet and the statements of income, cash flows, and retained earnings of each such Person for the period commencing at the end of the previous year and ending with the end of such fiscal quarter, all in reasonable detail and duly certified with respect to such consolidated statements (subject to year-end audit adjustments) by a Responsible Officer of the Borrower as having been prepared in accordance with GAAP.

(c)     Monthly Operating Reports.  Substantially concurrently with the filing thereof with the Bankruptcy Court, the monthly operating report of the Debtors required to be filed with the Bankruptcy Court.

(d)     13-Week Projections; Variance Reports. (i) On the fourth Business Day after each Testing Date, the Borrower shall provide to the Administrative Agent and the Lenders (A) an updated 13-week Projection solely for reporting purposes, covering the subsequent thirteen-weeks and (B) a Variance Report and (ii) no later than one week prior to the end of the thirteen-week period covered by the then effective Budget the Borrower shall provide to the Administrative Agent and the Lenders, (A) an updated Budget and (B) a certificate of the Chief Financial Officer of the Borrower stating that such Budget has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Borrower to be reasonable at the time made and from the best information then available to the Borrower in connection

Error! Unknown document property name.

therewith (such certificate a "Budget Certificate").  Such updated Budget shall, upon approval of the Administrative Agent, become the Budget for all purposes herein; provided, that the Borrower may request amendments or modifications to the then effective Budget as set forth in any updated 13-week Projection, which amended or modified 13-week Projection shall, upon approval of the Administrative Agent for such purpose, become the Budget for all purposes herein.

(e)      Motions, etc. To the extent reasonably practicable at least one day prior to, and in any event no later than the day after, such filing or distribution, copies of all material pleadings and motions to be filed by or on behalf of the Borrower or any of the Guarantors with the Bankruptcy Court or the United States Trustee in the Chapter 11 Cases, or to be distributed by or on behalf of the Borrower or any of the Guarantors to any official committee appointed in the Chapter 11 Cases (other than emergency pleadings or motions where, despite such Debtor's commercially reasonable efforts, such one-day notice is impracticable); provided that (x) copies of pleadings and motions to be so filed by or on behalf of the Borrower or any of the Guarantors to the extent directly relating to this Agreement or any other Loan Documents, including, without limitation, any amendment, modification or supplement to this Agreement (or a waiver of the provisions thereof) or any other matter directly and adversely affecting the liens, claims or rights of the Lenders under this Agreement or any other Loan Document in any material respect shall be delivered to the Administrative Agent and counsel to the Administrative Agent at least two business days prior to such filing (unless the Administrative Agent otherwise agrees to a shorter period) and (y) the Administrative Agent and the Majority Lenders shall be reasonably satisfied with any employee retention or incentive plans or arrangements.

(f)      [Reserved.]

(g)      Oil and Gas Engineering Reports.

(i)      As soon as available but in any event on or before March 31st of each year thereafter, commencing March 31, 2017, an Independent Engineering Report dated effective as of the immediately preceding January 1st;

(ii)      As soon as available but in any event on or before October 1st of each year, commencing October 1, 2016, an Internal Engineering Report dated effective as of the immediately preceding July 1st;

(iii)      Such other information as may be reasonably requested by the Administrative Agent or any Lender with respect to the Oil and Gas Properties (including customary information with respect to probable reserves attributable to such Oil and Gas Properties);

(iv)      With the delivery of each Engineering Report, a certificate from a Responsible Officer of the Borrower certifying that, to the best of his knowledge and in all material respects: (A) the information contained in the Engineering Report and any other information delivered in connection therewith is true and correct, (B) except as set forth on an exhibit to the certificate, on a net basis there are no gas imbalances, take or pay or other prepayments in excess of the volume specified in Section 4.24 with

Error! Unknown document property name.

respect to its Oil and Gas Properties evaluated in such Engineering Report which would require the Borrower or any of its Subsidiaries to deliver Hydrocarbons produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor, (C) none of its Oil and Gas Properties have been sold (other than Hydrocarbons sold in the ordinary course of business) since the date of the last certificate delivered pursuant to this Section 5.06(g)(iv) except as set forth on an exhibit to the certificate, which certificate shall list all of its Oil and Gas Properties sold (other than Hydrocarbons sold in the ordinary course of business) and in such detail as reasonably required by the Majority Lenders, (D) attached to the certificate is a list of its Oil and Gas Properties added to and deleted from the immediately prior Engineering Report and a list showing any change in working interest or net revenue interest in its Oil and Gas Properties occurring and the reason for such change, (E) attached to the certificate is a list of all Persons disbursing proceeds to the Borrower or to its Subsidiary, as applicable, from its Oil and Gas Properties, (F) except as set forth on a schedule attached to the certificate, all of the Oil and Gas Properties evaluated by such Engineering Report are pledged as Collateral for the Obligations, (G) attached to the certificate is a list of all marketing agreements entered into by a Loan Party subsequent to the later of the date hereof or the most recently delivered Engineering Report  and (H) attached thereto is a schedule of the Oil and Gas Properties evaluated by such Engineering Report that are subject to a mortgage in favor of the secured parties under the Existing Credit Agreement as of the Petition Date and demonstrating the percentage of the total value of the proved Oil and Gas Properties that the value of such Oil and Gas Properties represent.

(h)     Production Reports.

(i)     (A) As soon as available and in any event within 45 days after each month end (each such calendar month being referred to herein as a "monthly test period") a report certified by a Responsible Officer of the Borrower in form and substance satisfactory to the Administrative Agent prepared by the Borrower covering each of the Oil and Gas Properties of the Borrower and its Subsidiaries and detailing (1) the production, revenue, and price information and associated operating expenses for the then current monthly test period, (2) any changes to any producing reservoir, production equipment, or producing well during such monthly test period, which changes could reasonably be expected to cause a Material Adverse Change, and (3) any sales of the Borrower's or any Subsidiaries' Oil and Gas Properties during such test period; and (B) as soon as available and in any event within 45 days after each quarter end commencing with the quarter ending September 30, 2016 (each such quarter being referred to herein as a "quarterly test period"), a report certified by a Responsible Officer of the Borrower in form and substance satisfactory to the Majority Lenders prepared by the Borrower covering each of the Oil and Gas Properties of the Borrower and its Subsidiaries and detailing (1) the production, revenue, and price information and associated operating expenses for the then current quarterly test period, (2) any changes to any producing reservoir, production equipment, or producing well during such quarterly test period, which changes could reasonably be expected to cause a Material Adverse Change, and (3) any sales of the Borrower's or any Subsidiaries' Oil and Gas Properties during such quarterly test period;

Error! Unknown document property name.

(ii)     (A) As soon as available and in any event within five (5) Business Days after each of the 15th day and the last day of each calendar month (each such 15th or last day, as applicable, being referred to in this paragraph (ii) as a "test date"; and each period commencing on the immediately prior test date and ending on the then current test date, being referred to in this paragraph (ii) as a "test period"), a daily production summary covering the Oil and Gas Properties of the Borrower and its Subsidiaries in a form reasonably satisfactory to the Majority Lenders.

(i)     Defaults.  As soon as possible and in any event within three (3) Business Days after (i) the occurrence of any Default or (ii) the occurrence of any default under any instrument or document evidencing Debt binding on the Borrower, any Guarantor or any of their respective Subsidiaries after the Petition Date in excess of $500,000, in each case known to any officer of the Borrower, any Guarantor or any of their respective Subsidiaries which is continuing on the date of such statement, a statement of a Responsible Officer of the Borrower setting forth the details of such Default or default, as applicable, and the actions which the Borrower, such Guarantor or such Subsidiary has taken and proposes to take with respect thereto;

(j)     Termination Events.  As soon as possible and in any event (i) within 30 days after the Borrower or any member of the Controlled Group knows or has reason to know that any Termination Event described in clause (a) of the definition of Termination Event with respect to any Plan has occurred, and (ii) within 10 days after the Borrower, any Guarantor or any of their respective Subsidiaries knows or has reason to know that any other Termination Event with respect to any Plan has occurred, a statement of a Responsible Officer of the Borrower describing such Termination Event and the action, if any, which the Borrower, any Guarantor or any of their respective Subsidiaries proposes to take with respect thereto;

(k)     Termination of Plans.  Promptly and in any event within two Business Days after receipt thereof by the Borrower or any member of the Controlled Group from the PBGC, copies of each notice received by the Borrower or any such member of the Controlled Group of the PBGC's intention to terminate any Plan or to have a trustee appointed to administer any Plan;

(l)     Other ERISA Notices.  Promptly and in any event within five Business Days after receipt thereof by the Borrower or any member of the Controlled Group from a Multiemployer Plan sponsor, a copy of each notice received by the Borrower or any member of the Controlled Group concerning the imposition or amount of withdrawal liability pursuant to Section 4202 of ERISA;

(m)     Environmental Notices.  Promptly and in any event within three Business Days after receipt thereof by the Borrower, any Guarantor or any of their respective Subsidiaries, a copy of any form of request, notice, summons or citation received from the Environmental Protection Agency, or any other Governmental Authority, concerning (i) violations or alleged violations of Environmental Laws, which seeks to impose liability therefor and could cause a Material Adverse Change, (ii) any action or omission on the part of the Borrower, any Guarantor any of their respective Subsidiaries or former Subsidiaries in connection with Hazardous Waste or Hazardous Substances which could reasonably result in the imposition of liability therefor that

-57-

could cause a Material Adverse Change, including without limitation any information request related to, or notice of, potential responsibility under CERCLA, or (iii) concerning the filing of a Lien upon, against or in connection with the Borrower, any Guarantor, any of their respective Subsidiaries or former Subsidiaries or any of their leased or owned Property, wherever located;

(n)     <u>Other Governmental Notices</u>.   Promptly and in any event within five Business Days after receipt thereof by the Borrower, any Guarantor or any of their respective Subsidiaries, a copy of any notice, summons, citation, or proceeding seeking to modify in any material respect, revoke, or suspend any material contract, license, permit or agreement with any Governmental Authority;

(o)     <u>Material Changes</u>.   Prompt written notice of any condition or event of which the Borrower has knowledge, which condition or event (i) has resulted or could reasonably be expected to result in a Material Adverse Change or (ii) other than defaults or events of default arising as an effect of the Chapter 11 Cases, has resulted in a breach of or noncompliance with any material term, condition, or covenant of any material contract to which the Borrower, any Guarantor or any of their respective Subsidiaries is a party or by which they or their Properties may be bound;

(p)     <u>Disputes, Etc</u>.   Prompt written notice of (i) any claims, legal or arbitration proceedings, proceedings (other than the Chapter 11 Cases) before any Governmental Authority, or disputes pending, or to the knowledge of the Borrower threatened, or affecting the Borrower, any Guarantor or any of their respective Subsidiaries which, if adversely determined, could reasonably be expected to cause a Material Adverse Change, or any material labor controversy of which the Borrower, any Guarantor or any of their respective Subsidiaries has knowledge resulting in or reasonably considered to be likely to result in a strike against the Borrower, any Guarantor or any of their respective Subsidiaries and (ii) any claim, judgment, Lien or other encumbrance (other than a Permitted Lien) affecting any Property of the Borrower, any Guarantor or any of their respective Subsidiaries (other than the Chapter 11 Cases) if the value of the claim, judgment, Lien, or other encumbrance affecting such Property shall exceed $250,000 and which is not subject to the automatic stay in the Chapter 11 Cases or otherwise covered by insurance or in which injunctive or similar relief is sought;

(q)     <u>Other Accounting Reports</u>.   Promptly upon receipt thereof, a copy of each other report or letter submitted to the Borrower, any Guarantor or any of their respective Subsidiaries by independent accountants in connection with any annual, interim or special audit made by them of the books of the Borrower and its Subsidiaries, and a copy of any response by the Borrower, any Guarantor or any of their respective Subsidiaries, or the Board of Directors (or other applicable governing body) of the Borrower, any Guarantor or any of their respective Subsidiaries, to such letter or report;

(r)     <u>Notices Under Other Loan Agreements</u>.   Promptly and in any event within three Business Days after the furnishing thereof, copies of any statement, report or notice furnished by or to any Loan Party pursuant to the terms of any Second Lien Loan Document or Holdco Note Document (other than any statements, reports or notices received by any Purchaser Observer (as defined in the Holdco Note Purchase Agreement) pursuant to <u>Section 6.12</u> of the Holdco Note Purchase Agreement or received by any Purchaser from such Purchaser Observer in

Error! Unknown document property name.

connection therewith) or any other indenture, loan or credit or other similar agreement (other than this Agreement) and not otherwise required to be furnished to the Lenders pursuant to any other provision of this <u>Section 5.06</u>;

(s) <u>USA Patriot Act</u>.  Promptly, following a request by any Lender, all documentation and other information that such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act; and

(t) <u>Accounts Payable Aging</u>.  As soon as available and in any event within five Business Days after each of the 15th day and the last day of each calendar month (each such 15th day or last day, as applicable, being referred to herein as a "<u>Delivery Date</u>"), an accounts payable aging report of the Borrower and its Subsidiaries as of such Delivery Date prepared by management of the Borrower and in form and substance reasonably satisfactory to the Majority Lenders;

(u) <u>Meeting with Management</u>.  On each Delivery Date, the Borrower shall arrange for management of the Borrower to host a call with the Lenders to discuss the accounts payable aging report of the Borrower and its Subsidiaries,  the updated Budget of the Borrower and the operations of the Borrower and its Subsidiaries; and

(v) <u>Other Information</u>.  Such other information respecting the business or Properties, or the condition or operations, financial or otherwise, of the Borrower, any Guarantor or any of their respective Subsidiaries, as any Lender through the Administrative Agent may from time to time reasonably request.  The Administrative Agent agrees to provide the Lenders with copies of any material notices and information delivered solely to the Administrative Agent pursuant to the terms of this Agreement.

Section 5.07   <u>Maintenance of Property</u>.  Subject to any necessary order or authorization of the Bankruptcy Court, Holdco and the Borrower shall, and shall cause each of their respective Subsidiaries to, maintain their owned, leased, or operated Property in good condition and repair, normal wear and tear excepted; and shall abstain, and cause each such Subsidiary to abstain from, knowingly or willfully permitting the commission of waste or other injury, destruction, or loss of natural resources, or the occurrence of pollution, contamination, or any other condition in, on or about the owned, leased or operated Property involving the Environment that could reasonably be expected to result in Response activities and that could reasonably be expected to cause a Material Adverse Change.

Section 5.08   <u>Agreement to Pledge; Additional Guarantors</u>.  (a)  Subject to the entry of the DIP Order, Holdco and the Borrower shall, and shall cause each of their respective Subsidiaries to, grant to the Administrative Agent an Acceptable Security Interest in any personal Property of Holdco, the Borrower or any Subsidiary of the foregoing now owned or hereafter acquired and substantially all of the Oil and Gas Properties of the Borrower and its Subsidiaries, in each case, promptly after receipt of a written request from the Administrative Agent.

Error! Unknown document property name.

(b)      Holdco and the Borrower shall promptly cause each newly created or acquired domestic Subsidiary of Holdco or the Borrower to guarantee the Obligations pursuant to the Guaranty, including pursuant to a supplement or joinder thereto.  In connection with any such guaranty, Holdco or the Borrower, as applicable, shall, or shall cause (i) such Subsidiary to execute and deliver the Guaranty (or a supplement thereto, as applicable) and (ii) the owners of the Equity Interests of such Subsidiary to pledge all of the Equity Interests of such new Subsidiary (including delivery of original stock certificates evidencing the Equity Interests of such Subsidiary, together with an appropriate undated stock powers for each certificate duly executed in blank by the registered owner thereof) and to execute and deliver such other additional closing documents and certificates as shall reasonably be requested by the Administrative Agent.

Section 5.09   Use of Proceeds.  The Borrower shall use the proceeds of the Advances for general corporate purposes in such amounts set forth in the Budget (including any permitted variances set forth in Section 6.19).  Notwithstanding anything to the contrary, no portion of the Loans or the Collateral (including any cash collateral) shall be used (i) to challenge the validity, perfection, priority, extent or enforceability of the obligations under the DIP Facility or the obligations under the Existing Credit Agreement, (ii) to investigate or assert any other claims or causes of action against the Administrative Agent, any other agent or any Lender with respect to any holder of any such obligations, except as agreed by the Administrative Agent and provided in the DIP Order with respect to any investigation regarding the obligations under the Existing Credit Agreement or (iii) for any act which has the effect of materially or adversely modifying or compromising the rights and remedies of the Administrative Agent or the Lenders or any such party with respect to the DIP Facility or any Loan Document (as defined in the Existing Credit Agreement).

Section 5.10   Title Evidence and Opinions.  The Borrower shall, from time to time after the Effective Date upon the reasonable request of the Administrative Agent, take such actions and execute and deliver such documents and instruments as the Administrative Agent shall require to ensure that the Administrative Agent shall, at all times, have received satisfactory title evidence (including, if requested by the Administrative Agent, title opinions addressed to it), which title evidence (a) shall collectively cover at least 80% of PV-9 of the Proven Reserves of the Borrower and its Subsidiaries shown on the most recently delivered Engineering Report (and together with any Proven Reserves acquired since the date of such report), (b) shall be in form and substance acceptable to the Administrative Agent in its sole discretion, (c) shall include opinions or, to the extent acceptable to the Administrative Agent in its sole discretion, other title evidence regarding the before payout and after payout ownership interests held by the Borrower and its Subsidiaries for all wells located on the Oil and Gas Properties covered thereby as to the ownership of Oil and Gas Properties of the Borrower and its Subsidiaries.  The parties hereto acknowledge and agree that, if the title of the Borrower or any of its Subsidiaries  to any of the Oil and Gas Properties reviewed and accepted by the Administrative Agent as satisfactory to meet the preceding 80% requirement shall become the subject matter of litigation before any Governmental Authority or arbitrator which could reasonably be expected to result in a Material Adverse Change with respect to the Borrower's and the Subsidiaries' title to such Oil and Gas Properties, taken as a whole, then, at the election of the Administrative Agent, such title shall no longer be considered satisfactory for purposes of compliance with this Section 5.10.

-60-

Section 5.11   Further Assurances; Cure of Title Defects.   Holdco and the Borrower shall, and shall cause their respective Subsidiaries to, cure promptly any defects in the creation and issuance of the Notes and the execution and delivery of the other Loan Documents.  Each of Holdco and the Borrower hereby authorizes the Administrative Agent to file any financing statements without the signature of Holdco, the Borrower or such Subsidiary, as applicable, to the extent permitted by applicable law in order to perfect, maintain or otherwise evidence the perfection of any security interest granted under any of the Loan Documents.  Holdco and the Borrower at their expense will, and will cause each of their respective Subsidiaries to promptly execute and deliver to the Administrative Agent upon reasonable request by the Administrative Agent all such other documents, agreements and instruments to comply with or accomplish the covenants and agreements of the Borrower, any Guarantor or any Subsidiary, as the case may be, in the Loan Documents, or to further evidence and more fully describe the collateral intended as security for the Obligations, or to correct any omissions in the Loan Documents, or to state more fully the security obligations set out herein or in any of the Loan Documents, or to perfect, protect or preserve any Liens created pursuant to any of the Loan Documents, or to make any recordings, to file any notices or obtain any consents, all as may be necessary or appropriate in connection therewith or to enable the Administrative Agent to exercise and enforce its rights and remedies with respect to any Collateral.  Within 30 days after (a) a request by the Administrative Agent or the Lenders to cure any title defects or exceptions which are not Permitted Liens raised by such information or (b) a notice by the Administrative Agent that the Borrower has failed to comply with Section 5.10 above, the Borrower shall (i) subject to any necessary orders and authorizations of the Bankruptcy Court, cure such title defects or exceptions which are not Permitted Liens or substitute acceptable Oil and Gas Properties with no title defects or exceptions except for Permitted Liens covering Collateral of an equivalent value and (ii) deliver to the Administrative Agent satisfactory title evidence (including supplemental or new title opinions meeting the foregoing requirements) in form and substance acceptable to the Administrative Agent in its reasonable business judgment as to the Borrower's and its Subsidiaries' ownership of such Oil and Gas Properties and the Administrative Agent's Liens and security interests therein as are required to maintain compliance with Section 5.10.  To the extent that the Administrative Agent or the Majority Lenders are not satisfied with any cure to any title defects or exceptions after the 30-day period has elapsed, at the election of the Majority Lenders, such unacceptable Oil and Gas Property shall not count towards the 80% requirement.

Section 5.12   [Reserved].

Section 5.13   Leases; Development and Maintenance.   Subject to any necessary Bankruptcy Court approval and except to the extent excused by the applicable provisions of the Bankruptcy Code or order of the Bankruptcy Court, Holdco and the Borrower shall, and shall cause their respective Subsidiaries to, (a) pay and discharge promptly, or cause to be paid and discharged promptly, all rentals, delay rentals, royalties, overriding royalties, payments out of production and other indebtedness or obligations accruing under, and perform or cause to be performed each and every act, matter or thing required by each and all of, the oil and gas leases and all other agreements and contracts constituting or affecting the Oil and Gas Properties of the Borrower and its Subsidiaries (except where the amount thereof is being contested in good faith by appropriate proceedings), (b) do all other things necessary to keep unimpaired its rights thereunder and prevent any forfeiture thereof or default thereunder, and operate or cause to be operated such Properties as a prudent operator would in accordance with industry standard

Error! Unknown document property name.

practices and in compliance with all applicable proration and conservation Legal Requirements and any other Legal Requirements of every Governmental Authority, whether state, federal, municipal or other jurisdiction, from time to time constituted to regulate the development and operations of oil and gas properties and the production and sale of oil, gas and other Hydrocarbons therefrom, and (c) maintain (or cause to be maintained) the Leases, wells, units and acreage to which the Oil and Gas Properties of the Borrower and its Subsidiaries pertain in a prudent manner consistent with industry standard practices.

Section 5.14   Deposit Accounts and Securities Accounts.   Holdco and the Borrower shall, and shall cause each of their respective Subsidiaries to, cause all of its Deposit Accounts (other than Deposit Accounts with the Administrative Agent) and Securities Accounts to be subject to Account Control Agreements.

Section 5.15   Environmental Matters.

(a)   Subject to any necessary Bankruptcy Court approval, and except in the case of the Debtors, to the extent compliance with such Legal Requirement is excused, or is otherwise prohibited by the Bankruptcy Code or an order of the Bankruptcy Court, Holdco and the Borrower shall: (i) comply, and shall cause their respective Properties and operations and each of their respective Subsidiaries and each such Subsidiaries' Properties and operations to comply, with all applicable Environmental Laws, except to the extent any breach thereof could not be reasonably expected to cause a Material Adverse Change; (ii) not dispose of or otherwise Release, and shall cause each of their respective Subsidiaries not to dispose of or otherwise Release, any Hazardous Substance, or solid waste on, under, about or from any of the Borrower's or the other Loan Party's Properties or any other Property to the extent caused by Holdco's the Borrower's or any of their respective Subsidiaries' operations except in compliance with applicable Environmental Laws, the disposal or Release of which could reasonably be expected to cause a Material Adverse Change; (iii) timely obtain or file, and shall cause each of their respective Subsidiaries to timely obtain or file, all notices, and Environmental Permits, if any, required under applicable Environmental Laws to be obtained or filed in connection with the operation or use of Holdco's the Borrower's or of their respective Subsidiaries' Properties, which failure to obtain or file could reasonably be expected to cause a Material Adverse Change; (iv) promptly commence and diligently prosecute to completion, and shall cause each of its Subsidiaries to promptly commence and diligently prosecute to completion, any assessment, evaluation, investigation, monitoring, containment, cleanup, removal, repair, restoration, remediation or other remedial obligations (collectively, the "Remedial Work") in the event any Remedial Work is required or reasonably necessary under applicable Environmental Laws because of or in connection with the actual or suspected past, present or future disposal or other Release of any Hazardous Substances on, under, about or from any of Holdco's the Borrower's or its Subsidiaries' Properties, which failure to commence and diligently prosecute to completion could reasonably be expected to cause a Material Adverse Change; (v) conduct, and cause each of their respective Subsidiaries to conduct, their respective operations and businesses in a manner that will not expose any Property or Person to Hazardous Substances that could reasonably be expected to form the basis for a claim for damages or compensation, which claim for damages or compensation could reasonably be expected to cause a Material Adverse Change; and (vi) establish and implement, and shall cause each of their respective Subsidiaries to establish and implement, such procedures as may be necessary to determine and assure that Holdco's, the

Borrower's and their respective Subsidiaries' obligations under this Section 5.15(a) are timely and fully satisfied, which failure to establish and implement could reasonably be expected to cause a Material Adverse Change.

(b)     Holdco and the Borrower will promptly, but in no event later than five Business Days of Holdco or the Borrower becoming aware thereof, notify the Administrative Agent and the Lenders in writing of any threatened action, investigation or inquiry, in each case, threatened or evidenced in writing, by any Governmental Authority or any demand or lawsuit by any landowner or other third party threatened in writing against Holdco, the Borrower or any of their respective Subsidiaries or their Properties of which Holdco or the Borrower has knowledge in connection with any Environmental Laws (excluding routine testing and corrective action) if Holdco or the Borrower reasonably anticipates that such action will result in liability in excess of $500,000, not fully covered by insurance, subject to normal deductibles.

(c)     If an Event of Default has occurred and is continuing, the Administrative Agent may (but shall not be obligated to), at the reasonable expense of the Borrower and to the extent that the Borrower has the right to do so, conduct such Remedial Work as it deems appropriate to determine the nature and extent of any noncompliance with applicable Environmental Laws, the nature and extent of the presence of any Hazardous Substance and the nature and extent of any other environmental conditions that may exist at or affect any of the Oil and Gas Properties of the Borrower and its Subsidiaries, and Holdco, the Borrower and their respective Subsidiaries shall cooperate with the Administrative Agent in conducting such Remedial Work.  Such Remedial Work may include a detailed visual inspection of the Oil and Gas Properties of the Borrower and its Subsidiaries, including all storage areas, storage tanks, drains and dry wells and other structures and locations, as well as the taking of soil samples, surface water samples, and ground water samples and such other investigations or analyses as the Administrative Agent deems appropriate.  The Administrative Agent and its officers, employees, agents and contractors shall (subject to the rights of any third parties) have and are hereby granted the right to enter upon the Oil and Gas Properties of the Borrower and its Subsidiaries for the foregoing purposes.

Section 5.16   Marketing Activities.  Holdco and the Borrower shall not, and shall not permit any of their respective Subsidiaries to, engage in marketing activities for any Hydrocarbons or enter into any contracts related thereto other than (i) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from their proved Oil and Gas Properties during the period of such contract, (ii) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from proved Oil and Gas Properties of third parties during the period of such contract associated with the Oil and Gas Properties of the Borrower and the other Loan Parties that the Borrower or one of the other Loan Parties has the right to market pursuant to joint operating agreements, unitization agreements or other similar contracts that are usual and customary in the oil and gas business and (iii) other contracts for the purchase and/or sale of Hydrocarbons of third parties (A) which have generally offsetting provisions (i.e. corresponding pricing mechanics, delivery dates and points and volumes) such that no "position" is taken and (B) for which appropriate credit support has been taken to alleviate the material credit risks of the counterparty thereto.

Error! Unknown document property name.

Section 5.17   <u>Patriot Act, OFAC, FCPA</u>.  Now and hereafter to the extent applicable to this Agreement, the transactions contemplated hereby or the Loan Parties' execution, delivery and performance  of the Loan Documents, do and will comply, as applicable, in all material respects with the Patriot Act, OFAC and FCPA, and with respect to each statute, any successor statute thereto.

## ARTICLE VI
## NEGATIVE COVENANTS

So long as any Obligation (other than contingent indemnification obligations) shall remain unpaid or any Lender shall have any Commitment, each of Holdco and the Borrower agrees, unless the Majority Lenders otherwise consent in writing, to comply with the following covenants.

Section 6.01   <u>Liens, Etc.</u>  Holdco and the Borrower shall not create, assume, incur, or suffer to exist, or permit any of its Subsidiaries to create, assume, incur, or suffer to exist, any Lien on or in respect of any of its Property whether now owned or hereafter acquired, or assign any right to receive income, except that Holdco, the Borrower and their respective Subsidiaries may create, incur, assume, or suffer to exist:

(a)      Liens granted pursuant to the DIP Order and the other Loan Documents securing the Obligations;

(b)      purchase money Liens or purchase money security interests, in each case, upon or in any equipment acquired or held by the Borrower or any of its Subsidiaries in the ordinary course of business prior to or at the time of the Borrower's or such Subsidiary's acquisition of such equipment; <u>provided</u> that the Debt secured by such Liens (i) was incurred solely for the purpose of financing the acquisition of such equipment, and does not exceed the aggregate purchase price of such equipment, (ii) is secured only by such equipment and not by any other assets of the Borrower and its Subsidiaries, and (iii) is not increased in amount;

(c)      Liens for taxes, assessments, or other governmental charges or levies not yet due or that (provided foreclosure, sale, or other similar proceedings shall not have been initiated and such proceeding has not been stayed by the Chapter 11 Cases) are being contested in good faith by appropriate proceedings, provided such reserve as may be required by GAAP shall have been made therefor;

(d)      Liens in favor of vendors, carriers, warehousemen, repairmen, mechanics, workmen, materialmen, construction, or similar Liens arising by operation of law in the ordinary course of business (i) in respect of obligations that are not yet due or that are being contested in good faith by appropriate proceedings, provided such reserve as may be required by GAAP shall have been made therefor or (ii) that arise under applicable state law in respect of the exploration, development, operation or maintenance of Oil and Gas Properties;

(e)      Liens to operators and non-operators under joint operating agreements arising in the ordinary course of the business of the Borrower or the relevant Subsidiary to secure amounts owing, which (i) amounts are not yet due or are being contested in good faith by

-64-

appropriate proceedings, provided such reserve as may be required by GAAP shall have been made therefor or (ii) that arise under applicable state law;

(f)     royalties, overriding royalties, net profits interests, production payments, reversionary interests, calls on production, preferential purchase rights and other burdens on or deductions from the proceeds of production, that do not secure Debt for borrowed money and that are taken into account in computing the net revenue interests and working interests of the Borrower or any of its Subsidiaries warranted in this Agreement or any other Loan Documents;

(g)     Liens arising in the ordinary course of business out of pledges or deposits under workers' compensation laws, unemployment insurance, old age pensions or other social security or retirement benefits, or similar legislation or to secure public or statutory obligations of the Borrower or any of its Subsidiaries;

(h)     Liens arising under operating agreements, unitization and pooling agreements and orders, farmout agreements, gas balancing agreements and other agreements, in each case that are customary in the oil, gas and mineral production business and that are entered into in the ordinary course of business that are taken into account in computing the net revenue interests and working interests of the Borrower or any of its Subsidiaries warranted in this Agreement, to the extent that any such Lien referred to in this clause does not materially impair the use of the Property covered by such Lien for the purposes for which such Property is held by the Borrower or any Subsidiary or materially impair the value of such Property subject thereto;

(i)     easements, rights-of-way, restrictions, and other similar encumbrances, and minor defects in the chain of title that are customarily accepted in the oil and gas financing industry, none of which interfere with the ordinary conduct of the business of Borrower or any Subsidiary or materially detract from the value or use of the Property to which they apply;

(j)     Liens incurred prior to the Petition Date and existing on the Effective Date and set forth on Schedule 6.01;

(k)     Liens securing Debt permitted by Section 6.02(d) (other than any such Debt supported by letters of credit or secured by cash deposits); provided that such Liens are (i) incurred in the ordinary course of business and (ii) subordinated to the Liens securing the DIP Facility pursuant to documentation reasonably satisfactory to the Administrative Agent;

(l)     Liens on cash pledged to secure Debt permitted under Section 6.02(g); and

(m)     Liens in respect of adequate protection granted on account of any Debt existing prior to the Petition Date in accordance with the DIP Order.

Section 6.02   Debts, Guaranties, and Other Obligations.  Holdco and the Borrower shall not, and shall not permit any of their respective Subsidiaries to, create, assume, suffer to exist, or in any manner become or be liable in respect of, any Debt except:

(a)     Debt of the Loan Parties under the Loan Documents;

-65-

(b)     Debt of the Borrower and its Subsidiaries secured by the Liens permitted under paragraph (b) of <u>Section 6.01</u> and any renewal, refinancing or extension of such Debt; <u>provided</u> that (i) no Lien existing at the time of such renewal, refinancing or extension shall be extended to cover any property not already subject to such Lien, (ii) the principal amount of any Debt renewed, refinanced or extended shall not exceed the amount of such Debt outstanding immediately prior to such renewal, refinancing or extension; and (iii) in any event, the aggregate amount of such Debt at any time shall not exceed $50,000;

(c)     Debt incurred prior to the Petition Date and existing on the Effective Date and set forth in <u>Schedule 6.02</u>;

(d)     Debt consisting of sureties or bonds provided to any Governmental Authority or other Person and assuring payment of contingent liabilities of the Borrower or any of its Subsidiaries in connection with the operation of the Oil and Gas Properties, including with respect to plugging, facility removal and abandonment of its Oil and Gas Properties;

(e)     Debt of the Borrower or any Subsidiary Guarantor owing to the Borrower or to any other Guarantor; <u>provided</u> that such Debt is subordinated to the Obligations on terms acceptable to the Administrative Agent in its sole discretion;

(f)     Any guaranty of any Debt of the Borrower or a Guarantor permitted to be incurred under this <u>Section 6.02</u>;

(g)     Debt in respect of the letter of credit issued by Whitney Bank in favor of Apache Corporation in a face amount not to exceed $35,000.00; and

(h)     Debt arising under insurance premium finance arrangements for insurance as required under <u>Section 5.02</u> not to exceed an aggregate amount at any time of $1,600,000.

Notwithstanding anything to the contrary, nothing in this <u>Section 6.02</u> shall be deemed to permit the incurrence after the Petition Date of any Debt constituting trade payables or other accounts payable outstanding longer than ninety days (except to the extent that such account is being disputed in good faith with adequate reserves under GAAP established).

Section 6.03   <u>Agreements Restricting Liens and Distributions</u>.   Holdco and the Borrower shall not, nor shall they permit any of their respective Subsidiaries to, after the Petition Date, create, incur, assume or permit to exist any contract, agreement or understanding (other than this Agreement, the other Loan Documents or other Debt permitted under Sections 6.02(b) and (c), which in any way prohibits or restricts the granting, conveying, creation or imposition of any Lien on any of its Property, whether now owned or hereafter acquired, to secure the Obligations or restricts any Subsidiary from paying dividends to the Borrower, or which requires the consent of or notice to other Persons in connection therewith; <u>provided</u>, that the foregoing shall not apply to customary restrictions imposed on the granting, conveying, creation or imposition of any Lien on any Property of the Borrower or its Subsidiaries imposed by any contract, agreement or understanding related to the Liens permitted under clause (b) of <u>Section 6.01</u> so long as such restriction only applies to the Property permitted under such clause to be encumbered by such Liens.

Error! Unknown document property name.

Section 6.04    Merger or Consolidation; Asset Sales.  Holdco and the Borrower shall not, nor shall they permit any of their respective Subsidiaries to:

(a)    merge or consolidate with or into any other Person; provided that the Borrower or any Subsidiary may merge or may be consolidated into the Borrower or a Subsidiary Guarantor if the Borrower or such Subsidiary Guarantor is the surviving entity; provided further that immediately after giving effect to any such proposed transaction (i) no Default would exist, (ii) the Administrative Agent shall continue to have an Acceptable Security Interest in the Collateral and (iii) in the case of any such merger or consolidation to which the Borrower is a party, the Borrower is the surviving entity; or

(b)    Dispose of any of its Property (including, without limitation, any working interest, overriding royalty interest, production payments, net profits interest, royalty interest, or mineral fee interest) without the prior written consent of the Majority Lenders other than:

(i)    the sale of Hydrocarbons or liquidation of Liquid Investments in the ordinary course of business;

(ii)    the Disposition of equipment that is (A) obsolete, worn out, depleted or uneconomic and disposed of in the ordinary course of business, (B) no longer necessary for the business of such Person or (C) contemporaneously replaced by equipment of at least comparable value and use;

(iii)    the Disposition of Property between or among the Borrower and the Subsidiary Guarantors; and

(iv)    at any time while the Restructuring Support Agreement is in effect, the sale of the Designated Assets and the Non-Designated Assets in each case pursuant to, and as defined in, the Restructuring Support Agreement so long as, (A) in the case of the Designated Assets, the Extraordinary Cash Proceeds in respect thereof are applied in accordance with Section 2.05(b) and (B) in the case of the Non-Designated Assets the proceeds thereof are applied in accordance with the Restructuring Support Agreement or otherwise pursuant to arrangements reasonably satisfactory to the Administrative Agent.

Section 6.05    Restricted Payments.  Holdco and the Borrower shall not, nor shall it permit any of their Subsidiaries to, make any Restricted Payments, except that:

(a)    the Subsidiaries may make Restricted Payments to the Borrower; and

(b)    the Borrower may make Permitted Distributions in an amount not to exceed $2,500 per calendar year.

Section 6.06    Investments.  Holdco and the Borrower shall not, nor shall they permit any of their respective Subsidiaries to, make or permit to exist any loans, advances, or capital contributions to, or make any investment in (including, without limitation, the making of any Acquisition), or purchase or commit to purchase any stock or other securities or evidences of

Error! Unknown document property name.

indebtedness of or interests in any Person or any Oil and Gas Properties or activities related to Oil and Gas Properties, except:

        (a)      Liquid Investments;

        (b)      trade and customer accounts receivable which are for goods furnished or services rendered by the Borrower and its Subsidiaries in the ordinary course of business and are payable in accordance with customary trade terms;

        (c)      creation of any additional Subsidiaries in compliance with Section 6.15;

        (d)      investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business; provided that the aggregate amount of such investment shall not exceed $50,000 (other than by appreciation);

        (e)      Debt permitted under Section 6.02(e); and

        (f)      investments in the Borrower or any Subsidiary Guarantor.

Section 6.07   Affiliate Transactions.  Holdco and the Borrower shall not, nor shall they permit any of their respective Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction or series of transactions (including, but not limited to, the purchase, sale, lease or exchange of Property, the making of any investment, the giving of any guaranty, the assumption of any obligation or the rendering of any service) with any of their Affiliates (other than transactions among the Borrower and the Subsidiary Guarantors and transactions permitted under Section 6.05) unless such transaction or series of transactions is on terms no less favorable to the Borrower or the Subsidiary, as applicable, than those that could be obtained in a comparable arm's length transaction with a Person that is not such an Affiliate.

Section 6.08   Compliance with ERISA.  Subject to any necessary Bankruptcy Court approval, and except in the case of the Debtors, to the extent compliance with which is excused, or is otherwise prohibited, by the Bankruptcy Code or an order of the Bankruptcy Court, Holdco and the Borrower shall not, nor shall they permit any of their respective Subsidiaries to, directly or indirectly, (a) engage in, or permit any such Subsidiary to engage in, any transaction in connection with which the Borrower or any Controlled Group member could be subjected to either a civil penalty assessed pursuant to section 502(c), (i) or (l) of ERISA or a tax imposed by Chapter 43 of Subtitle D of the Code; (b) terminate, or permit any Subsidiary to terminate, any Plan in a manner, or take any other action with respect to any Plan, which could result in any liability to the Borrower or any Controlled Group member to the PBGC; (c) fail to make, or permit any such Subsidiary to fail to make, full payment when due of all amounts which, under the provisions of any Plan, agreement relating thereto or applicable law, the Borrower or any Controlled Group member is required to pay as contributions thereto; (d) permit to exist, or allow any such Subsidiary to permit to exist, any accumulated funding deficiency within the meaning of Section 302 of ERISA or section 412 of the Code, whether or not waived, with respect to any Plan; (e) permit, or allow any such Subsidiary to permit, the actuarial present value of the benefit liabilities (as "actuarial present value of the benefit liabilities" shall have the meaning specified in section 4041 of ERISA) under any Plan maintained by the Borrower or any Controlled Group

-68-

member which is regulated under Title IV of ERISA to exceed the current value of the assets (computed on a plan termination basis in accordance with Title IV of ERISA) of such Plan allocable to such benefit liabilities; (f) assume an obligation to contribute to, or permit any such Subsidiary to assume an obligation to contribute to, any Multiemployer Plan; (g) acquire, or permit any such Subsidiary to acquire, an 80% or greater interest in any Person if such Person sponsors, maintains or contributes to, or at any time in the six-year period preceding such acquisition has sponsored, maintained, or contributed to, (1) any Multiemployer Plan, or (2) any other Plan that is subject to Title IV of ERISA, and in either case, the actuarial present value of the benefit liabilities under such Plan exceeds the current value of the assets (computed on a plan termination basis in accordance with Title IV of ERISA) of such Plan allocable to such benefit liabilities, and the withdrawal liability, if assessed, could reasonably be expected to result in a Material Adverse Change; (h) incur, or permit any such Subsidiary to incur, a liability to or on account of a Plan under sections 515, 4062, 4063, 4064, 4201 or 4204 of ERISA; (i) assume an obligation to contribute to, or permit any such Subsidiary to assume an obligation to contribute to, any employee welfare benefit plan, as defined in section 3(1) of ERISA, including, without limitation, any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by such entities in their sole discretion without any material liability; (j) amend or permit any such Subsidiary to amend, a Plan resulting in an increase in current liability such that the Borrower or any Controlled Group member is required to provide security to such Plan under section 401(a)(29) of the Code; or (k) permit to exist any occurrence of any Reportable Event (as defined in Title IV of ERISA), or any other event or condition, which presents a material (in the opinion of the Majority Lenders) risk of such a termination by the PBGC of any Plan that could reasonably be expected to result in a Material Adverse Change.

Section 6.09   <u>Sale-and-Leaseback</u>.  Holdco and the Borrower shall not, nor shall they permit any of their respective Subsidiaries to, sell or transfer to a Person any Property, whether now owned or hereafter acquired, if at the time or thereafter Holdco, the Borrower or any of their respective Subsidiaries shall lease as lessee such Property or any part thereof or other Property which Holdco, the Borrower or any such Subsidiary intends to use for substantially the same purpose as the Property sold or transferred.

Section 6.10   <u>Change of Business; Accounting Change</u>.  Holdco and the Borrower shall not, nor shall they permit any of their respective Subsidiaries to, make any material change in the character of its business as an independent oil and gas exploration and production company, nor will Holdco, the Borrower or any of their respective Subsidiaries operate any business in any jurisdiction other than the United States.  Holdco and the Borrower shall not, nor shall they permit any of their respective Subsidiaries to, make a change in the method of accounting employed in the preparation of the financial statements referred to in <u>Section 4.04</u> or change the fiscal year end of the Borrower unless required to conform to GAAP or approved in writing by the Administrative Agent.

Section 6.11   <u>Organizational Documents, Name Change</u>.  Holdco and the Borrower shall not, nor shall they permit any of their respective Subsidiaries to, amend, supplement, modify or restate their articles or certificate of incorporation, bylaws, limited liability company agreements, or other equivalent organizational documents where such amendment, supplement, modification or restatement could have an adverse effect on the Lenders as determined by the Administrative Agent in its sole reasonable discretion, or amend its name or change its

Error! Unknown document property name.

jurisdiction of incorporation, organization or formation without prior written notice to, and the prior consent of, the Administrative Agent.

Section 6.12   <u>Use of Proceeds</u>.   Holdco and the Borrower will not permit the proceeds of any Advance to be used for any purpose other than those permitted by <u>Section 5.09</u>.   The Borrower will not engage in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U).   None of Holdco, the Borrower or any Person acting on behalf of Holdco or the Borrower has taken or shall take, nor permit any of their respective Subsidiaries to take any action which might cause any of the Loan Documents to violate Regulations T, U or X or any other regulation of the Board of Governors of the Federal Reserve System or to violate Section 7 of the Securities Exchange Act of 1934 or any rule or regulation thereunder, in each case as now in effect or as the same may hereinafter be in effect, including without limitation, the use of the proceeds of any Advance to purchase or carry any margin stock in violation of Regulations T, U or X.

Section 6.13   <u>Gas Imbalances, Take-or-Pay or Other Prepayments</u>.   Holdco and the Borrower shall not, nor shall they permit any of their respective Subsidiaries to, allow gas imbalances, take-or-pay or other prepayments with respect to the Oil and Gas Properties of Holdco, the Borrower or any such Subsidiary which would require Holdco, the Borrower or any such Subsidiary to deliver their respective Hydrocarbons produced on a monthly basis from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor.

Section 6.14   <u>Hedging Requirements</u>.   Holdco and the Borrower shall not, nor shall they permit any of their respective Subsidiaries to be party to or otherwise enter into any Hedge Contract.

Section 6.15   <u>Additional Subsidiaries</u>.   Holdco and the Borrower shall not, nor shall they permit any of their respective Subsidiaries to, create or acquire any additional Subsidiaries without (a) providing the Administrative Agent thirty days prior written notice of its intent to create or acquire a new Subsidiary, (b) if such new Subsidiary is a domestic Subsidiary, executing and delivering to the Administrative Agent, at the Administrative Agent's request, a Guaranty, and such other Loan Documents as the Administrative Agent or the Majority Lenders may reasonably request, (c) to the extent there are no adverse tax consequences, the holders of Equity Interest of such new Subsidiary pledging such Equity Interest to secure the Obligations along with the certificates pledged thereby, if any, and appropriately executed stock powers in blank, if applicable, and (d) the delivery by the Borrower of any certificates, opinions of counsel, title opinions or other documents as the Administrative Agent may reasonably request; <u>provided</u> that, in any event, no Subsidiary may be created or acquired if a Default has occurred before or after giving effect to such creation or acquisition of the new Subsidiary.

Section 6.16   <u>Account Payables</u>.   Holdco and the Borrower shall not, nor shall they permit any of their respective Subsidiaries to, allow any of its trade payables or other accounts payable incurred after the Petition Date to be outstanding for more than 90 days (except in cases where any such trade payable is being disputed in good faith and adequate reserves under GAAP have been established).

Error! Unknown document property name.

Section 6.17   <u>Environmental Matters</u>.   Subject to any necessary Bankruptcy Court approval, and except in the case of the Debtors, to the extent compliance with such Legal Requirement is excused, or is otherwise prohibited by the Bankruptcy Code or an order of the Bankruptcy Court, Holdco and the Borrower shall not, nor shall they permit any of their respective Subsidiaries to, (a) cause or knowingly permit any of its Property to be in violation of, or (b) do anything or knowingly permit anything to be done which will subject any such Property to any Remedial Work (other than Remedial Work done in the ordinary course of business) under, any Environmental Laws that in either case could reasonably be expected to cause a Material Adverse Change; it being understood that clause (b) above will not be deemed as limiting or otherwise restricting any obligation to disclose any relevant facts, conditions and circumstances pertaining to such Property to the appropriate Governmental Authority.

Section 6.18   <u>Anti-Terrorism Laws</u>.   Holdco and the Borrower shall not, nor shall they permit any of their respective Subsidiaries to (a) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in <u>Section 4.28</u>, (b) deal in, or otherwise engage in any transaction relating to, any property of interests in property blocked pursuant to the Executive Order of any other Anti-Terrorism Law or (c) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, (x) any of the prohibitions set forth in any Anti-Terrorism Law or (y) any prohibitions set forth in the rules or regulations issued by OFAC (and, in each case, Holdco and the Borrower shall, and shall cause each of their respective Subsidiaries to, promptly deliver or cause to be delivered to the Lenders any certification or other evidence requested from time to time by any Lender in its reasonable discretion, confirming compliance with this <u>Section 6.18</u>).

Section 6.19   <u>Budget Variance</u>.   As of the Friday of the first full calendar week ending after the Petition Date and on the Friday of each calendar week thereafter (each a "<u>Testing Date</u>" and (i) in respect of such first calendar week, such calendar week and (ii) thereafter, for the two-week period ending on each such Testing Date, each a "<u>Testing Period</u>"), the Borrower shall not permit (i) the Aggregate Total Receipts of the Borrower and its Subsidiaries during such Testing Period to be less than 95% of the Aggregate Total Receipts as set forth in the Budget for such Testing Period, (ii) the Aggregate Operating Expenditures made by the Borrower and its Subsidiaries during such Testing Period to be greater than 105% of the Aggregate Operating Expenditures as set forth in the Budget for such Testing Period, (iii) the Aggregate Net Operating Expenditures made by the Borrower and its Subsidiaries during such Testing Period to be greater than 105% of the Aggregate Net Operating Expenditures as set forth in the Budget for such Testing Period and (iv) the Aggregate Professional Fees made by the Borrower and its Subsidiaries during such Testing Period to be greater than 105% of the Aggregate Professional Fees as set forth in the Budget for such Testing Period.

Section 6.20   <u>Superpriority Claims</u>.   Holdco and the Borrower shall not, nor shall they permit any of their respective Subsidiaries to, incur, create, assume, suffer to exist or permit any other priority or administrative claim that is *pari passu* with or senior to the claims of the Secured Parties against the Debtors except with respect to the Carve-Out.

Error! Unknown document property name.

**ARTICLE VII**
**EVENTS OF DEFAULT; REMEDIES**

Section 7.01   Events of Default.  The occurrence of any of the following events shall constitute an "Event of Default" under any Loan Document:

(a)   Payment.  The Borrower shall (i) fail to pay when due any principal or interest payable hereunder or under the Notes or (ii) fail to pay, within three (3) Business Days of when due, any other amounts (including fees, reimbursements, and indemnifications) payable hereunder, under the Notes, or under any other Loan Document;

(b)   Representation and Warranties.  Any representation or warranty made or deemed to be made (i) by the Borrower, any Guarantor or any of their respective Subsidiaries (or any of their respective officers) in this Agreement or in any other Loan Document, or (ii) by the Borrower, any Guarantor or any of their respective Subsidiaries (or any of their respective officers) in a document or instrument delivered in connection with this Agreement or any other Loan Document, shall prove to have been incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) when made or deemed to be made;

(c)   Covenant Breaches.  The Borrower, any Guarantor or any of their respective Subsidiaries shall fail to (i) perform or observe any covenant contained in Section 5.02(a), Section 5.03, Section 5.06(g), Section 5.09, or Article VI of this Agreement, (ii) perform or observe any covenant contained in Section 5.06 (other than Section 5.06(g)) if such failure shall remain unremedied for three Business Days after the occurrence of such breach or failure, or (iii)  perform or observe any other term or covenant set forth in this Agreement or in any other Loan Document which is not covered by clauses (i) or (ii) above or any other provision of this Section 7.01 if such failure shall remain unremedied for 30 days after the occurrence of such breach or failure;

(d)   Cross-Defaults.  Other than any obligation with respect to which the Bankruptcy Code or any order of the Bankruptcy Court prohibits the Borrower, any Guarantor or any of their respective Subsidiaries from complying with such obligation or permits the Borrower, any Guarantor or any of their respective Subsidiaries not to comply with such obligation, (i) the Borrower, any Guarantor or any of their respective Subsidiaries shall fail to pay any principal of or premium or interest on any Debt incurred after the Petition Date by such Borrower, such Guarantor or such Subsidiary that is outstanding in a principal amount of at least $250,000 individually or when aggregated with all such Debt of the Borrower, any Guarantor or any of their respective Subsidiaries so in default (but excluding Debt incurred under the Loan Documents) when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or (ii) any other event shall occur or condition shall exist under any agreement or instrument relating to Debt (but excluding Debt incurred under the Loan Documents) incurred after the Petition Date by the Borrower, any Guarantor or any of their respective Subsidiaries that is outstanding in a principal amount (or termination payment amount or similar amount) of at least $250,000 individually or when aggregated with all such Debt so in default (but excluding Debt

-72-

incurred under this Agreement), and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt;

(e)     [Reserved];

(f)     Judgments.   Any final and non-appealable judgment or order for the payment of money in excess of $250,000 (to the extent not covered by insurance) shall be rendered against the Borrower, any Guarantor or any of their respective Subsidiaries and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise (including as a result of the automatic stay under the Chapter 11 Cases), shall not be in effect;

(g)     Termination Events.   Subject to the Budget and other than as a result of the Chapter 11 Cases, any Termination Event with respect to a Plan shall have occurred, and, 30 days after notice thereof shall have been given to the Borrower by the Administrative Agent, (i) such Termination Event shall not have been corrected and (ii) the then present value of such Plan's vested benefits exceeds the then current value of assets accumulated in such Plan by more than the amount of $250,000 (or in the case of a Termination Event involving the withdrawal of a "substantial employer" (as defined in Section 4001(a)(2) of ERISA), the withdrawing employer's proportionate share of such excess shall exceed such amount);

(h)     Plan Withdrawals.   The Borrower or any member of the Controlled Group as employer under a Multiemployer Plan shall have made a complete or partial withdrawal from such Multiemployer Plan and the plan sponsor of such Multiemployer Plan shall have notified such withdrawing employer that such employer has incurred a withdrawal liability in an annual amount exceeding $250,000;

(i)     Change in Control.   Other than pursuant to an Acceptable Plan, a Change in Control shall have occurred;

(j)     Loan Documents.   Other than in accordance with its terms, any material provision of any Loan Document shall for any reason cease to be valid and binding on the Borrower or a Guarantor or any such Person shall so state in writing;

(k)     Security Interests.   The DIP Order shall cease to create an Acceptable Security Interest, subject to Permitted Subject Liens and the Carve-Out, in any portion of the Collateral purported to be covered thereby (other than Collateral released in accordance with this Agreement or any other Loan Document);

(l)     Potential Failure of Title.   Other than as a result of the Chapter 11 Cases or to the extent not subject to the automatic stay in the Chapter 11 Cases, the title of the Borrower or any of its Subsidiaries to any of the Oil and Gas Properties, or any material part thereof, shall become the subject matter of litigation before any Governmental Authority or arbitrator which could reasonably be expected to result in a Material Adverse Change with respect to the Borrower's or such Subsidiary's title to such Oil and Gas Properties;

Error! Unknown document property name.

(m)     [Reserved].

(n)     [Reserved].

(o)     Casualty.   Loss, theft, substantial damage or destruction of a material portion of the Collateral shall have occurred and the Borrower shall have failed to provide evidence reasonably acceptable to the Administrative Agent that such loss, theft, damage or destruction is fully covered by insurance (except for deductibles and allowing for the depreciated value of such Collateral);

(p)     Chapter 11 Defaults.

(i)     The entry of an order dismissing the Chapter 11 Cases which does not contain a provision for the termination of the Commitments and payment in full of the Obligations, or converting the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (ii) the entry of an order appointing a chapter 11 trustee in the Chapter 11 Cases, (iii) the entry of an order in the Chapter 11 Cases appointing an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) and (iv) the filing of any pleading by any Debtor seeking, or otherwise consenting to, any of the matters set forth in clauses (i) through (iii) above.

(ii)     The entry of the Final Order shall not have occurred on or before the Final Order Entry Deadline, or there shall be a breach by any Loan Party of any material provisions of the Interim Order (prior to entry of the Final Order) or the Final Order, or the Interim Order (prior to entry of the Final Order) or Final Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in each case, without the prior written consent of Administrative Agent and Majority Lenders.

(iii)     [Reserved];

(iv)     The entry of an order in the Chapter 11 Cases charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders under which any Person takes action against the Collateral or that becomes a final non-appealable order, or the commencement by the Debtors of any suit or proceeding which is materially adverse to the Administrative Agent (in its capacity as such under the Loan Documents), the Lenders (in their respective capacities as such under the Loan Documents) or their respective rights and remedies under the DIP Facility in any of the Chapter 11 Cases.

(v)     The entry of an order granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure (or granting of a deed in lieu of foreclosure) against any asset with a value in excess of $250,000.

(vi)     The payment of any pre Petition Date claims (other than to the extent such payment is (x) permitted by any "first day orders," the Interim Order, the

-74-

Error! Unknown document property name.

Final Order or pursuant to an order entered in the Chapter 11 Cases that is supported by the Administrative Agent and (y) permitted under the Budget).

(vii)    Any Lien securing or Superpriority Claim in respect of the obligations under the DIP Facility created by the DIP Orders shall cease to be valid, perfected (if applicable) and enforceable in all respects or to have the priority granted under the Interim Order and the Final Order, as applicable.

(viii)    Except (A) with the consent of the Majority Lenders, or (B) to the extent such superpriority administrative claim or Lien is granted in respect of financing that shall provide for the payment in full of the Obligations, the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than in respect of the DIP Facility or as otherwise permitted under the Loan Documents, entitled to superpriority under Section 364(c)(1) of the Bankruptcy Code *pari passu* or senior to the DIP Facility (other than the Carve-Out), or there shall be granted by the Bankruptcy Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out) or (ii) any Lien on the Collateral having a priority senior to or *pari passu* with the liens and security interests granted herein and in the DIP Order, except for the Carve-Out, Permitted Subject Liens or as otherwise expressly provided herein or in the Interim Order or the Final Order, whichever is in effect.

(ix)    The Loan Parties or any of their Subsidiaries or other Debtors, shall seek or obtain court authorization to commence, or shall commence, join in, assist or otherwise participate in a motion or other pleading, or any suit or proceeding, to disallow the Lenders' claim in respect of the Obligations or the obligations under the Existing Credit Agreement or to contest any provision of any Loan Document or the Existing Credit Agreement (or any Loan Documents in respect thereof and as defined therein).

(x)    Failure to satisfy any of the Milestones in accordance with the terms relating to such Milestone.

(xi)    Except as otherwise consented to by the Majority Lenders, the Borrower or any Subsidiary shall have sold or otherwise Disposed of all or a material portion of the Collateral pursuant to the Bankruptcy Code other than as permitted pursuant (x) the Interim Order or the Final Order or (y) the Loan Documents.

(xii)    Any payment of or grant of adequate protection with respect to any Debt existing prior to the Petition Date other than in accordance with the DIP Order without the consent of the Majority Lenders.

(q)    At any time after the entry of the Final Order, the termination of the Restructuring Support Agreement as a result of the failure of the Borrower or any Subsidiary to comply with its obligations under the Restructuring Support Agreement.

(r)    (A) any plan other than the Acceptable Plan is filed by, or with the support of, a Loan Party without the consent of the Majority Lenders, (B) the Loan Parties shall

-75-

have commenced or participated in furtherance of any solicitation in respect of a proposed plan or reorganization other than the Acceptable Plan without the consent of the Majority Lenders, (C) the Bankruptcy Court shall terminate or reduce the period pursuant to Section 1121 of the Bankruptcy Code during which the Loan Parties have the exclusive right to file a plan of reorganization and solicit acceptances thereof, (D) the Bankruptcy Court shall grant relief that amends, supplements or modifies the Acceptable Plan in any material respect and that is adverse to the Administrative Agent's or the Secured Parties' interests under the Loan Documents without the consent of the Majority Lenders or (E) any of the Loan Parties or any of their affiliates shall file any motion or pleading with the Bankruptcy Court that seeks to amend, modify or supplement in any material respect the Acceptable Plan without the consent of the Majority Lenders and such motion or pleading has not been withdrawn prior to the earlier of (y) three (3) Business Days of the Borrower receiving notice from the Administrative Agent and (z) entry of an order of the Bankruptcy Court approving such motion or pleading.

Section 7.02    Acceleration of Maturity.  If any Event of Default shall have occurred and be continuing, at any time thereafter during the continuance of such Event of Default, and without further order of the Bankruptcy Court, then, and in any such event,

(a)    the Administrative Agent shall at the request, or may with the consent, of the Majority Lenders (provided, that solely for purposes of determining Majority Lenders with respect to this Section 7.02(a) and Sections 7.02(b) and (c), the aggregate principal amount of Advances and Commitments of any Lender that is an Affiliate of the Borrower (if any) shall be excluded from the determination of Majority Lenders) by notice to the Borrower (with a copy to counsel for any statutory committee appointed in the Chapter 11 Cases and to the United States Trustee for the Southern District of Texas Houston Division), (i) declare the obligation of each Lender to make Advances to be terminated, whereupon the same shall forthwith terminate, and (ii) shall declare all principal, interest, fees, reimbursements, indemnifications, and all other amounts payable under this Agreement, the Notes, and the other Loan Documents to be forthwith due and payable, whereupon all such amounts shall become and be forthwith due and payable in full, without notice of intent to demand, demand, presentment for payment, notice of nonpayment, protest, notice of protest, grace, notice of dishonor, notice of intent to accelerate, notice of acceleration, and all other notices, all of which are hereby expressly waived by the Borrower;

(b)    the Administrative Agent and the Lenders will have all other rights and remedies available at law and equity;

(c)    the Administrative Agent shall at the request of, or may with the consent of, the Majority Lenders proceed to enforce its rights and remedies under the Loan Document for the ratable benefit of the Secured Parties by appropriate proceedings; and

(d)    Notwithstanding the foregoing, any exercise of remedies under this Agreement or any other Loan Document is subject to the requirement that the Administrative Agent give five Business Days' prior written notice to the Debtors, counsel for the Debtors, the Office of the U.S. Trustee, and counsel for any official committee of unsecured creditors appointed in the Chapter 11 Cases in accordance with the terms of the DIP Order, during which period the Borrower may seek an emergency hearing before the Bankruptcy Court for the

Error! Unknown document property name.

purpose of determining whether an Event of Default has occurred.  During the five Business Day notice period, the Borrower may use proceeds of the Advances that were funded prior to such Event of Default or cash collateral to (i) fund operations in accordance with the Budget, including the variances permitted under Section 6.19, and (ii) fund the Carve-Out.

Section 7.03    [Reserved].

Section 7.04    Right of Set-off.  Upon the occurrence and during the continuance of any Event of Default, the Administrative Agent and each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Administrative Agent or such Lender to or for the credit or the account of the Borrower against any and all of the Obligations held by the Administrative Agent or such Lender, and the other Loan Documents, irrespective of whether or not the Administrative Agent or such Lender shall have made any demand under this Agreement, such Notes, or such other Loan Documents, and although such obligations may be unmatured.  The Administrative Agent and each Lender agrees to promptly notify the Borrower after any such set-off and application made by the Administrative Agent or such Lender, provided that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of the Administrative Agent and each Lender under this Section 7.04 are in addition to any other rights and remedies (including, without limitation, other rights of set-off) that the Administrative Agent or such Lender may have.

Section 7.05    Non-exclusivity of Remedies.    No remedy conferred upon the Administrative Agent or the Lenders is intended to be exclusive of any other remedy, and each remedy shall be cumulative of all other remedies existing by contract, at law, in equity, by statute or otherwise.

Section 7.06    Application of Proceeds.  From and during the continuance of any Event of Default, any monies or Property actually received by the Administrative Agent pursuant to this Agreement or any other Loan Document, the exercise of any rights or remedies under any Loan Document or any other agreement with the Borrower, any Guarantor or any of their respective Subsidiaries which secures any of the Obligations, shall be applied in the following order:

(a)    First, to the payment of all amounts, including costs and expenses incurred in connection with the collection of such proceeds and the payment of any part of the Obligations, due to the Administrative Agent under any of the expense reimbursement or indemnity provisions of this Agreement or any other Loan Document, or other collateral documents, and any applicable law;

(b)    Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders under the Loan Documents, ratably among them in proportion to the respective amounts described in this clause Second payable to them;

Error! Unknown document property name.

(c)     Third, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Advances, including without limitation, interest on the PIK Interest, and other Obligations arising under the Loan Documents, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

(d)     Fourth, to payment of that portion of the Obligations constituting unpaid principal under the Loan Documents, including without limitation, outstanding amounts of PIK Interest, ratably among the Lenders in proportion to the respective amounts described in this clause Fourth held by them;

(e)     Fifth, to the Existing Administrative Agent; and

(f)     Sixth, the remainder, if any, to the Borrower, its Subsidiaries, their respective successors or assigns, or such other Person as may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

## ARTICLE VIII
## THE ADMINISTRATIVE AGENT

Section 8.01   Appointment; Powers.  Each of the Lenders hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto.

Section 8.02   Duties and Obligations of Administrative Agent.  The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing (the use of the term "agent" herein and in the other Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law; rather, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties), (b) the Administrative Agent shall have no duty to take any discretionary action or exercise any discretionary powers, except as provided in Section 8.03, and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any Loan Party that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or under any other Loan Document or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or in any other Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of this

Error! Unknown document property name.

Agreement, any other Loan Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in ARTICLE III or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or as to those conditions precedent expressly required to be to the Administrative Agent's satisfaction, (vi) the existence, value, perfection or priority of any collateral security or the financial or other condition of the Borrower and the other Loan Parties or any other obligor or guarantor, or (vii) any failure by the Borrower or any other Person (other than itself) to perform any of its obligations hereunder or under any other Loan Document or the performance or observance of any covenants, agreements or other terms or conditions set forth herein or therein.  For purposes of determining compliance with the conditions specified in ARTICLE III, each Lender shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the Effective Date specifying its objection thereto.

 Section 8.03 <u>Action by Administrative Agent</u>.  The Administrative Agent shall have no duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise in writing as directed by the Majority Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 9.01</u>) and in all cases the Administrative Agent shall be fully justified in failing or refusing to act hereunder or under any other Loan Documents unless it shall (a) receive written instructions from the Majority Lenders or the Lenders, as applicable, (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 9.01</u>) specifying the action to be taken and (b) be indemnified to its satisfaction by the Lenders against any and all liability and expenses which may be incurred by it by reason of taking or continuing to take any such action.  The instructions as aforesaid and any action taken or failure to act pursuant thereto by the Administrative Agent shall be binding on all of the Lenders.  If a Default has occurred and is continuing, then the Administrative Agent shall take such action with respect to such Default as shall be directed by the requisite Lenders in the written instructions (with indemnities) described in this <u>Section 8.03</u>, <u>provided</u> that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default as it shall deem advisable in the best interests of the Lenders.  In no event, however, shall the Administrative Agent be required to take any action which, exposes the Administrative Agent to liability or which is contrary to this Agreement, the Loan Documents or applicable law, including, for the avoidance of doubt, any action that may be in violation of the automatic stay under any debtor relief law or that may effect a forfeiture, modification or termination property of a Defaulting Lender in violation of any debtor relief law.  If a Default has occurred and is continuing, the Administrative Agent shall not have any obligation to perform any act in respect thereof.  The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Majority Lenders or the Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 9.01</u>), and otherwise the Administrative Agent shall not be liable for any action taken or not taken by it hereunder or under any other Loan Document or under any other document or instrument referred to or provided for herein or therein or in

Error! Unknown document property name.

connection herewith or therewith INCLUDING ITS OWN ORDINARY NEGLIGENCE, except for its own gross negligence or willful misconduct.

Section 8.04   Reliance by Administrative Agent.   The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon and each of the Borrower and the Lenders hereby waives the right to dispute the Administrative Agent's record of such statement, except in the case of gross negligence or willful misconduct by the Administrative Agent.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  The Administrative Agent may deem and treat the payee of any Note as the holder thereof for all purposes hereof unless and until a written notice of the assignment or transfer thereof permitted hereunder shall have been filed with the Administrative Agent.

Section 8.05   Subagents.   The Administrative Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of this ARTICLE VIII shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Section 8.06   Resignation of Administrative Agent.   Subject to the appointment and acceptance of a successor Administrative Agent as provided in this Section 8.06, the Administrative Agent may resign at any time by notifying the Lenders and the Borrower.  Upon any such resignation, the Majority Lenders shall have the right, in consultation with the Borrower, to appoint a successor.  If no successor shall have been so appointed by the Majority Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a qualified financial institution as successor Administrative Agent.   Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder.  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the Administrative Agent's resignation hereunder, the provisions of this VIII and Sections 9.04 and 9.07 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.

Error! Unknown document property name.

Section 8.07   Administrative Agent as Lender.   The Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any other Loan Party or other Affiliate thereof as if it were not the Administrative Agent hereunder.

Section 8.08   No Reliance.   Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, the Sole Lead Arranger or any other Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and each other Loan Document to which it is a party.   Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, the Sole Lead Arranger or any other Lender, and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document, any related agreement or any document furnished hereunder or thereunder.   The Administrative Agent shall not be required to keep itself informed as to the performance or observance by the Borrower, or any of the other Loan Parties of this Agreement, the Loan Documents or any other document referred to or provided for herein or to inspect the Properties or books of any such Person.   Except for notices, reports and other documents and information expressly required to be furnished to the Lenders by the Administrative Agent hereunder, neither the Administrative Agent nor the Sole Lead Arranger shall have any duty or responsibility to provide any Lender with any credit or other information concerning the affairs, financial condition or business of the Borrower or any Loan Parties (or any of their Affiliates) which may come into the possession of the Administrative Agent or any of its Affiliates.   In this regard, each Lender acknowledges that Simpson Thacher & Bartlett LLP is acting in this transaction as special counsel to the Administrative Agent only, except to the extent otherwise expressly stated in any legal opinion or any Loan Document.   Each other party hereto will consult with its own legal counsel to the extent that it deems necessary in connection with the Loan Documents and the matters contemplated therein.

Section 8.09   [Reserved].

Section 8.10   Indemnification.   THE LENDERS SEVERALLY AGREE TO INDEMNIFY THE ADMINISTRATIVE AGENT AND EACH AFFILIATE THEREOF AND THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS (TO THE EXTENT NOT REIMBURSED BY THE BORROWER), ACCORDING TO THEIR RESPECTIVE PRO RATA SHARES FROM AND AGAINST ANY AND ALL LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, PENALTIES, ACTIONS, JUDGMENTS, SUITS, COSTS, EXPENSES, OR DISBURSEMENTS OF ANY KIND OR NATURE WHATSOEVER WHICH MAY BE IMPOSED ON, INCURRED BY, OR ASSERTED AGAINST THE ADMINISTRATIVE AGENT IN ANY WAY RELATING TO OR ARISING OUT OF THIS AGREEMENT OR ANY ACTION TAKEN OR OMITTED BY THE ADMINISTRATIVE AGENT UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (INCLUDING THE ADMINISTRATIVE AGENT'S OWN NEGLIGENCE), AND INCLUDING, WITHOUT LIMITATION, ENVIRONMENTAL LIABILITIES, PROVIDED THAT NO LENDER SHALL BE LIABLE FOR ANY PORTION OF SUCH LIABILITIES, OBLIGATIONS, LOSSES,

DAMAGES, PENALTIES, ACTIONS, JUDGMENTS, SUITS, COSTS, EXPENSES, OR DISBURSEMENTS RESULTING FROM THE ADMINISTRATIVE AGENT'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.  WITHOUT LIMITATION OF THE FOREGOING, EACH LENDER AGREES TO REIMBURSE THE ADMINISTRATIVE AGENT PROMPTLY UPON DEMAND FOR ITS RATABLE SHARE OF ANY OUT OF POCKET EXPENSES (INCLUDING COUNSEL FEES) INCURRED BY THE ADMINISTRATIVE AGENT IN CONNECTION WITH THE PREPARATION, EXECUTION, DELIVERY, ADMINISTRATION, MODIFICATION, AMENDMENT, OR ENFORCEMENT (WHETHER THROUGH NEGOTIATIONS, LEGAL PROCEEDINGS, OR OTHERWISE) OF, OR LEGAL ADVICE IN RESPECT OF RIGHTS OR RESPONSIBILITIES UNDER, THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, TO THE EXTENT THAT THE ADMINISTRATIVE AGENT IS NOT REIMBURSED FOR SUCH BY THE BORROWER. To the extent that the indemnity obligations provided in this Section 8.10 are for the benefit of the Administrative Agent as the named secured party under the Liens granted under the DIP Order and the other Loan Documents, each Lender hereby agrees that if such Lender ceases to be a Lender hereunder but Obligations owing to such Lender or an Affiliate of such Lender continue to be secured by such Liens, then such Lender shall continue to be bound by the provisions of this Section 8.10 until such time as such Obligations have been satisfied or terminated in full and subject to the terms of the last sentence of Section 9.09.

Section 8.11    Collateral Matters.

(a)    The Administrative Agent is authorized on behalf of the Secured Parties, without the necessity of any notice to or further consent from the Secured Parties, from time to time, to take any actions with respect to any Collateral or the Loan Documents which may be necessary to perfect and maintain Acceptable Security Interests in and Liens upon the Collateral granted pursuant to the Loan Documents.  The Administrative Agent is further authorized on behalf of the Secured Parties, without the necessity of any notice to or further consent from the Secured Parties, from time to time, to take any action (other than enforcement actions requiring the consent of, or request by, the Majority Lenders as set forth in Section 7.02 or Section 7.03 above) in exigent circumstances as may be reasonably necessary to preserve any rights or privileges of the Secured Parties under the Loan Documents or applicable law.  By accepting the benefit of the Liens granted pursuant to the Loan Documents, each Secured Party not party hereto hereby agrees to the terms of this paragraph (a).

(b)    Each Secured Party irrevocably authorizes the Administrative Agent to release any Lien granted to or held by the Administrative Agent upon any Collateral: (i) upon termination of the Commitments and payment in full of all Obligations; (ii) constituting Property sold or to be sold or otherwise disposed of as part of or in connection with any disposition permitted under this Agreement or the other Loan Documents; (iii) constituting Property in which the Borrower or any Subsidiary owned no interest at the time the Lien was granted or at any time thereafter; (iv) constituting Property leased to the Borrower or any Subsidiary under a lease which has expired or has been terminated in a transaction permitted under this Agreement or is about to expire and which has not been, and is not intended by the Borrower or such Subsidiary to be, renewed or extended; or (v) if approved, authorized or ratified in writing by the applicable Majority Lenders or all the Lenders, as the case may be, as required by Section 9.01. Upon the request of the Administrative Agent at any time, the Secured Parties will confirm in

Error! Unknown document property name.

writing the Administrative Agent's authority to release particular types or items of Collateral pursuant to this <u>Section 8.07</u>.  By accepting the benefit of the Liens granted pursuant to the Loan Documents, each Secured Party not party hereto hereby agrees to the terms of this paragraph (b).

(c)     Notwithstanding anything contained in any of the Loan Documents to the contrary, the Borrower, the Administrative Agent, and each Secured Party hereby agree that no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guaranties, it being understood and agreed that all powers, rights and remedies hereunder and under the Loan Documents may be exercised solely by Administrative Agent on behalf of the Secured Parties in accordance with the terms hereof.  By accepting the benefit of the Liens granted pursuant to the Loan Documents, each Secured Party not party hereto hereby agrees to the terms of this paragraph (c).

Section 8.12   <u>No Other Duties, Etc.</u>  Anything herein to the contrary notwithstanding, the Sole Lead Arranger listed on the cover page hereof shall not have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, a Lender hereunder.

# ARTICLE IX
# MISCELLANEOUS

Section 9.01   <u>Amendments, Etc.</u>  No amendment or waiver of any provision of this Agreement, the Notes, or any other Loan Document, nor consent to any departure by the Borrower or any Subsidiary therefrom, shall in any event be effective unless the same shall be in writing and signed by the Majority Lenders and the Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no amendment, waiver, or consent shall, unless in writing and signed by all the Lenders, do any of the following:  (a) waive any of the conditions specified in <u>Section 3.01</u>, (b) increase the Commitments of the Lenders, (c) reduce the principal of, or interest on, the Obligations or any fees or other amounts payable hereunder or under any other Loan Document, (d) postpone any date fixed for any payment of principal of, or interest on, the Obligations or any fees or other amounts payable hereunder or extend the Maturity Date or the Commitment Termination Date, (e) change the percentage of Lenders which shall be required for the Lenders or any of them to take any action hereunder or under any other Loan Document, (f) amend <u>Section 2.11</u> in such manner as to alter the pro rata sharing of payments required therein or this <u>Section 9.01</u>, (g) reduce any percentages specified in the definitions of "Majority Lenders" as defined in this Agreement, (h) release any Guarantor from its obligations under any Guaranty, other than as a result of a transaction permitted hereby, (i) release all or substantially all of the Collateral securing the Obligations, except for releases of Collateral sold or otherwise transferred as permitted by this Agreement and except for releases of Collateral as permitted under <u>Section 8.10(b)</u>; and <u>provided</u>, <u>further</u>, no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above to take such action, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document.

Error! Unknown document property name.

Section 9.02    Notices, Etc.

(a)    Notices Generally.  All notices and other communications shall be in writing (including, without limitation, facsimile) and mailed by certified mail, return receipt requested, faxed, hand delivered, or delivered by a nationally recognized overnight courier, at the address for the appropriate party specified in Schedule I or at such other address as shall be designated by such party in a written notice to the other parties.   All such notices and communications shall, when so mailed, faxed, or hand delivered or delivered by a nationally recognized overnight courier, be effective when received if mailed, when telecopy transmission is completed, when confirmed by telex answer-back, or when delivered by such messenger or courier, respectively, except that notices and communications to the Administrative Agent pursuant to Article II or VIII shall not be effective until received by the Administrative Agent.

(b)    Electronic Communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

Section 9.03    No Waiver; Remedies.  No failure on the part of any Lender or the Administrative Agent to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 9.04    Costs and Expenses.  The Borrower shall pay (a) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable fees, charges and disbursements of one primary counsel for the Administrative Agent and its Affiliates and to the extent necessary as determined by the Administrative Agent, other outside consultants for the Administrative Agent, the reasonable

Error! Unknown document property name.

travel, photocopy, mailing, courier, telephone, distributions, insurance, bank meetings and other similar expenses, and the cost of environmental invasive and non-invasive assessments and audits and surveys and appraisals, in connection with the preparation, negotiation, execution, delivery and administration (both before and after the execution hereof and including advice of counsel to the Administrative Agent as to the rights and duties of the Administrative Agent and the Lenders with respect thereto) of this Agreement and the other Loan Documents and any amendments, modifications or waivers of or consents related to the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (b) all reasonable and documented out-of-pocket costs, expenses, Taxes, assessments and other charges incurred by the Administrative Agent in connection with any search, filing, registration, recording or perfection of any security interest contemplated by this Agreement or any Loan Document or any other document referred to therein, (c) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, or any Lender, including the reasonable and documented fees, charges and disbursements of any counsel for the Administrative Agent or any Lender in connection with the enforcement or protection of its rights in connection with this Agreement or any other Loan Document, including its rights under this Section 9.04, or in connection with the Advances made hereunder, including all such reasonable and documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Advances (including, without limitation, periodic collateral/financial control, field examinations, asset appraisal expenses, the monitoring of assets, enforcement or rights and other miscellaneous disbursements).

Section 9.05   Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrower and the Administrative Agent, and when the Administrative Agent shall have, as to each Lender, either received a counterpart hereof executed by such Lender or been notified by such Lender that such Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, the Administrative Agent and each Lender and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights or delegate its duties under this Agreement or any interest in this Agreement without the prior written consent of each Lender.

Section 9.06   Lender Assignments and Participations.

(a)   The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 9.06.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in Section 9.06) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

-85-

(b)      (i) Subject to the conditions set forth in Section 9.06(b)(ii), any Lender may assign to one or more assignees (each, an "<u>Eligible Assignee</u>") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Advances at the time owing to it) with the prior written consent of the Administrative Agent, <u>provided</u> that no consent of the Administrative Agent shall be required for an assignment to an assignee that is a Lender immediately prior to giving effect to such assignment.

(ii)      Assignments shall be subject to the following additional conditions:

(A)      except in the case of an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Advances, the amount of the Commitment or Advances of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 unless the Administrative Agent otherwise consents;

(B)      each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)      the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee of $4,000;

(D)      the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire;

(E)      prompt written notice shall have been provided to the Borrower of any assignment; and

(F)      the assignee must not be a natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person), a Defaulting Lender, or an Affiliate or Subsidiary of the Borrower.

(iii)      Subject to <u>Section 9.06(b)(iv)</u> and the acceptance and recording thereof, from and after the effective date specified in each Assignment and Acceptance the Eligible Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of <u>Section 2.13</u>, <u>Section 2.14</u> and <u>Section 9.04</u>, and <u>Section 9.07</u>).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that

does not comply with this <u>Section 9.06</u> shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with <u>Section 9.06(f)</u>.

(iv)     The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent, and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  In connection with any changes to the Register, if necessary, the Administrative Agent will reflect the revisions on <u>Schedule I</u> and forward a copy of such revised <u>Schedule I</u> to the Borrower and each Lender.

(v)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, the Assignee's completed Administrative Questionnaire and, if required hereunder, applicable tax forms (unless the Eligible Assignee shall already be a Lender hereunder), the processing and recordation fee referred to in this <u>Section 9.06(b)</u> and any written consent to such assignment required by this <u>Section 9.06(b)</u>, the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this <u>Section 9.06(b)</u>.

(vi)     Notwithstanding the foregoing, no assignment or participation shall be made to any Loan Party or any Affiliate of a Loan Party.

(c)     (i) Any Lender may at any time, without the consent of, or notice to, the Borrower, the Administrative Agent, or any other Person, sell participations to any Person (other than a natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (a "<u>Participant</u>") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Advances owing to it); <u>provided</u> that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (C) the Borrower, the Administrative Agent, and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and (D) the selling Lender shall maintain the Participant Register.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; <u>provided</u> that such agreement or instrument may provide that such Lender will not, without the

consent of the Participant, agree to any amendment, modification or waiver described in Section 9.01(a) through (d) that affects such Participant.  In addition such agreement must provide that the Participant be bound by the provisions of Section 9.04 and Section 9.07.  The Borrower agrees that each Participant shall be entitled to the benefits of Section 2.13 and Section 2.14 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 9.06(b).  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 7.04 as though it were a Lender, provided such Participant agrees to be subject to Section 2.12 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Advances or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, Advance or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(ii)     A Participant shall not be entitled to receive any greater payment under Section 2.13 or Section 2.14 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from an adoption of or any Change in Law or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof that occurs after the Participant acquired the applicable participation.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.14 unless such Participant agrees, for the benefit of the Borrower, to comply with Section 2.14(g) as though it were a Lender (it being understood the documentation required under Section 2.14(g) shall be provided only to the selling Lender).

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or a central bank, and this Section 9.06(d) shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Eligible Assignee for such Lender as a party hereto.

(e)     Notwithstanding any other provisions of this Section 9.06, no transfer or assignment of the interests or obligations of any Lender or any grant of participations therein shall be permitted if such transfer, assignment or grant would require the Borrower and the other

Error! Unknown document property name.

Loan Parties to file a registration statement with the SEC or to qualify the Advances under the "Blue Sky" laws of any state.

     Section 9.07    <u>Indemnification; Waiver</u>.

        (a)    <u>Indemnification</u>.    THE BORROWER SHALL INDEMNIFY THE ADMINISTRATIVE AGENT, EACH SUB-AGENT, AND EACH LENDER, AND EACH RELATED PARTY OF ANY OF THE FOREGOING PERSONS (EACH SUCH PERSON BEING CALLED AN "<u>INDEMNITEE</u>") AGAINST, AND DEFEND AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL ACTUAL LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES AND RELATED EXPENSES, INCLUDING THE REASONABLE AND DOCUMENTED OUT-OF-POCKET FEES, CHARGES AND DISBURSEMENTS OF COUNSEL (SUBJECT TO THE LIMITATIONS IN SECTION 9.04) INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (i) THE EXECUTION OR DELIVERY OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, (ii) THE PERFORMANCE BY THE PARTIES HERETO OR THE PARTIES TO ANY OTHER LOAN DOCUMENT OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR BY ANY OTHER LOAN DOCUMENT, (iii) THE FAILURE OF THE BORROWER OR ANY LOAN PARTY TO COMPLY WITH THE TERMS OF ANY LOAN DOCUMENT, INCLUDING THIS AGREEMENT, OR WITH ANY GOVERNMENTAL REQUIREMENT, (iv) ANY INACCURACY OF ANY REPRESENTATION OR ANY BREACH OF ANY WARRANTY OR COVENANT OF THE BORROWER OR ANY LOAN PARTY SET FORTH IN ANY OF THE LOAN DOCUMENTS OR ANY INSTRUMENTS, DOCUMENTS OR CERTIFICATIONS DELIVERED IN CONNECTION THEREWITH, (v) ANY LOAN OR THE USE OF THE PROCEEDS THEREFROM (vi) ANY OTHER ASPECT OF THE LOAN DOCUMENTS, (vii) THE OPERATIONS OF THE BUSINESS OF THE BORROWER OR ANY OTHER LOAN PARTY BY SUCH PERSONS, (viii) ANY ASSERTION THAT THE LENDERS WERE NOT ENTITLED TO RECEIVE THE PROCEEDS RECEIVED PURSUANT TO THE LOAN DOCUMENTS, (ix) ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY OTHER LOAN PARTY OR ANY OF THEIR PROPERTIES OR OPERATIONS, INCLUDING THE PRESENCE, GENERATION, STORAGE, RELEASE, THREATENED RELEASE, USE, TRANSPORT, DISPOSAL, ARRANGEMENT OF DISPOSAL OR TREATMENT OF OIL, OIL AND GAS WASTES, SOLID WASTES OR HAZARDOUS SUBSTANCES ON OR AT ANY OF THEIR PROPERTIES, (x) THE BREACH OR NON-COMPLIANCE BY THE BORROWER OR ANY OTHER LOAN PARTY WITH ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY OTHER LOAN PARTY, (xi) THE PAST OWNERSHIP BY THE BORROWER OR ANY OTHER LOAN PARTY OF ANY OF THEIR PROPERTIES OR PAST ACTIVITY ON ANY OF THEIR PROPERTIES WHICH, THOUGH LAWFUL AND FULLY PERMISSIBLE AT THE TIME, COULD RESULT IN PRESENT LIABILITY, (xii) THE PRESENCE, USE, RELEASE, STORAGE, TREATMENT, DISPOSAL, GENERATION, THREATENED RELEASE, TRANSPORT, ARRANGEMENT FOR TRANSPORT OR ARRANGEMENT FOR DISPOSAL OF OIL, OIL AND GAS WASTES, SOLID WASTES OR HAZARDOUS SUBSTANCES ON OR AT ANY OF THE PROPERTIES OWNED OR

Error! Unknown document property name.

OPERATED BY THE BORROWER OR ANY OTHER LOAN PARTY OR ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS SUBSTANCES ON OR FROM ANY PROPERTY OWNED OR OPERATED BY THE BORROWER OR ANY OTHER LOAN PARTY, (xiii) ANY OTHER ENVIRONMENTAL, HEALTH OR SAFETY CONDITION IN CONNECTION WITH THE LOAN DOCUMENTS, OR (xv) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY, WHETHER BROUGHT BY A THIRD PARTY OR BY ANY LOAN PARTY, AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO, AND SUCH INDEMNITY SHALL EXTEND TO EACH INDEMNITEE NOTWITHSTANDING THE SOLE OR CONCURRENT NEGLIGENCE OF EVERY KIND OR CHARACTER WHATSOEVER, WHETHER ACTIVE OR PASSIVE, WHETHER AN AFFIRMATIVE ACT OR AN OMISSION, INCLUDING ALL TYPES OF NEGLIGENT CONDUCT IDENTIFIED IN THE RESTATEMENT (SECOND) OF TORTS OF ONE OR MORE OF THE INDEMNITEES OR BY REASON OF STRICT LIABILITY IMPOSED WITHOUT FAULT ON ANY ONE OR MORE OF THE INDEMNITEES INCLUDING ORDINARY NEGLIGENCE; <u>PROVIDED</u> THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO (X) ARISE FROM THE GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE, (Y) ARISE SOLELY OUT OF ANY CLAIM, ACTION, INQUIRY, SUIT, LITIGATION, INVESTIGATION OR PROCEEDING THAT DOES NOT INVOLVE AN ACT OR OMISSION OF ANY LOAN PARTY, ANY OF THEIR AFFILIATES OR SUBSIDIARIES AND THAT IS BROUGHT BY AN INDEMNITEE AGAINST ANY OTHER INDEMNITEE (OTHER THAN ANY CLAIM, ACTION, SUIT, INQUIRY, LITIGATION, INVESTIGATION OR PROCEEDING AGAINST THE ADMINISTRATIVE AGENT IN ITS CAPACITY OR IN FULFILLING ITS ROLE AS AN ADMINISTRATIVE AGENT OR (Z) RELATE TO TAXES, WHICH SHALL BE SUBJECT TO INDEMNIFICATION PURSUANT TO SECTION 2.14**.**

(b)     THE BORROWER SHALL NOT, WITHOUT THE PRIOR WRITTEN CONSENT OF EACH INDEMNITEE AFFECTED THEREBY, SETTLE ANY THREATENED OR PENDING CLAIM OR ACTION THAT WOULD GIVE RISE TO THE RIGHT OF ANY INDEMNITEE TO CLAIM INDEMNIFICATION HEREUNDER UNLESS SUCH SETTLEMENT (X) INCLUDES A FULL AND UNCONDITIONAL RELEASE OF ALL LIABILITIES ARISING OUT OF SUCH CLAIM OR ACTION AGAINST SUCH INDEMNITEE, (Y) DOES NOT INCLUDE ANY STATEMENT AS TO OR AN ADMISSION OF FAULT, CULPABILITY OR FAILURE TO ACT BY OR ON BEHALF OF SUCH INDEMNITEE AND (Z) REQUIRES NO ACTION ON THE PART OF THE INDEMNITEE OTHER THAN ITS CONSENT.

(c)     NO INDEMNITEE SEEKING INDEMNIFICATION OR CONTRIBUTION UNDER THIS AGREEMENT WILL, WITHOUT THE BORROWER'S WRITTEN CONSENT (WHICH CONSENT SHALL NOT BE UNREASONABLY WITHHELD, DELAYED OR CONDITIONED), SETTLE, COMPROMISE, CONSENT TO THE ENTRY OF ANY JUDGMENT IN OR OTHERWISE SEEK TO TERMINATE ANY

Error! Unknown document property name.

INVESTIGATION, LITIGATION OR PROCEEDING REFERRED TO HEREIN; HOWEVER IF ANY OF THE FOREGOING ACTIONS IS TAKEN WITH THE BORROWER'S CONSENT OR IF THERE IS A FINAL AND NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION FOR THE PLAINTIFF IN ANY SUCH INVESTIGATION, LITIGATION OR PROCEEDING, THE BORROWER AGREES TO INDEMNIFY AND HOLD HARMLESS EACH INDEMNITEE FROM AND AGAINST ANY AND ALL ACTUAL LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES AND RELATED EXPENSES BY REASON OF SUCH ACTION OR JUDGMENT IN ACCORDANCE WITH THE PROVISIONS OF THE PRECEDING PARAGRAPHS. NOTWITHSTANDING THE IMMEDIATELY PRECEDING SENTENCE, IF AT ANY TIME AN INDEMNITEE SHALL HAVE REQUESTED INDEMNIFICATION OR CONTRIBUTION IN ACCORDANCE WITH THIS AGREEMENT, THE BORROWER SHALL BE LIABLE FOR ANY SETTLEMENT OR OTHER ACTION REFERRED TO IN THE IMMEDIATELY PRECEDING SENTENCE EFFECTED WITHOUT THE BORROWER'S CONSENT IF (A) SUCH SETTLEMENT OR OTHER ACTION IS ENTERED INTO MORE THAN 30 DAYS AFTER RECEIPT BY THE BORROWER OF SUCH REQUEST FOR SUCH INDEMNIFICATION OR CONTRIBUTION AND (B) THE BORROWER SHALL NOT HAVE PROVIDED SUCH INDEMNIFICATION OR CONTRIBUTION IN ACCORDANCE WITH SUCH REQUEST PRIOR TO THE DATE OF SUCH SETTLEMENT OR OTHER ACTION.

(d)     No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, except to the extent that such damages have resulted from the willful misconduct, bad faith or gross negligence of any Indemnitee (as determined by a final non-appealable judgment of a court of competent jurisdiction).

(e)     To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent, or any sub-agent under Section 9.04 or Section 9.07(a), each Lender severally agrees to pay to the Administrative Agent or such sub-agent, as the case may be, such Lender's Pro Rata Share (as determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or such sub-agent in its capacity as such.

(f)     All amounts due under this Section 9.07 shall be payable not later than 10 days after written demand therefor.

Section 9.08   Execution in Counterparts.   This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart signature page of this Agreement by facsimile or by electronic mail in portable document format (.pdf) is as

Error! Unknown document property name.

effective as executing and delivering this Agreement in the presence of the other parties to this Agreement.

Section 9.09   <u>Survival of Representations, Etc.</u>   All representations and warranties contained in this Agreement or made in writing by or on behalf of the Borrower in connection herewith shall survive the execution and delivery of this Agreement and the Loan Documents, the making of the Advances and any investigation made by or on behalf of the Lenders, none of which investigations shall diminish any Lender's right to rely on such representations and warranties.  All obligations of the Borrower provided for in <u>Sections 2.12</u>, <u>2.13</u>, <u>2.14</u>, <u>9.04</u>, and <u>9.07</u> and all of the obligations of the Lenders in <u>Section 8.10</u> shall survive any termination of this Agreement and repayment in full of the Obligations.

Section 9.10   <u>Severability</u>.   In case one or more provisions of this Agreement or the other Loan Documents shall be invalid, illegal or unenforceable in any respect under any applicable law, the validity, legality, and enforceability of the remaining provisions contained herein or therein shall not be affected or impaired thereby.

Section 9.11   <u>Governing Law; Submission to Jurisdiction</u>.

(a)   THIS AGREEMENT, THE NOTES AND EACH OF THE OTHER LOAN DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT, THE NOTES AND THE EACH OF THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY, CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b)   EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY: SUBMITS (AND THE BORROWER SHALL CAUSE EACH LOAN PARTY TO SUBMIT) FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION AND APPELLATE COURTS THEREOF.  EACH PARTY HEREBY IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS.

(c)   EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO IT AT THE ADDRESS SPECIFIED IN <u>SECTION 9.02</u> OR SUCH OTHER ADDRESS AS IS SPECIFIED PURSUANT TO <u>SECTION 9.02</u> (OR ITS ASSIGNMENT AND ASSUMPTION), SUCH SERVICE TO BECOME EFFECTIVE THIRTY (30) DAYS AFTER SUCH MAILING.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF A PARTY OR ANY HOLDER OF A NOTE TO SERVE PROCESS

Error! Unknown document property name.

IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANOTHER PARTY IN ANY OTHER.

Section 9.12  <u>WAIVER OF JURY TRIAL</u>.   EACH PARTY HEREBY (i) IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN; (ii) IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, OR DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES; (iii) CERTIFIES THAT NO PARTY HERETO NOR ANY REPRESENTATIVE OR AGENT OF COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS, AND (iv) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT, THE LOAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS <u>SECTION 9.12</u>.

Section 9.13  <u>USA Patriot Act</u>.  Each Lender that is subject to the Patriot Act, the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the Patriot Act it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the Patriot Act.

Section 9.14  <u>ORAL AGREEMENTS</u>.  THIS WRITTEN AGREEMENT AND THE LOAN DOCUMENTS, AS DEFINED IN THIS AGREEMENT, REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

Section 9.15  <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)  the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

Error! Unknown document property name.

    (b)    the effects of any Bail-In Action on any such liability, including, if applicable:

        (i)    a reduction in full or in part or cancellation of any such liability;

        (ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

        (iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

    Section 9.16  <u>Confidentiality</u>.  Each of the Administrative Agent and the Lenders (severally and not jointly) agrees to maintain the confidentiality of the Confidential Information, except that Confidential Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and required to keep such Confidential Information confidential), (b) to the extent requested by any regulatory authority having authority over the Administrative Agent or any Lender, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to any Loan Document, (e) in connection with the exercise of any remedies under any Loan Document or any suit, action or proceeding relating to any Loan Document or the enforcement of rights thereunder, (f) to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under the Loan Documents (provided that such Person agrees to be bound by the provisions of this paragraph or provisions substantially similar to such provisions, it being understood that the provisions of any nondisclosure and/or confidentiality agreement that satisfies the requirements of clause (c) in the paragraph above shall be considered provisions substantially similar to this paragraph), (g) with the consent of the Borrower, or (h) to the extent such Confidential Information (i) becomes publicly available other than as a result of a breach of this paragraph or (ii) becomes available to the Administrative Agent or any Lender (or any other Person bound by the provisions of this paragraph or provisions substantially similar to such provisions) on a non-confidential basis from a source other than the Borrower.  Any Person required to maintain the confidentiality of Confidential Information as provided in this paragraph shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Confidential Information as such Person would accord to its own confidential information.

    **[Remainder of this page intentionally left blank.  Signature page follows.]**

Error! Unknown document property name.

EXECUTED as of the date first above written.

<strong><u>BORROWER</u></strong>:

SHORELINE ENERGY LLC


By:_____
Name: Toby E. Hamrick
Title: Chief Financial Officer

**ADMINISTRATIVE AGENT:**

MORGAN STANLEY ENERGY CAPITAL INC.
as Administrative Agent


By:_____
Name:
Title:

MORGAN STANLEY CAPITAL GROUP INC.,
as a Lender


By: _____
Name: _____
Title: _____

## <u>SCHEDULE I</u>

### NOTICE INFORMATION AND COMMITMENTS

Each of the commitments to lend set forth herein is governed by the terms of the Debtor-in-Possession Credit Agreement which provides for, among other things, conditions precedent which may restrict the Borrower's ability to request (and the Lenders' obligation to provide) Credit Extensions to a maximum amount which is less than the commitments set forth in this <u>Schedule I</u>.

**<u>Administrative Agent:</u>**

Morgan Stanley Energy Capital Inc.
1585 Broadway / Floor 16
New York, New York 10036-8293
Attention:      David Lazarus
Facsimile:      (914) 885-9595

and

750 Seventh Avenue, 11th Floor
New York, New York 10019
Attention:      Ed Diaz-Perez
Facsimile:      (212) 507-7092

with a copy to:

1585 Broadway / Floor 16
New York, New York 10036-8293
Attention:      Maria-Ines Raij
Facsimile:      (212) 404-9110

and

Morgan Stanley Energy Capital Inc.
1300 Thames Street, 4th Floor
Thames Street Wharf
Baltimore, MD 21231
agency.borrowers@morganstanley.com

**<u>Borrower:</u>**

Shoreline Energy LLC
16801 Greenspoint Park Drive, Suite 380
Houston, Texas 77060
Attention:      Toby E. Hamrick
Facsimile:      (281) 872-0031

| Lenders: | Commitments |
|---|---|
| Morgan Stanley Capital Group Inc. | $46,000,000.00[1] |
| Total: | $46,000,000.00 |

---

[1] In addition to the $46,000,000 Commitment, a $4,000,000 Incremental Commitment may be provided from time to time by the Lenders in their sole discretion pursuant to Section 2.20.

**Error! Unknown document property name.**

**Exhibit G to the DIP Credit Agreement**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

-----------------------------------------------------------------x
                                   :

In re                          :        **Chapter 11**
                                     :

**SHORELINE ENERGY LLC,  *et al.*[1]**    :        **Case No. 16-_____ (___)**
                                     :
                                     :

          **Debtors.**            :        **[Joint Administration Pending]**
                                     :
-----------------------------------------------------------------x

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 363(d), 364, AND 507 AND BANKRUPTCY RULES 2002, 4001 AND 9014 (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED, SUPERPRIORITY, POST-PETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING PRIMING LIENS, PRIORITY LIENS AND SUPER-PRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES AND (V) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C)**

Upon the motion, dated November 2, 2016 (the "**Motion**"),[2] of Shoreline Energy LLC

(the "**Company**" or "**DIP Borrower**") and all of its subsidiaries and the Company's direct

parent,  as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned

chapter 11 cases (the "**Chapter 11 Cases**") commenced on November 2, 2016 (the "**Petition

Date**") for interim and final orders pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1),

364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503 and 507 of title 11 of the United States Code, 11

U.S.C. §§ 101, *et seq*. (as amended, the "**Bankruptcy Code**"), Rules 2002 and 4001 of the

---

[1]    The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Shoreline Energy LLC  (20-4832777); Shoreline Southeast LLC (0562); Shoreline Offshore LLC (2882); Harvest Development LLC (2703); Shoreline GP LLC (5184); Shoreline Energy Partners, LP (5035); Shoreline EH LLC (47-1906570); and Shoreline Central Corporation (1579).

[2]    Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Motion or the DIP Credit Agreement, as applicable.

Federal Rules of Bankruptcy Procedure (as amended, the "**Bankruptcy Rules**")and Rules 2002-1, 4001-1(b), 4002-1(i) and 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Southern District of Texas and the Texas Complex Chapter 11 Case Procedures (together, the "**Local Rules**") for the United States Bankruptcy Court for the Southern District of Texas Houston Division (this "**Court**") seeking:

(I)      authorization for the DIP Borrower and the other Debtors to obtain a post-petition revolving credit facility in the aggregate principal amount of up to $50,000,000, of which $32,000,000 consists of advances outstanding under the Prepetition First Lien Credit Agreement (as defined in paragraph (II) below) and, upon entry of the Final Order, shall be deemed funded and outstanding under the credit facility (the "**DIP Facility**", all extensions of credit under the DIP Facility, the "**DIP Loans**"), and to otherwise incur the DIP Obligations (as defined in paragraph 5(e) below) on the terms and conditions set forth in this interim order (this "**Order**") and the Debtor-in-Possession Credit Agreement (substantially in the form attached hereto as **Exhibit 2**, and as hereafter amended, supplemented or otherwise modified, the "**DIP Credit Agreement**", and together with all other agreements, documents and instruments executed and delivered in connection with the DIP Credit Agreement, as hereafter amended, supplemented or otherwise modified, the "**DIP Documents**"), among the DIP Borrower, each Debtor that guarantees the DIP Obligations (collectively, the "**DIP Facility Guarantors**"), the lenders party thereto from time to time (collectively, together with  the other Secured Parties (as defined in the DIP Credit Agreement), the "**DIP Lenders**"), and Morgan Stanley Energy Capital Inc. ("**Morgan Stanley**"), as administrative agent for the DIP Lenders (in such capacity, the **"DIP Agent**");

(II)     Authorization for the DIP Facility Guarantors to guarantee on a secured and joint and several basis the DIP Obligations;

(III)     authorization for the Debtors to execute and deliver the DIP Credit Agreement and the other DIP Documents to which they are a party and to perform their respective obligations thereunder and such other and further acts as may be necessary or appropriate in connection therewith;

(IV)     authorization for the Debtors to  borrow up to $5,000,000 of DIP Loans on an interim basis and use proceeds of such borrowings in accordance with the DIP Documents, this Order and the Budget (as defined in the DIP Credit Agreement and a form of which is attached hereto as **Exhibit 1**) and, subject to entry of the Final Order (as defined below) to access the full remaining balance of the DIP Facility by borrowing up to an aggregate principal amount of $50,000,000, of which $32,000,000 shall be borrowed to permanently repay $32,000,000 of the outstanding Prepetition First Lien Loans (as defined in paragraph 4(a) below) under the Third Amended and Restated Credit Agreement, dated as of October 16, 2015 (as amended, supplemented or otherwise modified as of the Petition Date, the "**Prepetition First Lien Credit Agreement**", and together with all security, pledge and guaranty agreements and all other documentation executed in connection with any of the foregoing, each as amended, supplemented or otherwise modified as of the Petition Date, the "**Prepetition First Lien Documents**"), among the Company in its capacity as borrower thereunder, the lenders party thereto from time to time (together with the other "Secured Parties" (as defined in the Prepetition First Lien Credit Agreement), the "**Prepetition First Lien Lenders**") and Morgan Stanley as administrative agent for the Prepetition First Lien Lenders (in such capacity, the "**Prepetition First Lien Agent**", together with the Prepetition First Lien Lenders, the "**Prepetition First Lien**

**Secured Parties**"), which repayment may be effectuated by converting or rolling-over on a cashless basis such Prepetition First Lien Loans into DIP Loans on a dollar for dollar basis and deeming them made thereunder;

(V)     authorization for the Debtors to (a) use the cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code, the "**Cash Collateral**") pursuant to section 363 of the Bankruptcy Code, subject to the Budget, and all other Prepetition Collateral (as defined in paragraph 4(d) below), and (b) provide adequate protection to the following parties with respect to the applicable prepetition secured debt obligations of:

(a)     the Prepetition First Lien Secured Parties under the Prepetition First Lien Credit Agreement and the Prepetition First Lien Documents, and;

(b)     the lenders (collectively, the "**Prepetition Second Lien Lenders**", together with the "Prepetition Second Lien Agent (as defined below), the "**Prepetition Second Lien Secured Parties**") under (i) the Second Lien Credit Agreement, dated as of September 30, 2013 (as amended, supplemented or otherwise modified as of the Petition Date, the "**Prepetition Second Lien Credit Agreement**") and together with all security, pledge and guaranty agreements and all other documentation executed in connection with the foregoing, each as amended, supplemented or otherwise modified as of the Petition Date, the "**Prepetition Second Lien Documents**") among the Company as the borrower, the Prepetition Second Lien Lenders from time to time party thereto and Highbridge Principal Strategies, LLC, as the original administrative agent for the Prepetition Second Lien Lenders (any successors, the "**Prepetition Second Lien Agent**" and, together with the Prepetition First Lien Agent, the "**Prepetition Agents**"); the obligations of the Company and the other Debtors arising under the Prepetition Second Lien Credit Agreement are referred to herein as the "**Prepetition Second Lien Obligations**";

(VI)     authorization for the DIP Agent to exercise remedies under, and in accordance with, the DIP Documents upon the occurrence and during the continuance of a DIP Event of Default (as defined below);

(VII)     authorization for the Debtors to perform their obligations under, and pay the fees set forth in the DIP Credit Agreement;

(VIII)   subject to entry of the Final Order, the waiver by the Debtors of any right to seek to surcharge against the DIP Collateral (as defined in paragraph 8 below) or Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code and the waiver by the Debtors of the equities of the case exception of section 552(b) of the Bankruptcy Code with respect to the Prepetition Collateral and DIP Collateral;

(IX)   to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing (the "**Interim Hearing**") on the Motion to be held before this Court to consider entry of this Order (a) authorizing the DIP Borrower, on an interim basis, to access up to $5,000,000 of the aggregate principal amount of the DIP Facility, the collective proceeds of which shall be used for working capital and general corporate purposes of the Debtors (including fees, costs and expenses related to the Chapter 11 Cases and the DIP Documents, capital expenditures and to fund the Carve-Out), as and to the extent set forth in this Order and in accordance with the Budget and the DIP Documents, (b) authorizing the Debtors to use the Cash Collateral and the other Prepetition Collateral in accordance with the DIP Documents, the Budget and this Order and (c) granting adequate protection to the Prepetition Secured Parties;

(X)   to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "**Final Hearing**") for this Court to consider entry of a final order (the "**Final Order**") authorizing and approving on a final basis the relief requested in the Motion, including without limitation, for the DIP Borrower to access, subject to the terms and conditions set forth in the DIP Credit Agreement, the full amount of the DIP Facility, of which $32,000,000 shall be borrowed to permanently repay $32,000,000 of Prepetition First Lien Loans (which repayment may be effectuated by converting or rolling over on a cashless basis such Prepetition First Lien Loans and deeming them made under the DIP Agreement), for the Debtors to continue to use the Cash

Collateral and the other Prepetition Collateral and for the Debtors to grant adequate protection to the Prepetition Secured Parties; and

(XI)   waiver of any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Order and providing for the immediate effectiveness of this Order.

The Interim Hearing having been held by this Court on November [●], and upon the record made by the Debtors at the Interim Hearing, including without limitation, the admission into evidence of the *Declaration of Robert Warshauer in Support of the Motion*, filed on the Petition Date, and the other evidence submitted or adduced and the arguments of counsel made at the Interim Hearing, and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Jurisdiction*. This Court has core jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      *Notice*. Notice of the Motion, the relief requested therein and the Interim Hearing was served by the Debtors on (i) the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**"); (ii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (iii) counsel to the DIP Agent; (iv) counsel to the Prepetition First Lien Agent; (v) counsel to the Prepetition Second Lien Agent; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service; (viii) the United States Attorney's Office for the Southern District of Texas; and (ix) any other party entitled to notice pursuant to Local Rule 9013-1(d). Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein and the

Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c), and no further notice of the relief sought at the Interim Hearing is necessary or required.

3.     *Approval of Motion.* The relief requested in the Motion is granted on an interim basis as set forth herein. Except as otherwise expressly provided in this Order, any objection to the entry of this Order that has not been withdrawn, waived, resolved or settled, is hereby denied and overruled on the merits.

4.     *Debtors' Stipulations.* Without prejudice to the rights of any other party (but subject to the limitations thereon contained in paragraph 19), the Debtors, on behalf of themselves and their respective estates, admit, stipulate, and agree that:

(a)     as of the Petition Date, the Debtors party to or otherwise obligated under the Prepetition First Lien Documents were truly and justly indebted and liable on a joint and several basis to the Prepetition First Lien Lenders, without defense, objection, counterclaim or offset of any kind, in the aggregate principal amount of not less than $150.4013 million in respect of loans (such loans, the "**Prepetition First Lien Loans**"), plus all accrued and unpaid interest thereon and any fees and expenses (including fees and expenses of attorneys and outside consultants) related thereto as provided in the Prepetition First Lien Documents (collectively, the "**Prepetition First Lien Obligations**");

(b)     prior to the Petition Date, the Company, certain other Debtors[3] and Morgan Stanley Capital Services LLC, a Prepetition First Lien Secured Party, were party to certain swap agreements (the "**Prepetition Swap Agreements**") which were subject to early settlements resulting in settlement payments in favor of the Company or such other Debtor

---

[3]     Each of the Debtors other than Shoreline EH LLC are obligors under the Prepetition First Lien Documents.

counterparties. The settlement payments constituted Prepetition Collateral (as defined in paragraph 4(d) below) and were used to fund the Company's operations prior to the Petition Date and to repay Prepetition First Lien Obligations in accordance with the terms of the Prepetition First Lien Documents;

    (c)  the Prepetition First Lien Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Debtors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise. No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition First Lien Agent or Prepetition First Lien Secured Parties by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Prepetition First Lien Documents or Prepetition Swap Agreements is subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise;

    (d)  the liens, security interests, and mortgages granted by the Debtors to the Prepetition First Lien Agent (for the ratable benefit of the Prepetition First Lien Secured Parties) to secure the Prepetition First Lien Obligations are (i) legal, valid, binding, perfected, enforceable, first priority (in each case, subject to permitted exceptions under the Prepetition First Lien Credit Agreement) liens on and security interests in the Debtors' real or personal property constituting Collateral (as defined in the Prepetition First Lien Credit Agreement, and hereinafter referred to as the "**Prepetition Collateral**") to secure the Prepetition First

                

Lien Obligations and (ii) not subject to avoidance, recharacterization, offset, subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law or other challenge and (iii) after giving effect to this Order and subject to the Carve-Out (as defined below), subject and subordinate only to other valid and unavoidable liens properly perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) to the extent such liens are permitted under the Prepetition First Lien Documents to be senior to the liens securing the Prepetition First Lien Obligations;

(e)     none of the DIP Agent, the DIP Lenders or the Prepetition First Lien Secured Parties are control persons or insiders of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the DIP Facility, the DIP Documents, the Prepetition First Lien Documents;

(f)     (i) no portion of any of the Prepetition First Lien Obligations shall be subject to contest, avoidance, attack, offset, re-characterization, subordination or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise, and (ii) the Debtors, on behalf of themselves and their respective estates, forever and irrevocably release, discharge, and acquit all former, current and future DIP Agents, DIP Lenders and Prepetition First Lien Secured Parties, affiliates of the DIP Agent and DIP Lenders and the Prepetition First Lien Secured Parties, and each of their respective former, current and future officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors and successors in interest of each of the DIP Agent, each DIP Lender and each Prepetition First Lien Secured Party and their respective affiliates (collectively, the "**Releasees**"), of and from any and all

claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, reasonable attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Documents, the Prepetition First Lien Documents, the Prepetition Swap Agreements and/or the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability" or equitable subordination or disallowance claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Agent, the DIP Lenders, and/or the Prepetition First Lien Secured Parties, *provided, that*, the releases set forth in this section shall be limited to such claims arising prior to or including the date of the entry of this Order.   The Debtors further waive and release any defense, right of counterclaim, right of setoff or deduction of the payment of the Prepetition First Lien Obligations and the DIP Obligations that the Debtors now have or may claim to have against the Releasees arising out of, connected with, or relating to any and all acts, omissions or events occurring prior to the entry of this Order;

(g)   no portion of any of the Prepetition First Lien Obligations shall be subject to contest, attack, avoidance, impairment, disallowance, defense, counterclaim,

recharacterization, reduction, recoupment, setoff, recovery or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law;

(h)     The Prepetition Agents, together with the Debtors, are party to that certain Intercreditor Agreement, dated as of October 16, 2015 (as amended, supplemented or otherwise modified as of the Petition Date, the "**Intercreditor Agreement**"), that set forth, among other things, the relative lien priorities and other rights and remedies of the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties with respect to the Prepetition Collateral; pursuant to section 6.01 of that Intercreditor Agreement, (x) the liens on the Prepetition Collateral held by the Prepetition Second Lien Secured Parties are subordinate to the DIP Liens, the First Lien Adequate Protection Liens (as defined in paragraph 15(a) below) and the liens securing the Prepetition First Lien Obligations, and (y) the Second Lien Adequate Protection Liens are subordinate to the DIP Liens, the liens securing the Prepetition First Lien Obligations and the First Lien Adequate Protection Liens;

(i)     The aggregate value of the Prepetition Collateral securing the Prepetition First Lien Obligations exceeds the sum of (x) aggregate amount of the Prepetition First Lien Obligations that are to be repaid by and rolled into the DIP Facility upon entry of the Final Order and (y) $18,000,000 .

5.     *Findings Regarding the DIP Loans.*

(a)     Good cause has been shown for the entry of this Order.

(b)     The Debtors have an immediate need to enter into the DIP Facility, obtain the DIP Loans, and to use the Prepetition Collateral, including the Cash Collateral (as defined below), in order to, among other things, permit the orderly continuation of their businesses, preserve the going concern value of the Debtors, make payroll and satisfy other

working capital and general corporate purposes of the Debtors (including fees, costs and expenses related to the Chapter 11 Cases and the DIP Documents and capital expenditures, as and to the extent set forth in this Order and in accordance with the Budget and the DIP Documents).

(c)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders pursuant to, and for the purposes set forth in, the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 364(b) of the Bankruptcy Code. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without (x) granting priming liens under section 364(d)(1) of the Bankruptcy Code and the Superpriority Claims (as defined in paragraph 7(a) below) and (y) subject to entry of the Final Order, using proceeds from the DIP Facility to repay $32,000,000 of the Prepetition First Lien Loans, in each case on the terms and conditions set forth in this Order and the DIP Documents.

(d)     The terms of the DIP Facility pursuant to the DIP Documents and the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The DIP Documents, the use of the Prepetition Collateral (including the Cash Collateral), and the grant of adequate protection hereunder have been the subject of extensive negotiations conducted in good faith and at arm's length among the Debtors, the DIP Agent, the DIP Lenders, and the other Prepetition First Lien Secured Parties, and all of the Debtors' obligations and indebtedness arising under or in connection with the DIP

Documents, this Order and the DIP Loans (collectively, the "**DIP Obligations**") shall be deemed to have been extended by the DIP Agent and DIP Lenders in "good faith" as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified on appeal or otherwise.  Any such reversal, modification, or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder or any lien, claim or priority authorized or created hereby.  Any liens or claims granted to the DIP Lenders hereunder arising prior to the effective date of any such reversal, modification, or vacatur of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

(f)       The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2). Absent granting the interim relief set forth in this Order, the Debtors' estates and their business operations will be immediately and irreparably harmed. The borrowing of the DIP Loans and the use of the Prepetition Collateral (including the Cash Collateral) in accordance with this Order and the DIP Documents are, therefore, in the best interest of the Debtors' chapter 11 estates.

6.       *Authorization of the DIP Loans and the DIP Documents*.

(a)       The Debtors are hereby authorized (i) to enter into and perform under the DIP Documents and, (ii) to borrow under the DIP Credit Agreement up to an aggregate principal amount of $5,000,000 of the DIP Loans, the proceeds of which shall be used for, subject to the terms of this Order, the DIP Documents and the Budget, working capital and other general corporate purposes of the Debtors (including fees, costs and expenses related to

- 13 -

the Chapter 11 Cases and the DIP Documents, capital expenditures and to fund the Carve-Out), including without limitation, to pay interest, fees and expenses in connection with the DIP Loans. Amounts borrowed under the DIP Credit Agreement may be repaid and re-borrowed in accordance with the terms of the DIP Documents and subject to the limitations set forth in this Order.

(b) In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and empowered to perform all acts and to execute and deliver all instruments and documents that the DIP Agent determines to be reasonably required or necessary for such Debtor's performance of its obligations under the applicable DIP Documents, including without limitation:

(i) the execution, delivery and performance of the DIP Documents;

(ii) the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents (including, without limitation, the Budget) (in each case in accordance with the terms of the applicable DIP Documents and in such form as the Debtors, the DIP Agent and the required DIP Lenders may agree) and no further approval of this Court shall be required for any amendment, waiver, consent or other modification to and under the DIP Documents (including, without limitation, the Budget) that does not materially and adversely affect the Debtors or which does not (A) shorten the scheduled maturity of the DIP Loans, (B) increase the principal amount of the DIP Facility or the rate of interest payable on the DIP Loans, or (C) change any DIP Event of Default, add any covenants or amend the covenants therein, in any such case to be materially more restrictive; *provided*, *however*, that a copy of any such amendment, waiver, consent or other modification shall be filed by the Debtors with this Court and served by the Debtors on counsel for the Prepetition Agents, the U.S. Trustee, and counsel to any statutory committee of unsecured creditors (the "**Committee**") appointed in the Chapter 11 Cases within three (3) Business Days of its effectiveness;

(iii) the non-refundable payment to the DIP Agent and the DIP Lenders, as the case may be, of the commitment, upfront, and administrative agency fees set forth in the applicable DIP Documents as described in the Motion; and

(iv)     the performance of all other acts required under or in connection with the DIP Documents.

(c)     Upon the execution thereof, the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with the terms of this Order and the DIP Documents.  No obligation, payment, transfer or grant of security by the Debtors under the DIP Documents or this Order shall be voidable, avoidable, restrained or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

(d)     All borrowings under the DIP Facility and all use of Cash Collateral shall be in compliance with the Budget (including any permitted variance set forth in the DIP Credit Agreement; as the Budget may be modified from time to time consistent with and subject to the terms of the DIP Credit Agreement), and the Debtors shall not use any portion of the proceeds of the DIP Facility or any Cash Collateral, directly or indirectly, in excess of the amounts set forth in the Budget, except (and to the extent of) any variance permitted under the DIP Credit Agreement. The Budget may be updated and amended from time to time in accordance with the DIP Credit Agreement, *provided that* (i) such updated or amended Budget shall be provided promptly to counsel for the Prepetition Agents and any Committee and (ii) and the Debtors shall be required always to comply with the Budget as set forth in DIP Credit Agreement.

7.     *Superpriority Claims*.

(a)     Except to the extent expressly set forth in this Order in respect of the

Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed senior administrative expense claims (the "**Superpriority Claims**") against the Debtors on a joint and several basis (without the need to file a proof of claim or request for payment) with priority over any and all administrative expenses, adequate protection claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre- and post-petition property of each of the Debtors.   Other than the Carve-Out, no priority claims are, or will be, senior to, prior to, or *pari passu* with the Superpriority Claims, or any of the DIP Obligations, or with any other claims of the DIP Agent or the DIP Lenders arising hereunder or under the other DIP Documents, or otherwise in connection with the DIP Facility.

      (b)     For purposes hereof, the "**Carve-Out**" shall mean, collectively: the sum of (i) all fees owing to the United States Trustee incurred in connection with the Chapter 11 Cases, (ii) professional fees, expenses, and disbursements incurred by professional persons retained by the Debtors or any Committee pursuant to section 327, 328, 363 or 1103 of the Bankruptcy Code ("**Allowed Professional Fees and Expenses**") accrued on and after the Petition Date and before the occurrence of a Carve-Out Trigger Date to the extent allowed by the Court at any time (whether before or after the Carve-Out Trigger Date

- 16 -

(defined in this paragraph 7 below) and (c) Allowed Professional Fees and Expenses incurred on and after the occurrence of a Carve-Out Trigger Date, in an amount not to exceed $750,000 (the "**Post-Trigger Date Carve-Out**"). For the purposes hereof, a "**Carve-Out Trigger Date**" means the first business day after the DIP Agent provides a written notice to the DIP Borrower and its counsel that an Event of Default under (and as defined in) the DIP Credit Agreement (a "**DIP Event of Default**") (or an event which with the giving of notice would constitute a DIP Event of Default) has occurred. For the avoidance of doubt, the Carve-Out shall be senior to any claims arising under or relating to and liens securing the DIP Facility, the Prepetition First Lien Obligations, the Prepetition First Lien Documents, the Prepetition Second Lien Obligations, the Prepetition Second Lien Documents including, without limitation, any administrative or superpriority claims and all forms of adequate protection liens or security interests.

(c)        Immediately upon delivery of the written notice required in connection with the Carve-Out Trigger Date, the Debtors shall be permitted to transfer from their concentration account to a segregated account (the **"Carve-Out Account"**) not subject to the control of the DIP Agent, DIP Lenders or the Prepetition Secured Parties an amount equal to the Post-Trigger Date Carve-Out; *provided* *that* such amount shall include an amount equal to the aggregate unpaid fees, costs and expenses described in clause (b) of the definition of "Carve-Out" as reasonably determined by a good faith estimate of the Debtors. The Carve-Out Account and the proceeds on deposit in the Carve-Out Account shall be available only to satisfy obligations benefitting from the Carve-Out and shall not constitute DIP Collateral, except that the DIP Agent shall retain security interests in any residual interests in the Carve-Out Account available following satisfaction in full of all obligations benefitting from the

- 17 -

Carve-Out, and shall receive distributions on accounts of such residual interests.

(d)    To the extent funded from the DIP Facility, the Carve-Out shall be added to and made part of the DIP Facility.

8.    *DIP Liens*.  As security for the DIP Obligations, effective and perfected upon the date of this Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Agent of any property, the following security interests in and liens and mortgages upon all property identified in clauses (a), (b) and (c) below (other than any leasehold interest (or any of rights or interests thereunder) the grant of a lien on which, notwithstanding the Bankruptcy Code, shall constitute or result in the abandonment, invalidation or unenforceability of any right, title or interest of the obligor under any lease governing such leasehold interest or a breach or termination pursuant to the terms of, or a default under, any such lease ("**Excepted Leases**"); *provided* *that* the proceeds of such leasehold interests shall constitute DIP Collateral) (collectively, the "**DIP Collateral**") are hereby granted to the DIP Agent, for its own benefit and the benefit of the DIP Lenders, subject only to the Carve-Out and any existing valid, perfected, enforceable and non-avoidable liens existing as of the Petition Date that are senior to any liens securing the Prepetition First Lien Obligations (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Order and the DIP Documents, the "**DIP Liens**"):

(a) <u>First Lien on Unencumbered Property</u>.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority lien on, and security interest in, all tangible and intangible prepetition and post-petition

property in which the Debtors have an interest, whether existing on or as of the Petition Date or thereafter acquired, that is not subject to valid, perfected, non-avoidable and enforceable liens in existence on or as of the Petition Date or valid liens perfected (but not granted) after the Petition Date to the extent such postpetition perfection is expressly permitted by section 546(b) of the Bankruptcy Code (collectively, the "**Unencumbered Property**"), including without limitation, any and all unencumbered cash, hydrocarbons and other inventory generated or produced after the Petition Date, accounts receivable, inventory, general intangibles, contracts, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, vehicles, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, capital stock of the subsidiaries of the Debtors and the proceeds of all of the foregoing; *provided that* the Unencumbered Property shall exclude any of the Debtors' claims and causes of action arising under chapter 5 of the Bankruptcy Code  (collectively, the "**Avoidance Actions**") but subject to entry of the Final Order, Unencumbered Property shall include all proceeds or property recovered from Avoidance Actions, whether by judgment, settlement or otherwise.

(b) <u>Liens Junior to Certain Existing Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior lien on, and security interest in, all tangible and intangible prepetition and post-petition property in which the Debtors have an interest (other than the property described in paragraph 8(c), as to which the DIP Liens will be as described in such clause), whether now existing or hereafter acquired and all proceeds thereof, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as

permitted by section 546(b) of the Bankruptcy Code and are senior to the liens of the Prepetition First Lien Agent (collectively, the "**Non-Primed Liens**"), which security interests and liens in favor of the DIP Agent and the DIP Lenders shall be junior to the Non-Primed Liens.

(c) <u>Liens Priming the Liens of the Prepetition Secured Parties</u>. Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority, senior priming lien on, and security interest in, all Prepetition Collateral. The DIP Liens on the Prepetition Collateral shall be senior in all respects to the security interests in, and liens on, the Prepetition Collateral of each of the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties (collectively, the "**Prepetition Secured Parties**") (including the Adequate Protection Liens granted to such Prepetition Secured Parties), but, for the avoidance of doubt, shall be subject to the Non-Primed Liens (other than the liens of the Prepetition Secured Parties).

(d) <u>Liens Senior to Certain Other Liens</u>. Other than Permitted Subject Liens (as defined in the DIP Credit Agreement) incurred after the Petition Date, no claim or lien, security interest or mortgage having a priority senior to or *pari passu* with those granted by this Order to the DIP Agent and the DIP Lenders other than the Carve-Out shall be granted or allowed while any portion of the DIP Obligations remain outstanding, and the DIP Liens shall not be (i) subject or subordinate to (A) any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any liens, security interests or mortgages arising after the Petition Date or (ii) subordinated to or made *pari passu* with any other lien, security interest or mortgage under sections 363 or 364 of the Bankruptcy Code or otherwise. The DIP Liens

- 20 -

and Adequate Protection Liens shall be valid and enforceable against any trustee appointed in

the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under

Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing

(such Chapter 11 Cases or proceedings, "**Successor Cases**"), and/or upon the dismissal of

any of the Chapter 11 Cases.  Subject to the entry of the Final Order, the DIP Liens and the

Adequate Protection Liens shall not be subject to section 510 of the Bankruptcy Code (other

than as set forth in the Intercreditor Agreement), to the "equities of the case" exception of

section 552 of the Bankruptcy Code, or to section 506(c) of the Bankruptcy Code, or sections

549, 550 or 551 of the Bankruptcy Code.

9.      *Remedies after Event of Default*.  Upon the occurrence and during the continuance

of a DIP Event of Default, five (5) Business Days after the DIP Agent provides written notice to

the Debtors of a DIP Event of Default (the "**Remedies Notice Period**") (with a copy to counsel

to the Debtors, counsel to the Prepetition Agents, the U.S. Trustee and counsel to the

Committee), the automatic stay under section 362 of the Bankruptcy Code is vacated and

modified automatically to the extent necessary to permit the DIP Agent and the DIP Lenders to

exercise all rights and remedies provided for in the DIP Documents and this Order (including,

without limitation, the right to setoff monies of the Debtors in accounts maintained with the DIP

Agent or any DIP Lender) following the conclusion of the Remedies Notice Period and in the

absence of an order of the Court issued during such Remedies Notice Period that a DIP Event of

Default has not occurred and/or is not continuing.  For the avoidance of doubt, neither the DIP

Agent nor any of the DIP Lenders shall exercise any such rights and remedies on account of an

DIP Event of Default until after expiration of the Remedies Notice Period. The only issue that

may be raised by any party in opposition to the exercise of rights and remedies is that no DIP

Event of Default has occurred or is continuing. During the Remedies Notice Period, the Debtors shall be entitled to (x) use the proceeds of the DIP Facility and/or the Cash Collateral in accordance with the Budget and fund the Carve-Out, (y) contest the occurrence and/or continuance of the a DIP Event of Default and (z) to seek and obtain an emergency hearing before the Court, with proper notice to the DIP Agent, solely for the purpose of contesting whether a DIP Event of Default has occurred and/or is continuing. In no event shall the DIP Agent, the DIP Lenders or the Prepetition First Lien Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral.  Neither the DIP Agent's nor any DIP Lender's delay or failure to exercise rights and remedies under the DIP Documents or this Order shall constitute a waiver of such DIP Agent's or any DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Credit Agreement.  During the Remedies Notice Period, notwithstanding the foregoing or any provision in the DIP Documents, neither the DIP Agent nor the DIP Lenders shall be required to fund any Advances or other funding requests of the Debtors.

10.      *Limitation on Charging Expenses against Collateral*.  Subject to and effective upon entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral, as the case may be, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent or the Prepetition First Lien Agent, as

applicable, and no such consent shall be implied from any other action or inaction by the DIP

Agent, the DIP Lenders or the Prepetition First Lien Secured Parties.

11.     *Limitations under Section 552(b) of the Bankruptcy Code*. The Prepetition First

Lien Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the

Bankruptcy Code, and, subject to and effective upon entry of the Final Order, the "equities of the

case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the

Prepetition First Lien Secured Parties with respect to (i) proceeds, products, offspring or profits

of any of the Prepetition Collateral or any of the DIP Collateral or (ii) the extension of the First

Lien Adequate Protection Liens to cover proceeds of the Prepetition Collateral.

12.     *Payments Free and Clear*. Any and all payments or proceeds remitted to the DIP

Agent on behalf of the DIP Lenders or (except as provided in paragraph 19 of this Order) to the

Prepetition Secured Parties pursuant to the provisions of this Order or any subsequent order of

this Court shall be received free and clear of any claim, charge, assessment or other liability,

other than the Carve-Out.

13.     *Cash Collateral*. All of the Debtors' cash as of the Petition Date on deposit or

maintained by the Debtors in any account or accounts with any Prepetition Secured Party and

any cash proceeds of the disposition of any Prepetition Collateral, constitute proceeds of the

Prepetition Collateral and, therefore, are Cash Collateral of the Prepetition Secured Parties

(subject in all cases to the Intercreditor Agreement), within the meaning of section 363(a) of the

Bankruptcy Code.

14.     *Use of Prepetition Collateral (Including Cash Collateral)*. The Debtors are

hereby authorized to use the Prepetition Collateral, including the Cash Collateral, during the

period from the Petition Date through and including the Termination Date (as defined below) for

working capital and general corporate purposes (including to fund the Carve-Out, pay fees, costs and expenses related to the Chapter 11 Cases and the DIP Documents and capital expenditures, as and to the extent set forth in this Order and in accordance with the Budget and the DIP Documents) in accordance with the terms and conditions of this Order and subject to compliance with the Budget; *provided that* the occurrence of the Termination Date as a result of a DIP Event of Default and any termination of the use of Cash Collateral in connection therewith, or as a result thereof, is subject to the Remedies Notice Period; *provided further that*, (a) the Prepetition Secured Parties are granted adequate protection as set forth herein and (b) except on the terms of this Order, the Debtors are not authorized to use the Cash Collateral.  As used herein, "**Termination Date**" means the earlier to occur of (a) the Maturity Date (as defined in the DIP Credit Agreement) of the DIP Facility and (b) the acceleration of any DIP Loans and the termination of any Commitments (as defined in the DIP Credit Agreement) in accordance with the terms of the DIP Credit Agreement.

15.     *Adequate Protection for the Prepetition First Lien Agent and Prepetition First Lien Lenders*.  The Prepetition First Lien Agent and the Prepetition First Lien Lenders are entitled, pursuant to sections 361, 363(c)(2), and 363(e) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in value of their valid, perfected and enforceable interests in the Prepetition Collateral, including without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of the Cash Collateral and any other Prepetition Collateral, the priming of the Prepetition First Lien Agent's liens on the Prepetition Collateral by the DIP Liens and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the "**First Lien Adequate**

**Protection Obligations**"). As adequate protection, the Prepetition First Lien Agent and the Prepetition First Lien Lenders are hereby granted the following:

        (a)     <u>First Lien Adequate Protection Liens</u>. As security for the payment of the First Lien Adequate Protection Obligations, the Prepetition First Lien Agent (for itself and for the benefit of the Prepetition First Lien Secured Parties) is hereby granted (effective and perfected upon the date of this Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements) a valid, perfected replacement security interest in and lien on all of the DIP Collateral (the "**First Lien Adequate Protection Liens**"), subject and subordinate only to (i) the DIP Liens, (ii) the Carve-Out and (iii) the Non-Primed Liens.

        (b)     <u>First Lien 507(b) Claims</u>. The First Lien Adequate Protection Obligations shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "**First Lien 507(b) Claims**"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out, and (ii) the Superpriority Claims granted in respect of the DIP Obligations.

        (c)     <u>Fees and Expenses</u>. As additional adequate protection to the Prepetition First Lien Agent and the Prepetition First Lien Lenders, the Debtors shall pay to the Prepetition First Lien Agent all reasonable and documented out-of-pocket fees and expenses of counsel and advisors payable to the Prepetition First Lien Agent under the Prepetition First Lien Documents (including any forbearance agreements). None of the fees and expenses payable pursuant to this paragraph 15(c) shall be subject to separate approval by this Court (but the U.S. Trustee, the Debtors and the Committee may object to the reasonableness of such fees and expenses within ten (10) Business Days of the receipt of an invoice detailing such fees and expenses, and this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto. Promptly following the completion of the ten (10) Business Day objection period, if no objection is made or following the resolution of any dispute regarding the fees and expenses payable pursuant to this paragraph 15(c) in the Court, the Debtors shall pay the professional fees and expenses provided for in this paragraph 15(c) promptly after receipt of monthly invoices therefor, and the Prepetition First Lien Agent shall promptly provide copies of such invoices (redacted to protect privileges) to the counsel to the Committee and to the U.S. Trustee.

        16.     *Adequate Protection for the Prepetition Second Lien Agent and Prepetition Second Lien Lenders.* The Prepetition Second Lien Agent and the Prepetition Second Lien Lenders are entitled, pursuant to sections 361, 363(c)(2), and 363(e) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral,

in an amount equal to the aggregate diminution in value of their valid, perfected and enforceable interests in the Prepetition Collateral, including without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of the Cash Collateral and any other Prepetition Collateral, the priming of the Prepetition Second Lien Agent's liens on the Prepetition Collateral by the DIP Liens and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the " **Second Lien Adequate Protection Obligations**" and, together with the First Lien Adequate Protection Obligations, the "**Adequate Protection Obligations**"). As adequate protection, the Prepetition Second Lien Agent (for itself and for the benefit of the Prepetition Second Lien Secured Parties) is hereby granted (effective and perfected upon the date of this Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements) a valid, perfected replacement security interest in and lien on all of the DIP Collateral (the "**Second Lien Adequate Protection Liens**" and, together with the First Lien Adequate Protection Liens, the "**Adequate Protection Liens**"), subject and subordinate only to (i) the DIP Liens, (ii) the Carve-Out, (iii) the First Lien Adequate Protection Liens, (iv) the liens securing the Prepetition First Lien Obligations and (v) the Non-Primed Liens, and subject further to the Intercreditor Agreement.

17.     *Perfection of DIP Liens and Adequate Protection Liens*.

(a)     The DIP Agent and each of the Prepetition Agents, as applicable, are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over (including pursuant to a deposit account control agreement), or take any other action in order to validate and perfect the DIP Liens or the applicable

Adequate Protection Liens granted to them hereunder, in each case, subject to the terms of the DIP Documents. In addition, to the extent that any filing and any other perfection actions described in the foregoing were taken by or in favor of the Prepetition First Lien Agent in respect of the Prepetition First Lien Documents, such filings and actions shall serve to perfect the DIP Liens in favor of the DIP Agent, for the benefit of the DIP Secured Parties, securing the DIP Obligations and, solely for purposes of perfecting the DIP Liens, the Prepetition First Lien Agent shall act as bailee for the DIP Agent.  Whether or not the DIP Agent or any of the Prepetition Agents, in their respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the DIP Liens and the applicable Adequate Protection Liens, such DIP Liens and such Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or, other than as set forth in the Intercreditor Agreement, subordination as of the date of entry of this Order, *provided* all parties reserve the right to dispute whether any diminution in value of interests in Prepetition Collateral has occurred or Adequate Protection Obligations exist.

(b)      A certified copy of this Order may, in the discretion of the applicable DIP Agent or Prepetition Agent, as the case may be, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording.

(c)      The Debtors shall execute and deliver to the DIP Agent or the applicable Prepetition Agent, as the case may be, all such agreements, financing statements,

instruments and other documents as the applicable DIP Agent or Prepetition Agent, as the case may be, may reasonably request to evidence, confirm, validate or perfect the DIP Liens and the applicable Adequate Protection Liens.

(d)      Subject to entry of the Final Order, any provision of any lease or other license, contract or other agreement (other than an Excepted Lease) that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other DIP Collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, and any such provision shall have no force and effect with respect to the granting of the DIP Liens or the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in favor of the DIP Lenders or Prepetition Secured Parties in accordance with the terms of the DIP Documents or this Order.

18.      *Preservation of Rights Granted Under the Order.*

(a)      Other than the Carve-Out, the DIP Liens, the Superpriority Claims, any Permitted Liens (as defined in the Prepetition First Lien Credit Agreement), and subject to the terms of the Intercreditor Agreement, no claim or lien having a priority senior to or *pari passu* with those granted by this Order to the Prepetition Agents shall be granted or allowed while any portion of the Adequate Protection Obligations remain outstanding, and the Adequate Protection Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or, except as set forth in the Intercreditor Agreement, subordinated to or

made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)     Unless all DIP Obligations shall have been indefeasibly paid in full in cash, it shall constitute a DIP Event of Default under the DIP Credit Agreements and a termination of the right to use the Cash Collateral if (i) any of the Debtors seeks, or if there is entered, any modification of this Order without the prior written consent of the DIP Agent, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Agent or (ii) an order is entered converting or dismissing any of the Chapter 11 Cases.

(c)     If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect (i) the validity, priority or enforceability of any DIP Obligations or the Adequate Protection Obligations incurred prior to the effective date of such reversal, stay, modification or vacatur or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens. Notwithstanding any such reversal, stay, modification or vacatur, any use of the Cash Collateral, any DIP Obligations or any Adequate Protection Obligations incurred by the Debtors to the DIP Agent, the DIP Lenders or to the Prepetition Secured Parties, as the case may be, prior to the effective date of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions of this Order, and the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Order, the DIP Documents (with respect to all DIP Obligations), the Adequate Protection Obligations and uses of the Cash Collateral.

(d)     Except as expressly provided in this Order or in the DIP Documents,

the Carve-Out, the DIP Liens, the Superpriority Claims, the Adequate Protection Liens, the First Lien 507(b) Claims and all other rights and remedies of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties granted by this Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases, or (ii) the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Order and the DIP Documents shall continue in the Chapter 11 Cases, in any Successor Cases, and the DIP Liens, the Adequate Protection Liens, the DIP Obligations, the Carve-Out, the Adequate Protection Obligations, the Superpriority Claims, the First Lien 507(b) Claims, and the other administrative claims granted pursuant to this Order, and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by this Order and the DIP Documents shall continue in full force and effect until all DIP Obligations are indefeasibly paid in full in cash and all Adequate Protection Obligations are indefeasibly paid in full in cash.

19.     *Effect of Stipulations on Third Parties*.

(a)     The stipulations and admissions contained in this Order, including without limitation, in paragraphs 4 and 13 of this Order, shall be binding upon the Debtors under all circumstances. The stipulations and admissions contained in this Order, including without limitation, in paragraphs 4 and 13 of this Order, shall be binding upon all parties in interest unless (a) any party-in-interest (including the Committee, if any) (a "**Challenge**

**Party**") that successfully seeks and obtains standing to do so has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including without limitation, in this paragraph 19) (a "**Challenge**") by the later of (a) seventy-five (75) days after entry of this Order and (b) sixty (60) days after the formation of the Committee (if any) (the "**Challenge Period**"); *provided that* any such deadline is subject to extension as may be specified by this Court for cause shown, or if the Prepetition First Lien Agent agrees to such an extension with respect to any Claims and Defenses in respect of the Prepetition First Lien Obligations, (i) challenging the validity, enforceability, priority or extent of the Prepetition First Lien Obligations or the liens on Prepetition Collateral securing the Prepetition First Lien Obligations or (ii) otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "**Claims and Defenses**") against any of the Prepetition First Lien Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, each in their capacity as such, in connection with any matter related to the Prepetition First Lien Obligations, or the Prepetition Collateral and (b) an order is entered and becomes final in favor of the Challenge Party sustaining any such Challenge; *provided that*, subject to this paragraph 19, as to the Debtors, all such Claims and Defenses, are hereby irrevocably waived, released and relinquished as of the Petition Date; *provided further, that* the Challenge Period shall not be applicable to any chapter 7 or 11 trustee appointed or elected for any of the Debtors.

(b)     If no such Challenge is timely filed in respect of the Prepetition First Lien Obligations (x) the Prepetition First Lien Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, defense, avoidance, impairment,

disallowance, recharacterization, reduction, recoupment, recovery, for all purposes in the Chapter 11 Cases and any subsequent chapter 7 case, (y) the liens on the Prepetition Collateral securing the Prepetition First Lien Obligations shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph 4(c) as applicable, not subject to setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, or recovery and (z) the Prepetition First Lien Obligations, the Prepetition First Lien Lenders, and the Prepetition First Lien Agent, and the liens on the Prepetition Collateral granted to secure the Prepetition First Lien Obligations shall not be subject to any other or further challenge by any party-in-interest (including any Committee), and such party-in-interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or 11 trustee appointed or elected for any of the Debtors).  Nothing in this Order shall confer standing on any party in interest to assert any Claims or Defenses or otherwise bring any cause of action.

(c)     If any Challenge is timely filed, the stipulations and admissions contained in paragraphs 4 and 13 of this Order shall nonetheless remain binding and preclusive (as provided in the third sentence of this paragraph 19) on all parties-in-interest (including the Committee, if any), except as to any such findings and admissions that were expressly and successfully challenged in such Challenge.

20.     *Limitation on Use of DIP Loans, DIP Collateral and Prepetition Collateral.* The Debtors shall use the DIP Loans and the Prepetition Collateral (including the Cash Collateral) solely as provided in this Order, the Budget (including any permitted variance set forth in the DIP Credit Agreement) and the DIP Documents.  Notwithstanding anything herein or in any

other order of this Court to the contrary, none of the DIP Loans, the DIP Collateral, the Prepetition Collateral (including the Cash Collateral) or the Carve-Out may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents, the Prepetition First Lien Documents, or the liens or claims granted under this Order, the DIP Documents or the Prepetition First Lien Documents, (b) assert any Claims and Defenses or any other causes of action against the DIP Agent, the DIP Lenders, the Prepetition First Lien Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the DIP Agent's assertion, enforcement or realization on the DIP Collateral in accordance with the DIP Documents or this Order, (d) seek to modify any of the rights granted to the DIP Agent, the DIP Lenders or the Prepetition First Lien Secured Parties hereunder or under the DIP Documents or the Prepetition First Lien Documents, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted under the DIP Documents (including, without limitation, the Budget); *provided that*, notwithstanding anything to the contrary herein, no more than an aggregate of $50,000 of the Cash Collateral or proceeds of the DIP Loans may be used by any Committee to investigate the validity, enforceability or priority of the Prepetition Obligations or the liens on the Prepetition Collateral securing the Prepetition Obligations or investigate any Claims and Defenses against the Prepetition Secured Parties.

21.    *Insurance*. To the extent any Prepetition Secured Party is listed as loss payee under the Debtors' insurance policies, the DIP Agent is also deemed to be the loss payee under the Debtors' insurance policies and shall act in that capacity and subject to the terms of the DIP

Documents, distribute any proceeds recovered or received in respect of any such insurance policies, <u>first</u>, to the payment of the DIP Obligations until paid in full, and <u>second</u>, to the payment of the Prepetition First Lien Obligations and the Prepetition Second Lien Obligations, subject to and in accordance with the Intercreditor Agreement.

22.    *Order Governs*. In the event of any inconsistency between the provisions of this Order and the DIP Documents, the provisions of this Order shall govern.

23.    *Binding Effect; Successors and Assigns*. The DIP Documents and the provisions of this Order, including all findings herein, shall be binding upon all parties-in-interest in the Chapter 11 Cases, including without limitation, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for any of the Debtors, an examiner with expanded powers appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition First Lien Secured Parties and the Debtors and their respective successors and assigns; *provided that*, except to the extent expressly set forth in this Order, the DIP Documents, or the Intercreditor Agreement, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the use of the DIP Loans or the Cash Collateral or extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

24.    *Limitation of Liability*. In determining to make any loan under the DIP Credit Agreement, permitting the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Order or the DIP Documents, the DIP Agent, the DIP Lenders

and the Prepetition Secured Parties shall not solely by reason thereof be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute). Furthermore, nothing in this Order or in the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders or any Prepetition Secured Party of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

25.     *Intercreditor Agreement*. Nothing in this Order shall amend or otherwise modify the terms or enforceability of the Intercreditor Agreement, including without limitation, the turnover provisions contained therein, and the Intercreditor Agreement shall each remain in full force and effect. The rights of the Prepetition Secured Parties shall at all times remain subject to the Intercreditor Agreement.

26.     *[Reserved].*

27.     *Proofs of Claim.* None of the DIP Agent or DIP Lenders shall be required to file proofs of claim in any of the Chapter 11 Cases or any Successor Cases for any claim allowed herein, and none of Prepetition First Lien Secured Parties shall be required to file proofs of claim or request for payment of an administrative expense in any of the Chapter 11 Cases or any Successor Cases for any claim in respect of the Prepetition Obligations.  Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation administrative claims) in any of the Chapter 11 Cases or any Successor Cases shall not apply to

(i) the DIP Agent or the DIP Lenders, or (ii) the Prepetition First Lien Secured Parties with respect to the Prepetition First Lien Obligations.

28.     *Credit-Bid*.  (a) The DIP Agent shall have the right (on behalf of the DIP Lenders) to credit-bid the amount of the DIP Obligations in connection with any sale of all, substantially all, or any portion of the Debtors' assets and property or in connection with the exercise of any rights and remedies under the DIP Documents or this Order, including, without limitation, any sale occurring pursuant to section 363 of the Bankruptcy Code or included as part of any plan of reorganization subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code and (b) except to the extent any party in interest or the Committee successfully prosecutes a Challenge in accordance with paragraph 19 of this Order, the Prepetition First Lien Agent, subject to the terms of the Intercreditor Agreement, shall have the right (on behalf of the Prepetition First Lien Lenders) to credit-bid the amount of the Prepetition First Lien Obligations in connection with any sale of all, substantially all, or any portion of the Debtors' assets and property or in connection with the exercise of any rights and remedies under the Prepetition First Lien Documents or this Order, including, without limitation, any sale occurring pursuant to section 363 of the Bankruptcy Code or included as part of any plan of reorganization subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.  The DIP Agent and the Prepetition First Lien Agent shall (i) each be a qualified and permitted bidder in all respects at any auction, and shall not be required to submit a deposit, and (ii) have the right to designate any person or entity in its sole and absolute discretion that shall take title to the individual asset, portion of the assets, or all of the assets that are subject to their credit bid.  No bid procedures shall be sought by the Debtors or approved by the Court in the Cases other than bid procedures that are on terms and conditions in form and substance reasonably acceptable to the DIP Agent

and the Prepetition First Lien Agent.

29.     *No Waiver*.  The failure of the DIP Lenders or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Order, the DIP Documents or the Prepetition First Lien Documents or otherwise, as applicable, shall not constitute a waiver of any of the DIP Lenders' or Prepetition Secured Parties' rights hereunder, thereunder, or otherwise.  Except as expressly provided herein, the entry of this Order and the entry of the Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair any of the rights, claims, privileges, objections, defenses or remedies of the DIP Lenders or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law against any other person or entity in any court.

30.     *No Third-Party Rights*.  Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, third party or incidental beneficiary.

31.     *Effectiveness.* This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon entry hereof, and there shall be no stay of effectiveness of this Order.

32.     *Final Hearing*. The Final Hearing is scheduled for [          ], 2016, at [          ] a.m./p.m., prevailing Central Time, before this Court.

33.     *Retention of Jurisdiction*. This Court shall have and retain exclusive jurisdiction to enforce the terms of this Order and to adjudicate any and all matters arising from or related to the interpretation or implementation of this Order, including with respect to any and all disputes or matters under, arising out of or in connection with either the DIP Loans or the DIP Documents.

34.    *Final Hearing Notice.* The Debtors shall promptly serve copies of this Order (which shall constitute adequate notice of the Final Hearing) on the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to the Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed. Any party-in-interest objecting to the relief sought at the Final Hearing shall serve and file written objections; which objections shall be served upon (a) Jones Day, 717 Texas Avenue #3300, Houston, TX 77002 Attention: Thomas Howley, Esq. and Jones Day, 77 West Wacker Drive, 35th floor, Chicago, IL 60601 Attention: Steven A. Domanowski, Esq., attorneys for the Debtors; (b) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, Attention: Sandeep Qusba, Esq. and Nicholas Baker, Esq., attorneys for the DIP Agent and Prepetition First Lien Agent; (c) [  ],      attorneys    for    the Prepetition Second Lien Agent; (d) counsel to any Committee; and (e) the Office of the U.S. Trustee for the Southern District of Texas Houston Division, and shall be filed with the Clerk of the Bankruptcy Court, in each case to allow actual receipt by the foregoing no later than [●], 2016 at [_ _:_ _ a.m./p.m.], prevailing Central time.

Dated:   _____, 2016
            Houston, Texas


_____
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT 1</u>**

**DIP Budget**

**EXHIBIT 2**

**DIP Credit Agreement**

**Exhibit A-3 to the Restructuring Support Agreement**

**Acquisition Term Sheet**

# SHORELINE ENERGY LLC
## ACQUISITION TERM SHEET

This acquisition term sheet (the "***Term Sheet***") is attached as **Exhibit A-3** to the Restructuring Support Agreement (the "***Restructuring Support Agreement***") among Shoreline Energy LLC ("***Shoreline***"), Shoreline EH LLC ("***Holdco***"), each subsidiary of Shoreline and Holdco (the "***Shoreline Subsidiaries***," together with Shoreline and Holdco, the "***Debtors***"), Morgan Stanley Capital Group, Inc. ("***MS***") in its capacity as First Lien Lender[1] and HB Parent. The Restructuring Support Agreement provides that the parties thereto will support the Restructuring Transactions described therein, including the sale of certain of the Debtors' assets pursuant to a definitive asset purchase agreement (the "***Agreement***") and related documentation acceptable to the Debtors and the Restructuring Support Parties that is consistent with this Term Sheet and the Restructuring Support Agreement.[2]

| | |
|---|---|
| **Parties**: | Purchaser and MS will enter into the Agreement with the Debtors on the terms set forth generally in this Term Sheet. |
| **Property**: | All of the rights, title, and interests in and to the Debtors' oil and gas properties and related assets, including, but not limited to, all documents, contracts, and assets related thereto and any other documents, leases, contracts, assets, and property of the Debtors set forth on ***Schedule 1*** hereof (collectively, the "***Designated Assets***"); provided that Schedule 1 hereof (and the corresponding schedule of Designated Assets in the Agreement) may be revised by the Purchaser[3] and MS (by mutual consent) to add or remove Designated Assets at any time prior to December 1, 2016 and thereafter to the closing of the Agreement, Purchaser and MS (by mutual consent) may add or remove Designated Assets in the event that Purchaser and MS (by mutual consent) determine any material change to any such Designated Asset has occurred; provided further that the Designated Assets may only be added or removed on a lease by lease basis and Designated Assets may not be added or removed on a well by well basis. The Non-Designated Assets shall be liquidated or abandoned through the Plan, and/or |

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Restructuring Support Agreement.

[2] The terms set forth in this Term Sheet are being provided on preliminary basis as part of a comprehensive proposal, each element of which is consideration for the other elements and an integral aspect of this Term Sheet and the Agreement. This Term Sheet is not meant to be, nor shall it be construed as an attempt to describe all of, or the specific phrasing for, the provisions of the definitive documentation. Rather, it is intended only to outline certain key terms to be included in, or otherwise be consistent with, and subject to terms of definitive documentation acceptable to the Purchaser, MS, and the Debtors.

[3] HB Parent shall have all consent, approval, and agreement rights granted to Purchaser herein.

pursuant to the Bidding Procedures.

**Acquisition:**

The Debtors shall sell all of their right, title and interest in, to and under the Designated Assets free and clear of any and all liens, encumbrances, claims, and other interests to the Purchaser, subject to certain agreed upon title exceptions.

**Purchase Price:**

In consideration for the Designated Assets, the Purchaser and MS have agreed to pay to the Debtors on the Sale Closing Date: (a) the outstanding balance under the DIP Credit Agreement pursuant to a credit bid by MS, plus (b) an amount equal to $115 million less the amount of claims bid under the DIP Credit Agreement pursuant to a credit bid by MS under the First Lien Credit Agreement, plus (c) $1.5 million in cash as described in more detail below (to be funded by the Purchaser First Lien Facility) (collectively, the "***Purchase Price***").[4] The Purchase Price shall be allocated first to Designated Assets that constitute collateral that secures claims under the First Lien Credit Agreement and second to collateral that secures claims under the DIP Credit Agreement. The $1.5 million cash component of the Purchase Price shall be paid by the Debtors to Imperial Capital at closing (subject to Court approval) for any allowed Restructuring Transaction Fee (as described in Imperial Capital's amended engagement letter dated as of November 1, 2016 (the "***Amended Engagement Letter***")) or similar transaction fee that is or may become payable to Imperial Capital under the terms of its Amended Engagement Letter, and the Bid Procedures will also provide that $1.5 million in cash from any topping bid will be so set aside to pay the same, provided that any obligation for such payment to Imperial Capital shall be an obligation only of the Debtors, and not of the Restructuring Parties, Purchaser, or any of their affiliated or related entities. Further, in resolution of their prior renegotiation of the amount of Imperial Capital's Restructuring Transaction Fee, the Restructuring Parties agree to support the retention of Imperial Capital on the terms of the Amended Engagement Letter which reduced the amount of the Restructuring Transaction Fee.

**Purchaser Capital Structure:**

The Purchaser shall have the following capital structure:

- A $40 million first lien multi-draw term loan facility (the "***Purchaser First Lien Facility***") funded by an entity designated by HPS (defined below) ("***HPSD***"), which facility shall be governed by a loan agreement in form and substance satisfactory to the Purchaser and MS (the "***Purchaser First Lien Credit Agreement***"). On the Sale Closing Date, the

---

[4] The Restructuring Support Parties agree that, in the event any other higher and better bids are received by the Debtors, MS will credit bid up to the full amount of its claims under the DIP Credit Agreement and the First Lien Credit Agreement.

Purchaser shall use proceeds from the Purchaser First Lien Facility to pay MS an amount of cash equal to the principal amount outstanding under the DIP Credit Agreement (prior to giving effect to any credit bid), less the Rolled-Up Loans (as defined below), together with all accrued and unpaid interest thereon, including any PIK interest, and commitment fees and other amounts due MS under the DIP Credit Agreement.[5]  The Purchaser First Lien Facility shall:

- o  bear interest at a rate equal to LIBOR + 7.00%, with a 1.00% LIBOR floor;

- o  be secured by a first lien on substantially all of the assets of the Purchaser and its subsidiaries;

- o  be issued with 2% OID;

- o  mature 4.5 years from the Sale Closing Date; and

- o  have such other terms and conditions to be agreed by MS and the Purchaser and set forth on a term sheet no later than November 11, 2016 (which term sheet shall be deemed incorporated herein by reference).

- A second lien term note with an initial principal amount of $35 million (the "***Purchaser Second Lien Facility***"), which shall be governed by a loan agreement in form and substance satisfactory to the Purchaser and MS (the "***Purchaser Second Lien Credit Agreement***"). The Purchaser Second Lien Facility shall be issued to MS on the Sale Closing Date in satisfaction of (a) the "rolled up" DIP loans of $30 million[6] (the "***Rolled-Up Loans***"), (b) all accrued and unpaid PIK interest thereon and (c) in satisfaction of First Lien Credit Agreement claims in an amount equal to the remainder, if any, of $35 million less

---

[5] The Restructuring Support Parties agree that in the event the Bankruptcy Court does not permit any "roll-up" of loans under the First Lien Credit Agreement into the DIP loans, the Purchaser shall use proceeds from the Purchaser First Lien Facility to pay MS an amount of cash equal to the principal amount outstanding under the DIP Credit Agreement (prior to giving effect to any credit bid), plus $2 million, together with all accrued and unpaid interest thereon, including any PIK interest, and commitment fees and other amounts due MS under the DIP Credit Agreement, in each case including any interest that would have accrued on such additional $2 million as if it has been outstanding under the DIP Credit Agreement from the Petition Date.

[6] If the Bankruptcy Court approves the roll-up of loans under the First Lien Credit Agreement into DIP loans in an amount less than $32 million, the defined term "Rolled-Up Loans" shall mean such lesser amount approved to roll up, less $ 2 million.

the amounts described in the foregoing clauses (a) and (b).[7] The Purchaser Second Lien Facility shall:

- o bear interest at a rate equal to LIBOR + 6.00%, with a 1.00% LIBOR floor, which interest may be paid-in-kind by adding such interest to the principal outstanding;

- o be secured by a second lien on substantially all of the assets of the Purchaser and its subsidiaries, subject to an intercreditor agreement in form and substance satisfactory to the Purchaser and MS;

- o mature 5 years from the Sale Closing Date; and

- o have such other terms and conditions to be agreed by MS and the Purchaser and set forth on a term sheet no later than November 11, 2016 (which term sheet shall be deemed incorporated herein by reference).

- Preferred A equity with zero coupon in the face amount of $60 million split 78% to MS and 22% to HPSD;

- Preferred B equity with zero coupon in the face amount of $60 million split 50% to MS and 50% to HPSD;

- Common equity split 4.9% to MS and 95.1% to HPSD.

MS and HPS may modify this structure only to the extent such modification is in writing.

The relative lien priorities and rights of the Purchaser First Lien Facility and Purchaser Second Lien Facility shall be governed by an intercreditor agreement satisfactory to MS and the Purchaser.

The rights and obligations with respect to the preferred and common equity and the holders thereof shall be governed by a shareholders agreement in form and substance satisfactory to the Purchaser and MS (the "**_Purchaser Shareholders Agreement_**"). The Purchaser Shareholders Agreement shall provide, among other things, that (i) all preferred equity held by MS shall be non-voting and non-convertible, subject to anti-priming protection and be freely transferable, (ii) all common equity held by MS shall be subject to anti-dilution protections and shall be freely transferable and (iii) MS shall have approval rights in connection with changes in senior management, material asset sales, and other non-ordinary course, material transactions, and such

---

[7] The Purchaser Second Lien Facility shall be issued to MS in the full amount of $35 million even if the Bankruptcy Court does not permit any "roll-up" of loans under the First Lien Credit Agreement into the DIP loans.

approval not to be unreasonably withheld. The Purchaser Shareholders Agreement shall include such other terms and conditions to be agreed by MS and the Purchaser and set forth on a term sheet no later than November 11, 2016 (which term sheet shall be deemed incorporated herein by reference).  For the avoidance of doubt, the Purchaser shall be treated as a partnership for U.S. federal income tax purposes.

**Covenants:**   The Agreement shall contain covenants as required by the Purchaser and MS, including the following:

1. The Debtors will promptly provide the Purchaser and MS with a list of all of their assets and liabilities, including all of the Debtors' executory contracts and unexpired leases (each a "***365 Contract***" and collectively, the "***365 Contracts***") and the estimated amount to cure monetary defaults thereunder (such list may from time to time be amended or supplemented with written notice to the Purchaser and MS, the "***365 Schedule***"). The Debtors agree to update, amend, and supplement the 365 Schedule promptly upon learning of any omission or inaccuracy to such schedule, and at any time as may be reasonably requested by the Purchaser or MS.  Additionally, the Debtors will file and serve the 365 Schedule and related cure amounts pursuant to the Bid Procedures.

2. The Purchaser (with the consent of MS) will provide the Debtors with a list of the 365 Contracts listed on the 365 Schedule received from the Debtors that the Purchaser (with the consent of MS) desires to be assumed by the Debtor party thereto and assigned, transferred, and conveyed to the Purchaser (and as may be modified by the Purchaser (with the consent of MS) at any time prior to the closing of the Agreement, each, a "***Desired 365 Contract***" and collectively, the "***Desired 365 Contracts***").   As promptly as practicable following the designation by the Purchaser (with the consent of MS) of any 365 Contract as a Desired 365 Contract, the Debtors shall take all necessary actions to determine the cure costs with respect to such Desired 365 Contract and serve a notice of assumption of such Desired 365 Contract on the counterparty thereto and shall otherwise take all necessary actions to effect the assumption and assignment of such Desired 365 Contract by the applicable Debtor in accordance with the title 11 of the United States Code (the "***Bankruptcy Code***") and the Bid Procedures Order, effective as of the closing of the Agreement.  The Purchaser (with the consent of MS) shall have the right prior to the closing of the Agreement to remove any 365 Contract from the list of Desired 365 Contracts and, after such removal, such removed 365 Contract shall no longer be a Desired 365 Contract and the

Purchaser shall have no obligation to pay any amounts to cure defaults thereunder or take any further action with respect thereto; *provided, however*, the Purchaser (with the consent of MS) shall retain the right to add such 365 Contract as a Desired 365 Contract at any time prior to the closing under the Agreement; provided further that the designation of Designated Assets shall be governed by the deadline and terms set forth hereinabove.

3.   At the closing of the Agreement, the Purchaser shall pay all agreed upon cure costs with respect to the Desired 365 Contracts in the amount listed on the 365 Schedule and the Purchaser shall provide adequate assurance of future performance of all of the Desired 365 Contracts so all Desired 365 Contracts can be assumed by the Debtors and assigned, transferred, and conveyed to the Purchaser at the closing of the Agreement in accordance with the provisions of section 365 of the Bankruptcy Code, this Term Sheet, and the Agreement. Except for the amounts listed on the 365 Schedules with respect to the Desired 365 Contracts, neither the Purchaser nor any of its subsidiaries or affiliates shall have any liability or obligation to any person for any default under or cure costs related to any 365 Contract of any Debtor existing at or prior to the closing of the Agreement.  In the event that any executory contract or unexpired lease is added to the 365 Schedule in accordance with Paragraph 2 above and the Purchaser (with the consent of MS) elects to list such 365 Contract as a Desired 365 Contract, the Purchaser, in its sole discretion, will pay the cure costs associated with such additional Desired 365 Contract.  In addition, in the event the Purchaser determines that any executory contract or unexpired lease exists that is not listed on the 365 Schedule on or prior to the end of the closing of the Agreement, (a) the Purchaser (with the consent of MS) shall have the right to designate any such executory contract or unexpired lease as a Desired 365 Contract, (b) the Debtors shall assume and assign such additional Desired 365 Contract to the Purchaser within twenty-three (23) calendar days thereafter by order of the Bankruptcy Court in form and substance acceptable to the Purchaser and MS in their sole discretion, and (c) the Purchaser, in its sole discretion, will pay the cure costs associated with such additional Desired 365 Contract at such time.

4.   In the event that any cure cost associated with any Desired 365 Contract is found to be greater than the amount listed on the 365 Schedule, then the amount of the Purchase Price allocated to cure defaults under the Desired 365 Contracts (the "**Cure**

*Amount*") shall be increased in an equivalent amount of such increase.

5. In accordance with the terms and conditions of the Restructuring Support Agreement, the Debtors will, at their sole cost and expense, file a motion in form and substance acceptable to Purchaser and the Debtors (the "*Sale Motion*") to obtain approval of the sale of the Designated Assets and assumption and assignment of the Desired 365 Contracts pursuant to an order in form and substance acceptable to the Restructuring Support Parties and the Debtors (the "*Sale Order*"). The Debtors will use their commercially reasonable efforts to obtain the entry of the Sale Order in accordance with the deadline set forth in the Restructuring Support Agreement.

6. In addition to the Debtors' obligations set forth in the Restructuring Support Agreement, the Debtors agree to provide the Purchaser and MS and their respective counsel with copies of all material motions, applications, supporting papers and notices prepared by any Debtor (including forms of orders and notices to interested parties) relating to the assumption and assignment of Desired 365 Contracts, or otherwise relating to the transactions contemplated by this Agreement in accordance with section 11 of the Restructuring Support Agreement.

7. If entry of the Sale Order, any orders relating to the assumption and assignment of the Desired 365 Contracts, or any other orders of the Bankruptcy Court relating to the transaction contemplated by this Agreement shall be appealed or otherwise challenged by any party (including by petition for *certiorari* or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing, or reargument), the Debtors agree to diligently oppose such appeal, challenge, petition, or motion and use all efforts to obtain an expedited resolution thereof.

**Representations and Warranties:**   The Agreement shall contain representations and warranties acceptable to the Purchaser, MS, and the Debtors.

**Closing Conditions:**   The Purchaser's obligation to close, and an express condition to the effectiveness of, the Agreement shall be subject to conditions acceptable to the Purchaser, MS, and the Debtors, including, but not limited to:  (a) entry of the Sale Order by the Bankruptcy Court approving, *inter alia*, the Agreement, the transfer of the Designated Assets free and clear of all liens, claims, and encumbrances, and the assumption and assignment of the Desired 365 Contracts; and (b) the execution of the agreements between MS and the Purchaser regarding

(i) the capitalization of the Purchaser and (ii) certain other agreements with respect to the transaction contemplated by this Agreement including the Purchaser First Lien Credit Agreement, the Purchaser Second Lien Credit Agreement and the Shareholders Agreement. The Agreement shall not contain any diligence or financing conditions and shall not be conditioned on consummation of the Plan or any other plan of reorganization.

**Termination Rights:**   The Agreement may be terminated by the Purchaser upon the occurrence of a Termination Event under the Restructuring Support Agreement and shall include such other termination events as agreed to by MS, the Purchasers, and the Debtors, including:

1. If the Debtors breach any agreement or covenant herein or in the Agreement, and the Debtors will have five (5) business days from the receipt written notice from the Purchaser to cure any breach of an agreement or covenant herein or in the Agreement.

2. If the Agreement has not closed on or prior to May 15, 2017, unless such date has been extended by written agreement of the Purchaser and MS in their sole and absolute discretion.

3. If any condition to closing set forth in the Agreement is incapable of being satisfied or is not satisfied on or prior to May 15, 2017, unless such date has been extended by written agreement of the Purchaser and MS in their sole and absolute discretion.

4. If the Agreement is not executed by the Debtors on or before November 18, 2016, which executed Agreement shall include a schedule of the Designated Assets (provided that such schedule may be revised as described above).

5. If the Debtors receive and consummate a higher and better cash offer for the Designated Assets.

6. By mutual written agreement of the Debtors, MS, and the Purchaser.

7. If any applicable law that makes consummation of the Agreement and the transactions contemplated thereby illegal or otherwise prohibited or if consummation of the Agreement or the transactions contemplated thereby would violate any nonappealable final order, decree, or judgment of any governmental authority having competent jurisdiction.

8. If any of the Debtors representations and warranties contained in the Agreement are not true and correct in any material

respects.

If the Agreement is terminated as permitted thereby, such termination shall be without liability of the Purchaser (or any stockholder, representative, or affiliate of the Purchaser) to the Debtors.

**Expenses:**

The Debtors will pay all reasonable fees, costs, and expenses (including reasonable attorneys' fees) incurred by the Purchaser in the negotiation, preparation, and drafting of the Agreement and any documents in connection therewith under the terms set forth in the Restructuring Support Agreement.

**Assignment:**

The Purchaser may assign the Purchaser's rights and interests in this Term Sheet, the Agreement, and all documents referenced herein or therein without the Debtors' consent to any controlled affiliated entity of HB Parent or any entity controlled by or under common control with HB Parent, and, upon any such assignment, the Purchaser shall be released from all liability hereunder and thereunder and the assignee shall be deemed the Purchaser provided that such assignee first agrees in writing to be bound by the terms of this Term Sheet, the Agreement, and all documents referenced herein or therein.

**SCHEDULE 1**

**Designated Assets**



**Exhibit B to the Restructuring Support Agreement**

**Form of Transferee Joinder**

**Form of Transferee Joinder**

This joinder (this "*Joinder*") to the Restructuring Support Agreement (the "*Agreement*"),[11] dated as of November 2, 2016, by and among (i) Shoreline Energy LLC ("*Shoreline*"), Shoreline EH LLC ("*Holdco*") and each of the subsidiaries set forth in **Exhibit A** to the Agreement (such subsidiaries, Shoreline, and Holdco each a "*Debtor*" and, collectively the "*Debtors*"), and (ii) the Restructuring Support Parties, is executed and delivered by _____ (the "*Joining Party*") as of _____ ___, 201_.

1.  <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as <u>Annex 1</u> (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof).  The Joining Party shall hereafter be deemed to be a Party for all purposes under the Agreement and one or more of the entities comprising the Restructuring Support Parties, as applicable.

2.  <u>Representations and Warranties</u>.  The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the claims identified below its name on the signature page hereof,.

3.  <u>Governing Law</u>.  This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require or permit the application of the law of any other jurisdiction.

4.  <u>Notice</u>.  All notices and other communications given or made pursuant to the Agreement shall be sent to:

> To the Joining Party at:
>
> [JOINING PARTY]
> [ADDRESS]
> Attn:
> Facsimile: [FAX]
> EMAIL:

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

---

[11] Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Agreement.

**[JOINING PARTY]**


By:

Name:

Title:

**Annex 1 to the Form of Transferee Joinder**

**Restructuring Support Agreement**